

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JAMES R. STILLWAGON**,

        Plaintiff,

   v.

**THE CITY OF DELAWARE**,

   and

**DETECTIVE BENJAMIN SEGAARD**     Case No.    2:14CV-807

   and                         JUDGE SARGUS

**FORMER DETECTIVE PATRICK GERKE**,       MAGISTRATE JUDGE KEMP

   and                  COMPLAINT AND
                                  JURY DEMAND

**OFFICER ADAM WILLAUER**,

   and

**DETECTIVE SERGEANT JONATHAN
   RADABAUGH**,

   and

**RICHARD O. MATTINGLY**,

        Defendants.

## JURISDICTION

This is a civil rights action alleging police misconduct.  The Plaintiff alleges that the

defendants violated his constitutional rights, as protected by 42 U.S.C. §1983, and further

1

committed tortious conduct pursuant to Ohio law.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

## INTRODUCTORY SUMMARY

1.      The facts in this case have already been thoroughly developed.  The liability of the defendants is based upon a very large number of important details.  For this reason, an initial summary may be useful.  While riding his motorcycle on a Sunday afternoon, on Route 42 north of Columbus, Mr. Stillwagon was the victim of a series of criminal assaults by a drunk driver operating a large hemi pickup truck.  This driver attempted to run Mr. Stillwagon off the road, and attempted repeatedly to strike the Plaintiff with his truck.  Mr. Stillwagon did everything he could to escape these assaults.  At one point he pulled off the road and waited several minutes after the truck drove on, hoping to end the encounter.  However, the drunk driver parked in a concealed ambush a few miles down the road.  When Mr. Stillwagon subsequently rode by, the truck pulled out behind him and continued the assaultive driving.

2.      This series of near-fatal assaults, including at least six separate attacks at different locations, continued into the City of Delaware.  After the drunk driver tried to run him over on an exit ramp, Mr. Stillwagon entered a parking lot and sought protection by parking beside a concrete structure located there.  The truck also entered the parking lot.  Mr. Stillwagon was lawfully in possession of a handgun, and he used it to successfully disable the truck by shooting out the rear tire.  When the truck came to a halt, and the intoxicated driver got out, Mr. Stillwagon approached him, struck him in the head once knocking him to the ground, and shouted at bystanders to call the police.  He then set the pistol down in a visible location and waited for police to arrive.

2

3.     When the police arrived Mr. Stillwagon explained exactly what had happened. He was taken into custody, taken to the Delaware Police Department, and interrogated. He again told the defendants exactly what had happened, truthfully and specifically. He acknowledged firing his weapon at the truck, but he told them he had neither shot nor attempted to shoot the driver of the truck. He told them that the man had "tried to kill me about six times."

4.     Amazingly, the defendants arrested Mr. Stillwagon rather than the perpetrator, and subsequently caused the Plaintiff to be charged with four counts of felonious assault. In their pursuit of charges against Mr. Stillwagon, the defendants falsely alleged that he had engaged in "road rage" against the truck driver, had pursued the truck driver, had stood at a distance, pointed his pistol, and shot the other man in the head in cold blood. In truth, Mr. Stillwagon never engaged in any road rage conduct whatsoever. The drunk driver was the sole aggressor and pursued Mr. Stillwagon. Further, the drunk driver was never shot at all, nor did the Plaintiff ever make any attempt to shoot him. These charges were entirely groundless and false.

5.     In order to achieve their stated goal to "get Stillwagon", the police defendants engaged in numerous improper and unlawful acts. They ignored and suppressed the forensic evidence in the case, which clearly disproved their accusations. They disregarded eyewitnesses who supported Mr. Stillwagon's innocence. They promised the real perpetrator immunity from any responsibility for his actions if he would cooperate in their prosecution of Mr. Stillwagon. They destroyed or discarded known exculpatory evidence, and failed to gather and preserve other known exculpatory evidence. They threatened, coaxed and coached the driver of the truck to change his testimony on certain facts in

3

order to strengthen their case against Mr. Stillwagon.

6.      As Mr. Stillwagon's criminal trial approached the prosecution communicated to his legal team a series of increasingly reduced plea bargain offers. Mr. Stillwagon refused to plead guilty to anything, since he was in fact a crime victim rather than a criminal. A jury trial commenced, Mr. Stillwagon's complete innocence was established beyond dispute, and all charges were dismissed by the Court at the end of the evidence.

7.      As a result of this false arrest and malicious prosecution, Mr. Stillwagon was forced to spend over $400,000.00 for bond, legal fees and investigators to prove his innocence. His business suffered serious and ongoing financial losses due to the false allegations. Most importantly, Mr. Stillwagon and his family have suffered immense insult, humiliation and injury to his reputation and name. He is still thought of by most of the public as the former Ohio State football star who had a fit of road rage and shot someone. All of this is due to the unlawful actions of the defendants.

## PARTIES

8.      Plaintiff James R. Stillwagon is a sixty-five year old resident of Franklin County, Ohio. He was born and raised in Mt. Vernon, Ohio. He has been married to his wife Effie for over 43 years. They have three adult daughters who are employed as a doctor, a pharmacist, and a registered nurse. Mr. Stillwagon has no criminal record.

9.      Mr. Stillwagon attended high school at the Augusta Military Academy in Virginia, where he excelled. He then attended The Ohio State University, where he obtained his degree in four years.

10.      Mr. Stillwagon was recruited to attend Ohio State by football coach Woody Hayes, and he was awarded a full four-year scholarship. He was a captain of the Ohio

4

State football team, a member of the 1968 national championship team and a two-time consensus All-American. He was the winner of the Knute Rockne award and the Outland trophy, both awards given to the best college lineman in America. In 1970 he was presented by then-Vice President Agnew with the first ever Vince Lombardi Trophy, as the best college lineman in America. He was drafted by the Green Bay Packers, but chose to play professional football in the Canadian Football League, where he was a perennial all-pro. Mr. Stillwagon's skills and success as an athlete would not be particularly relevant herein, except that they were the subject of discussion by the defendants, including critical or insulting comments, at the time when the decision was made to prosecute the Plaintiff.

11.     Since retiring from professional football, Mr. Stillwagon has been a successful businessman. He and his wife own and operate Stillwagon Enterprises and Stillwagon Promotions and Awards. They produce and sell speciality jewelry items, awards, wearable items and other products for businesses and associations. Mr. Stillwagon operates an office, warehouse and production facility in Dublin, Ohio. He has also been a successful designer and inventor of patented electrical products purchased and used by utility companies, and of security lock systems used by Coca-Cola and other companies on their vending machines. Again, Mr. Stillwagon's success as a businessman would not be particularly relevant herein, except that his economic status was the subject of discussion by the defendants, including critical or insulting comments, at the time when the defendants were initiating the prosecution against him.

12.     Defendant Richard O. Mattingly is approximately 42 years old. On the date of the events herein he was a resident of Kettering, Ohio. He was the intoxicated driver of the truck on the date in question. He is a person with a proven history of sociopathic

5

violence, including the violent homicide of his own infant son during a drunken rage. At the time of the events herein he had spent about half of his adult life in prison, and he was on parole from the State of Wisconsin when he attacked Mr. Stillwagon.

13.    Defendant City of Delaware is a duly authorized and operating municipality, and a political subdivision pursuant to Ohio law, located in Delaware County, Ohio. It was at all times relevant the employer, master and principal of Defendants Segaard, Gerke, Willauer and Radabaugh.

14.    Defendant Detective Segaard is and was at all times relevant a police detective and an employee, agent and servant of Defendant City of Delaware. During his employment with the Delaware Police Department prior to the events herein, he had been subject to repeated criticism in his evaluations for low rates of criminal enforcement, low rates of solving cases, and lack of thoroughness and follow-through on investigations.

15.    Defendant former Detective Gerke was at all times relevant a police detective and an employee, agent and servant of Defendant City of Delaware.    During his employment with the Delaware Police Department prior to the events herein, he had been subject to repeated criticism in his evaluations for failure to pay attention to detail in his cases, cutting corners with his reports, failure to stay on top of his investigations, not documenting his investigations, and failure to complete investigations. Mr. Gerke is no longer a police officer. He was indicted for both felony and misdemeanor charges involving dishonesty. This included the use of computers at the Delaware Police Department to engage in illegal activities. He subsequently pled guilty to the felony offense of "identity fraud" and the misdemeanor offense of "attempted forgery." As a part of the plea bargain, Defendant Gerke surrendered his certification as a police officer, and will never be

6

permitted to work in law enforcement again.

16.     Defendant Detective Sergeant Radabaugh is and was at all times relevant a supervisor of police detectives and an employee, agent and servant of Defendant City of Delaware.  On the date of the Plaintiff's arrest and throughout his prosecution, Defendant Radabaugh was the supervisor of Defendants Segaard and Gerke.

17.     Defendant Officer Willauer is and was at all times relevant a police officer and an employee, agent and servant of Defendant City of Delaware.

18.     Defendants Segaard, Gerke, Radabaugh and Willauer are sued in their individual capacities.  All of the actions of the defendants herein were done within the scope of their employment, and under color of law.  Further, all acts of the defendants herein were done knowingly, recklessly, in bad faith and/or maliciously.

## FACTS REGARDING DEFENDANT MATTINGLY'S CRIMINAL ATTACKS ON MR. STILLWAGON

19.     On Sunday, September 30, 2012, Mr. Stillwagon spent the morning with his family, attending his grandson's baseball game.  When it was over, he told his wife that he was going to the Stillwagon Enterprises facility to clean up.  They had worked late getting out a big order the night before, and left the office a mess.  After that he was going to ride his BMW motorcycle to Mt. Vernon to visit his parents' gravesite, and he said he would be home for supper.

20.     Mr. Stillwagon went home, changed into his riding clothes, and went to the office.  As was his normal habit when he was going to be at the office alone, Mr. Stillwagon took a firearm with him.  The nature of his business included promotional products containing diamonds and other jewels, and there had been break-ins at area businesses.

7

Mr. Stillwagon had obtained a concealed carry permit back in 2009, and his possession of the firearm on that date was entirely legal.

21.     Mr. Stillwagon cleaned and straightened up the warehouse area where they had been working the day before. Then he set out for Mt. Vernon on his motorcycle. He was wearing full riding gear, gloves and helmet. His personal effects, including the handgun, were stored in the tank bag of the motorcycle.

22.     On that same Sunday morning, Defendant Mattingly got up at his home in Kettering and began drinking. He consumed a large amount of alcohol at home. Then he went out, got into a big Dodge Ram hemi pickup truck, and headed off for a drive on the public highways in a state of intoxication. He continued drinking beer in the truck as he drove. He ended up heading north on U.S. Rt.42.

23.     Mr. Stillwagon and Defendant Mattingly first came into contact at a Marathon station located at the intersection of Rt. 42 and Rt. 33, although the Plaintiff was unaware of Mattingly's presence. Mr. Stillwagon had pulled into the station, pulled up to a pump, and stood there getting gas for the motorcycle. He then paid for the gas at the pump by credit card.

24.     Security camera footage from the station, which was later obtained by the Plaintiff's legal team, reveals that Defendant Mattingly was at that same Marathon station at exactly the same time. He had stopped there to buy more beer. His truck was parked at a pump directly behind the one where Mr. Stillwagon was getting gas. When Mattingly came out of the store and climbed into the large silver pickup truck, Mr. Stillwagon was directly in front of him.

25.     As the video shows, Defendant Mattingly sat in the truck for some time, facing the Plaintiff, until Mr. Stillwagon started his bike, took it off the kickstand, and began to pull away.  The silver truck followed.  The video shows Mr. Stillwagon crossing the lot, turning to the right and leaving the Marathon station onto Rt. 42 north.  Unbeknownst to Mr. Stillwagon, the defendant followed him.  During these moments Defendant Mattingly fixated on the Plaintiff, and decided to initiate assaultive behavior with his truck against the man on the motorcycle.  The video shows the truck pulling out of the lot and accelerating rapidly in the direction of the motorcycle.  The first attempt on Mr. Stillwagon's life occurred only seconds later, and only 3/10ths of a mile from the Marathon station.

### (a) Defendant Mattingly's First Attack - The Route 33 Bridge

26.     The Plaintiff has prepared a map, which is attached as Exhibit 1, to assist the Court in understanding the events that occurred on Route 42, as described hereafter. Route 42 north crosses over Route 33 on an elevated bridge immediately adjacent to the Marathon station.  When Mr. Stillwagon pulled out he began to cross over Route 33.  He was traveling at about 50 miles per hour.  At the other side of the overpass, the road narrows from four lanes to two.  As the Plaintiff approached this merger, the silver truck sped past him on the left, cutting off Mr. Stillwagon and nearly hitting him.  The truck came within six inches of Mr. Stillwagon's motorcycle, startling the Plaintiff.  As the truck went past Mr. Stillwagon could see the driver looking directly at him, laughing and grinning.

27.     The silver truck sped on out of sight.  Mr. Stillwagon had been frightened by this near-collision.  He continued on his way at his normal speed.  It never occurred to him that he would see the big silver pickup again.  He was mistaken.  Less than two miles

9

further along the road Mr. Stillwagon observed the same truck, completely stopped in the roadway ahead of him. Defendant Mattingly was waving a blue metal baseball bat out of the driver's side window, and signaling for the motorcycle to go around him.

28.     Wishing to avoid any further contact with this man, Mr. Stillwagon stopped 40-50 yards back from the truck. The truck began to move, but was driving erratically. The Plaintiff kept his distance. Once again, Defendant Mattingly waved his baseball bat out the window, urging the Plaintiff to come by him, but Mr. Stillwagon stayed back. The truck eventually fell in behind a slow moving car traveling at about 45 miles per hour. Since another car was present, the Plaintiff thought that this preying upon him would end if he passed both vehicles, and sped up. This is what he did. This was the one and only time that Mr. Stillwagon ever passed the truck on the highway that day.

### (b) Defendant Mattingly's Second Attack - Near Watkins/Moore Road

29.     Mr. Stillwagon carefully passed these two vehicles and began to put distance between himself and the truck. However, he kept checking his rear view mirror. Only moments after Mr. Stillwagon had passed, he saw the truck come around the slower moving car at a great rate of speed. Traveling in the left lane of this two-lane road, Defendant Mattingly drove toward Mr. Stillwagon. The truck pulled up next to the motorcycle. Defendant Mattingly rode parallel to Mr. Stillwagon for a few seconds, holding the baseball bat in his right hand and shaking it at the Plaintiff. Then Mattingly made several cut-in moves into Mr. Stillwagon's bike, attempting to hit it. On the third try, Mr. Stillwagon abruptly braked his bike. When Defendant Mattingly saw this he accelerated quickly, made a sharp right turn immediately in front of Mr. Stillwagon, and slammed on his

brakes.  Mr. Stillwagon reacted by slamming on his own brakes, thereby barely avoiding crashing into the back of Mattingly's truck.

30.     This was an intentional effort to injure Mr. Stillwagon, by causing him to wreck his motorcycle or to collide with the truck.  It was very nearly successful.  Another driver who was an eyewitness to this event later testified to this assault by Defendant Mattingly as follows: "He kicked out around the motorcycle and went into the southbound lane . . . So, he got close to the motorcycle . . .came in immediately and I saw brake lights; it wasn't a tap, it wasn't a signal, it was brake lights, brake lights, brake lights.  That bike's going right down. . . he had no chance.  I thought I would be picking him up. . . I don't know how he kept his bike up. . . The motorcycle wasn't . . . he hadn't done anything abnormal at all. . . I was sure he was going to go right under that truck. . . It really affected me. . . that's the first time I ever seen a truck really try to kill a motorcyclist."

31.     In addition to nearly killing Mr. Stillwagon, Defendant Mattingly's conduct near Watkins/Moore Road endangered the lives and safety of other innocent persons.  As the silver pickup entered the southbound lane and charged toward Mr. Stillwagon, several vehicles traveling south were forced to swerve off the road in order to avoid a head-on collision with the truck.

32.     This second attack upon the Plaintiff occurred just south of the intersection of Route 42 and Watkins/Moore Road. (See Exhibit 1)  As the vehicles approached that intersection, the light turned red.  Defendant Mattingly ran the red light and continued north on Route 42, until he was out of sight.  Mr. Stillwagon stopped at the light and waited.  After the light changed, he proceeded forward slowly and pulled into a gravel parking area just past the light.  He turned off his motorcycle.  Mr. Stillwagon's intent was to wait until the

truck was long gone before proceeding on his way. A female driver pulled in and parked near the Plaintiff, and shortly thereafter a male driver also pulled his vehicle into the gravel lot. Both of these people indicated that they had seen the truck driver's attempt on Mr. Stillwagon's life. They described the truck driver as "crazy". They asked if Mr. Stillwagon was alright, and whether he needed help.

33.     As they were talking, the male witness asked Mr. Stillwagon whether he had obtained the truck's license plate, but the Plaintiff had not. The male witness asked Mr. Stillwagon if he wanted him to call the police. The Plaintiff said yes, he should call the police. The gentleman went back to his vehicle, made the call, and subsequently returned. He reported that the police said there was nothing they could do. However, the police had indicated that if the parties wished to wait there, they would send someone out to take a report. Both the Plaintiff and the other drivers felt that this would be pointless.

34.     By this time, Defendant Mattingly had been gone for approximately ten minutes and the Plaintiff felt safe in proceeding with his trip to Mt. Vernon. He did not expect to see the silver truck again. As a precaution, however, Mr. Stillwagon removed his firearm from the tank bag and secured it on his person. He started his bike, pulled out, and continued on his way at a leisurely pace.

### (c) Defendant Mattingly's Third and Fourth Attacks - The Ambush at Section Line Road

35.     Unfortunately, after he left the Plaintiff at Watkins/Moore Road the intoxicated Mr. Mattingly decided that he was not yet finished with his campaign of terror against the man on the motorcycle. He drove about four miles north on Route 42, to the intersection of Section Line Road. (See Exhibit 1) There he circled his truck around behind a building

12

on the corner, to a location where he could watch the road without being seen. He waited in ambush for the motorcyclist to come by.

36.     Eventually, Defendant Mattingly saw Mr. Stillwagon pass through the intersection of Route 42 and Section Line Road at a normal rate of speed. It had now been about fifteen minutes since their last contact. When Mattingly observed the Plaintiff go by, he pulled around the building and entered northbound Route 42, following Mr. Stillwagon. There were several cars between him and the Plaintiff.

37.     Once again Defendant Mattingly began driving dangerously, turning on his headlights, crossing left of center into the southbound lane, into oncoming traffic, and passing approximately eight cars ahead of him. This forced at least three southbound drivers to pull off the road quickly in order to avoid a head-on collision with Mattingly's truck. Mattingly then pulled back into the right lane and accelerated his truck in an attempt to strike Mr. Stillwagon from behind. The Plaintiff saw the truck coming up quickly, and was able to escape being hit by speeding up to almost 85 miles per hour, but Defendant Mattingly got so close that there were only inches between the truck's front bumper and the back of Mr. Stillwagon's motorcycle. The Plaintiff could see that Mr. Mattingly was grinning and laughing.

38.     After 10-15 seconds of high speed pursuit from behind, Defendant Mattingly slowed down, and backed away from the bike. However, the truck soon accelerated into the southbound lane and, at about 70 miles per hour, Mattingly started his cut-in moves again. The Plaintiff braked again, Mattingly sped past Mr. Stillwagon, quickly cut in front of him, and again slammed on his brakes, causing Mr. Stillwagon to nearly crash into the back of Mattingly's truck for the second time. Mr. Stillwagon was able to swerve, apply his

brakes hard, and avoid the collision, but again it was a close call. This encounter ended as Mr. Stillwagon slowed in an effort to get away from Defendant Mattingly, and the Defendant sped away down the road, out of sight. Mr. Stillwagon did not see Mattingly for a period of time thereafter, and he drove slowly and cautiously in the hope that this frightening encounter was now over.

### (d) Defendant Mattingly's Fifth Attack - On the Exit Ramp to William Street

39.     As Route 42 approaches Delaware it curves left and merges with Route 23 for a few miles. This portion of the road is four-lane divided highway. Then there is an exit ramp to the right which goes down to William Street in Delaware. Route 23 continues straight ahead. Route 42 takes the exit ramp and then intersects with Route 36. (See Exhibit 1) At the bottom of the ramp is a traffic light at William Street, and Route 36 turns to the right at that light.

40.     Mr. Stillwagon's normal and intended route of travel was to follow Route 36. Thus, he would get in the right lane on 23/42, take the William Street exit, go down the exit ramp to the light at the bottom, turn right onto William Street and continue on Route 36 toward Mt. Vernon. This is exactly the path he followed on the date in question.

41.     As he was nearing the point where Routes 23 and 42 joined, Mr. Stillwagon saw Mattingly's truck once more. It was far ahead of him, and it disappeared out of sight. As the Plaintiff got nearer to his exit ramp, he saw the truck again. It was ahead of him, positioned in the far left passing lane, as if it were continuing on Route 23, but it was traveling at a very slow speed, 10-20 miles per hour, with vehicles backed up behind it.

14

42.     Mr. Stillwagon moved to the right into the exit lane for Route 36/William Street.  It appeared that Defendant Mattingly would go straight on Route 23, the Plaintiff would exit onto William Street, and the two would thus be separated.  This is not what happened, however.  Defendant Mattingly was looking back, waiting to see which way the motorcycle would go.  When Mr. Stillwagon put on his turn signal and moved to the right into the exit lane, Mattingly - - who was nearly past the exit area but not quite - - made a sudden, radical turn to the right, crossed two lanes of traffic at 90 degrees, and just made it onto the ramp.  The Plaintiff saw this and understood that the silver pickup truck was stalking him from the front again.

43.     On the exit ramp Mr. Stillwagon slowed down and kept a substantial distance between himself and the truck which was now in front of him.  When Defendant Mattingly got to the bottom of the exit ramp the traffic light was green, but he stopped his truck there anyway.  His vehicle was straddling the left and right-turn lanes, stopped right in the middle.  Mattingly was looking back at Mr. Stillwagon.  It was obvious that he was waiting for the motorcycle to approach.

44.     Mr. Stillwagon did not wish to get near the truck.  He pulled his motorcycle to the right and stopped more than 130 feet back from the intersection.  The exit ramp is closed in at that point.  To the Plaintiff's left was a concrete wall about twenty feet high, to the right was an unbroken guardrail in front of a heavily wooded area leading down to the Olentangy River banks. (See Exhibit 2, attached) There was nowhere to go except forward, so Mr. Stillwagon determined that he would have to wait there until the driver of the truck went on.  Once again, however, Defendant Mattingly did something unexpected.

15

45.    Defendant Mattingly put the truck in reverse, and the vehicle began to accelerate backwards, up the exit ramp, heading toward Mr. Stillwagon.  The Plaintiff retrieved his pistol and pointed it at the oncoming truck.  He did not intend or wish to shoot the driver, only to make the truck stop, so he aimed for an area on the rear truck bed by the tailgate latch, to the right of the driver's position.  Mr. Stillwagon fired three times.  By the third shot, Mattingly had stopped backing up and begun to drive forward again.  Plaintiff saw the truck run a red light nearly striking eastbound traffic, turn right onto William Street rapidly and disappear from his sight.  Plaintiff put away the firearm.

46.    Mr. Stillwagon proceeded forward to the light, which was still red for the exit ramp, and he stopped there for 25-30 seconds.  He could not yet see down William Street to the right, but he expected that his use of gunfire would have had the desired effect.  The threatening truck driver would now know that the man on the motorcycle was armed, and the silver pickup would be gone.  Mr. Stillwagon would continue on Route 36 toward Mt. Vernon, his destination, without further problems.  When the light changed and the Plaintiff came around the corner, however, there was the truck stopped dead in the right lane of William Street a short distance ahead.

### (e) Defendant Mattingly's Sixth and Final Attack - The Autozone Lot

47.    Mr. Stillwagon determined at that moment that the best thing to do was to get off the public roads entirely, and try to find cover for the motorcycle and himself where the other driver would be unable to keep using his truck as a weapon.  He saw an entrance to a parking lot ahead on the left.  He began moving to the left on William Street, approached the entrance to the lot, and turned in.

16

48.     Defendant Mattingly, who was still stopped in the street, saw Mr. Stillwagon coming up behind him.  He saw Mr. Stillwagon move into the center lane on an angle toward the lot, looking to the left.  Just as the motorcycle was heading toward the parking lot entrance, Mattingly accelerated his truck, turned sharply to the left across William Street, and cut in front of the motorcycle, into the parking lot.

49.     Mr. Stillwagon had initially looked for parked cars.  His thought was to put his motorcycle between two vehicles parked in the lot.  However, the parked cars were some distance away, up near the buildings at the opposite end of the lot.  The truck was looping around, Mr. Stillwagon could hear the engine, and Plaintiff was not sure he could make it safely to the area of parked cars.  There was a circular concrete light pole stand about 2 feet high near the entrance to the lot, so Mr. Stillwagon pulled his motorcycle next to this for protection.  The Plaintiff took out his firearm and held it visibly in his hand.

50.     Defendant Mattingly had turned his truck and driven by the Plaintiff closely, stopping briefly near the concrete structure.  Mr. Stillwagon had put down his kickstand and turned off the bike.  When Mattingly drove past Mr. Stillwagon on this first loop, the driver's side was facing the Plaintiff, at a distance of only a few feet away.  Mr. Stillwagon could easily have shot him.  Mr. Stillwagon had no desire or intention to harm the driver, only to disable the truck.  Mr. Stillwagon pointed his firearm downward, toward the rear of the truck, fired two rounds, and shot out the left rear tire.

51.     Defendant Mattingly drove on past the concrete pillar, past Mr. Stillwagon, and back toward William Street.  His truck exited the parking lot, turned left, and began to head east down the street.  At that point Mattingly was free to leave, driving away from the man on the motorcycle. Mr. Stillwagon remained stationary, and made no effort to follow

17

the truck. If Mattingly had wished to do so, he could have simply kept on driving and left the area. He did not do so. Instead, he attempted one last attack on the Plaintiff.

52.     Defendant Mattingly quickly circled back around and re-entered the parking lot. He drove to a position where his truck was aimed straight at Mr. Stillwagon, and where there was nothing between them. Then Mattingly revved his engine loudly, pushed the accelerator to the floor and, with his tires squealing, sped across the lot directly toward the Plaintiff.

53.     When the truck got dangerously close, Mr. Stillwagon fired once. He certainly could have shot Defendant Mattingly at this time. The Defendant was clearly visible, directly in front of him, and at close range, but the Plaintiff had neither the desire nor the intention to harm the truck driver. His purpose in firing was only to disable the vehicle, and deter the madman who was driving it. Mr. Stillwagon aimed specifically for the lowest portion of the truck engine, as far from the driver as possible, and fired one round. When the truck was shot it swerved to the left and came to a stop about ten feet from the motorcycle, and directly in front of Mr. Stillwagon.

54.     Defendant Mattingly kicked open the driver's door of the truck in an aggressive manner. Mr. Stillwagon approached the truck on the passenger side, with the firearm still in his hand. He glanced into the truck through the passenger window, and then circled around the rear of the truck. Defendant Mattingly came out of the truck and stood by the open driver's door.

55.     Contrary to the later false accusations of the Delaware Police Department, Mr. Stillwagon did not stop at the back of the pickup, point his pistol at Mattingly, fire across the truck bed and shoot the Defendant in cold blood, causing him to fall to the ground.

Rather, Mr. Stillwagon came around the rear of the truck without stopping or firing.  He walked right up to Defendant Mattingly.  He could not see Mattingly's right hand.

56.     When Mattingly began to turn, Mr. Stillwagon kicked him once, forcefully, in the left leg.  This caused Mattingly to bend over.  The Plaintiff then struck him once on the back of the head with the gun, and pushed Mattingly down to the ground.  Mr. Stillwagon thus used the minimum amount of force necessary to protect himself, and not one bit more.

57.     As Mr. Stillwagon was pressing Mattingly downward, with the firearm still in his hand, he unintentionally squeezed the trigger and the weapon discharged.  The shot fired up into the air and away from Mattingly, never touching him at all.  Defendant Mattingly suffered  only a minor flesh wound to the rear of his head, a small cut, caused by being struck with the gun.

58.     Defendant Mattingly began to stand up again.  Mr. Stillwagon told him to stay on the ground, and he did.  The Plaintiff yelled to bystanders in the area to "call the police."  Then he set the firearm down on a nearby planter, where it would be visible, and waited for police to arrive.  As the police arrived on scene, Mr. Stillwagon was happy to see them.  When the first cruiser pulled into the lot Mr. Stillwagon waved for them to come over to his location.  Officers got out and approached, and the Plaintiff immediately acknowledged that he was the one who had fired the weapon.  He explained that the man on the ground had just "tried to kill me about six times", and that Defendant Mattingly had not been shot, only the truck.

59.     Each of the six attacks by Mr. Mattingly against Jim Stillwagon, as described above, constituted  a  separate  "felonious  assault"  offense  in  violation  of  Section

2903.11(A)(2) of the Ohio Revised Code. That statute makes it a felony of the second degree for any person to "knowingly attempt to cause serious physical harm to another by means of a deadly weapon." Ohio law is specific and long-standing that a motor vehicle can be a deadly weapon under this statute. In addition, Defendant Mattingly was guilty of drunk driving from the moment he got behind the wheel of his truck until he got out of it; he had engaged in menacing threats against the Plaintiff with a baseball bat; he had been drinking while driving the truck; and he had intentionally endangered the lives of numerous other motorists and their passengers by operating his truck left of center in a lane of oncoming traffic.

60. On the other hand, Mr. Stillwagon had committed no crimes of any kind. Rather, he had been the victim of a series of unprovoked violent attacks by a big truck against a smaller motorcycle, some of which very nearly cost him his life (attached as Exhibit 3 is a document from Mr. Stillwagon's criminal trial demonstrating the respective vehicles involved). Mr. Stillwagon had never engaged in any dangerous or provocative driving toward Defendant Mattingly. He had never engaged in any "road rage" activity at all. He had not shot Mattingly, he had not tried to shoot Mattingly, and even the physical force he used to subdue Mattingly was minimal.

61. Mr. Stillwagon had taken no steps of any kind to continue contact with the silver truck. He had not chased, followed or pursued the truck. He had never driven at a high rate of speed to find or catch up to the truck. On the contrary, Mr. Stillwagon had done everything he could to disengage from the threatening truck driver. In every instance it was Defendant Mattingly, not the Plaintiff, who took steps to renew contact between the vehicles after they had separated. Mattingly raced to catch up to the motorcycle on the

Route 33 Bridge, and did so again just before Watkins/Moore Road. Mattingly waited in hiding for the motorcycle at Section Line Road, he cut across traffic to join the motorcycle on the William Street exit ramp, and he turned around and re-entered the Autozone parking lot for the sole purpose of going after Mr. Stillwagon once again. At all times Defendant Mattingly was the intoxicated pursuer and aggressor. At all times, Mr. Stillwagon was the sober, law-abiding victim attempting to avoid his pursuer when possible and protect himself from harm when necessary.

**FACTS REGARDING THE FALSE ARREST
AND MALICIOUS PROSECUTION OF MR. STILLWAGON
BY THE DELAWARE POLICE**

62.     After the incident, Mr. Stillwagon certainly did not act like someone who had done something wrong. He himself requested people nearby to call the police and medics. He did not try to leave the scene. He did not try to conceal himself. He immediately advised the first officers on the scene that he was the person who fired at the truck. He showed them where he had set down his firearm.

63.     The responding officers drew their guns and pointed them at Mr. Stillwagon. They began screaming at him. They had him get on the ground, remove his jacket, lay on his stomach and similar orders. As the cruiser videos confirm, Mr. Stillwagon was completely respectful and cooperative. He did everything that he was instructed to do. He was handcuffed, led to a cruiser and locked in the back seat. The cuffing and confinement was quite painful for the Plaintiff, because he has prior wrist surgeries, two artificial knees and an artificial shoulder. In spite of this, Mr. Stillwagon was fully compliant and courteous. He never resisted, or complained, or became belligerent with officers at any time. He told the officers "I'll do anything that you want."

64.     Although he had committed no crimes, Mr. Stillwagon understood that the Delaware Police detaining and questioning him were reasonable and necessary steps under the circumstances.  None of the claims alleged herein are based upon this initial detention of the Plaintiff.  It was at this point that the Delaware Police began to obtain information from Mr. Stillwagon.

### (a) Information from Mr. Stillwagon - The Interview in the Cruiser

65.     Within a few minutes of the event itself, while sitting in the cruiser, Mr. Stillwagon described for the Delaware Police the details of what had happened. He told the truth, giving the facts exactly as they are listed above. He told about the near collision during the Route 33 Bridge cutoff, where the truck rode "over that bridge and he missed me by about five inches going about 70 miles an hour."  Mr. Stillwagon described Mattingly's parking in the road and threatening him with the baseball bat. He told them about Mattingly's attack near Watkins/Moore Road, and about him parking his bike for several minutes there: "So all of a sudden he comes flying by me again. . . right at that intersection he about killed me. He slams his brakes on hard and left skid marks in the road. . . I stopped and got off the road and two cars came off with me and said, he's trying to kill you, sir." The Plaintiff described how Mattingly ambushed him later at Section Line Road. "He came back after he was gone, all of a sudden he's behind me. He tries to cut me off the road again."

66.     While in the cruiser, Mr. Stillwagon also told the Delaware Police what happened in the Autozone parking lot. First, the Plaintiff was explicit that this was not road rage. The Plaintiff only fired his weapon in self-defense, when Mattingly was trying to hit

22

him with his truck: "It's not road rage. He tried to kill me."; "he went right around and I heard his engine revving. . . He was coming for me." Second, the Plaintiff emphasized that he fired only at the truck, not the driver: "So then I shot the side of his truck, or something." Third, the Plaintiff told them he did not shoot Mattingly, he just kicked and struck him: "Shoot him? No. I hit him"; "I kicked him in the leg. .. When I hit him the gun just went off. . . he got hit by the gun, not the bullet"; "I kicked him in the leg and I hit him in the head with the gun. I didn't shoot him."

67.    The cruiser recordings reveal that even the uniformed Delaware Police on the scene concurred with Mr. Stillwagon's statements based upon their own observations. One officer was recorded stating "he just looks like he wasn't shot," referring to Mattingly. Another officer commented that "with the way the shots are, it's almost like he was just trying to scare him." Defendants Gerke, Radabaugh and Willauer were present at the Autozone lot; Defendant Segaard was not.

### (b) Information from Mr. Stillwagon - The Interview at the Delaware Police Station

68.    Jim Stillwagon was transported from the Autozone lot to the Delaware Police Department. He was held in handcuffs and leg-irons for several hours. He was then taken into an interview room for questioning by Defendants Gerke and Segaard, in handcuffs and leg irons attached to a leather belt. This interview was recorded on video, and was later played in its entirety during the Plaintiff's criminal trial. The Plaintiff agreed to give this statement without speaking to a lawyer, or having one present.

69.    Once again, Mr. Stillwagon explained truthfully and specifically the frightening experience he had just been through. This interview was completely consistent with the

statement he had given earlier, in the police cruiser. He described the first time Mattingly nearly hit him, on the Route 33 bridge: "right when I got over 33" this truck "just flew by. He missed my motorcycle by that much," then "he waited for me up the road. Stopped in the middle of the road." He described Mattingly's second attack at Watkins/Moore Road, and the stop he made thereafter: "just missed clipping the front of my bike at 70 miles an hour", "I could feel the wind off of it," "he jammed his brakes on," "I pulled off the side of the road the second time he did it", "a lady pulled up. . .and this guy helped me," "I thought he was long gone when I talked to these people."

70. Mr. Stillwagon said that he had tried to wait until the truck was gone, but Mattingly had driven up to the Section Line Road intersection and waited for the Plaintiff: "He must have hid at that gas station waiting for me to go by again", "all of a sudden here comes this pickup truck going about 80 miles an hour, passing seven cars", "he had his lights on", "and he comes up right behind me. . . this close, and I said this guy is going to kill me," "and he was smiling at me."

71. Mr. Stillwagon told the detectives about Mattingly waiting for him at the Route 23/Route 42 split, and rushing his truck across traffic to confront the Plaintiff once more on the exit ramp at William Street. He described how Mattingly was driving on Rt. 23, "He had like 10 or 20 cars backed up . . . going like 10 miles an hour down the road. . . in the passing lane", "all of a sudden he just rips off and goes down that exit." He told them when he stopped his motorcycle further back on the ramp he saw the truck start "coming backwards on me and going to run me right over." He explained that he only fired his weapon to protect himself, and that he had intentionally aimed for the truck bed, not at the driver: "I just shot right down the middle, I wasn't trying to shoot [Mattingly]", "I shot two

24

shots into his car to say. . . just go your way", "you can see the pattern, I put a tight pattern right there, if I wanted to kill [him] I would have shot him", "I was in fear for my life".

72.     Finally, Mr. Stillwagon described how he tried to escape Defendant Mattingly by seeking shelter in the Autozone lot.  He talked about Mattingly's final attack in that lot, and how he shot the truck in order to protect himself.  He told them about turning onto William Street from the exit ramp and seeing the silver truck stopped in the street ahead. He explained that this looked like another ambush to him.  He rode into the lot to find cover, and Mattingly reacted by accelerating into the lot at the same moment. He told them about trying to use the concrete pillar as protection.

73.     Specifically concerning his use of the firearm, Mr. Stillwagon told the detectives that the truck made two consecutive loops through the lot.  On the first pass Mattingly drove within a few feet of the Plaintiff and Mr. Stillwagon fired twice into the rear tire area: "I shot his tire . . . when he went right by me. . . I wanted him to not be on the road anymore and I shot and flattened his tire."  Detective Gerke asked this question, and Mr. Stillwagon gave this answer: "Q. Shooting at the truck? A. Yeah. I wasn't going to shoot him." During this interview Defendant Gerke acknowledged receiving a text from the officers at the scene, confirming exactly what Mr. Stillwagon had said.  One bullet punctured the rear driver's side tire, a second one entered the rear driver's side panel a few inches behind that tire. (See Exhibit 4)

74.     Mr. Stillwagon described the truck's second loop toward him.  After the Plaintiff had shot out the rear tire, Mattingly drove out of the parking lot heading east on William Street.  Rather than leaving the area, however, Mattingly circled back into the lot, aimed at the Plaintiff and accelerated: "He was coming right for me. . . I shot again right

into his engine," "I felt I - - he was trying to take my life, you know, and I was protecting myself." When asked again by the detective, "your intentions weren't to shoot him?" Mr. Stillwagon answered "No." Once again, the detectives were able to confirm the truthfulness of this statement. There was one bullet hole into the front of the truck, beneath and to the left of the license plate, below the engine. (See Exhibits 5, 6 and 7). As Mr. Stillwagon pointed out to the detectives, and as the Exhibits demonstrate, the Plaintiff could easily have aimed higher and shot the driver if he had chosen to do so.

75.     After this second loop, Mattingly brought his truck to a stop adjacent to Mr. Stillwagon and his motorcycle, and got out of the vehicle. In this interview, just as he had in the cruiser, Mr. Stillwagon explained in step-by-step detail exactly what happened next: "I ran around the car", "he had his hand down like that and I had the gun", "I just kicked him right in the leg", "and I saw his hand go like that and that's when I hit him in the back of the head with the gun." Mr. Stillwagon explained that as he was pushing Mattingly down with the handle of the gun "my finger must have been on the trigger" and a round went off. As he had at the scene, the Plaintiff reiterated that he believed the bullet fired into the air and Mattingly had not been shot at all. He told them that Mattingly was alert and conscious and even started to stand up again before Mr. Stillwagon told him to stay down.

76.     The detectives asked explicitly whether the Plaintiff had intentionally shot, or attempted to shoot, at Mattingly. Mr. Stillwagon was equally explicit that he did not, even though he certainly had the opportunity to do so numerous times: "Q. All right. So you didn't walk up to him and shoot him in the head? A. No. . .." As this interrogation at the Delaware Police Department came to a close, Defendant Gerke said to Mr. Stillwagon "I'm just going to tell you I appreciate you being honest about it."

26

77.     At this point, just hours after the incident had ended, Mr. Stillwagon had now given two detailed statements to the Delaware Police about what had happened that day. Both statements were given without consulting an attorney, and without the Plaintiff taking time for reflection, to gather his thoughts, or to rehearse or create a story. Both statements were given on the record. Moreover, Mr. Stillwagon had set out the facts and details the same way each time. These things suggested truthfulness and credibility.

78.     In addition, Mr. Stillwagon had articulated to the defendants a story which, if it were true, rendered his actions entirely lawful. If it had happened as the Plaintiff had twice described it to the police, then Mr. Stillwagon was a victim rather than a lawbreaker, and his use of his firearm had been entirely justified. The Plaintiff had denied any road rage, retaliatory conduct or other improper action on Route 42, telling the defendants "I didn't do nothing to him." Furthermore, he had shot at the truck, not at the man, and those shots were taken only to defend himself from peril. If the Plaintiff's statements were true, then there was no basis to charge him with any crime.

79.     The Delaware Police already knew two other important facts. First, they knew that Defendant Mattingly had been under the influence of alcohol that day. Mr. Stillwagon had told them bluntly "he was drunk." The officers who were near Mattingly in the Autozone lot reported that he had a strong odor of alcohol about his person. And police recovered several beers and an open container from the truck. Second, the Delaware Police knew the respective criminal histories of these two men. They had immediately done a record search on both parties. They knew that Mr. Stillwagon had no record. They knew that Mattingly had a very serious criminal background, including a long prison term for homicide, and that he was presently on parole.

27

80.    The Delaware Police had not yet interviewed Mr. Mattingly at all. He had been taken away immediately for a medical exam and treatment. The detectives had not even seen him, or seen his injury, or heard what he had to say about the facts. They had not done any investigation, had not interviewed the witnesses or searched for additional evidence. Having completed their interview with Mr. Stillwagon, they prepared to drive to the hospital and see the driver of the truck. Even before leaving, however, they revealed to Mr. Stillwagon that they had already made up their mind about the case. They were placing Mr. Stillwagon under arrest, they had decided to prosecute him for crimes against Mattingly, and he was going to be taken straight to the county jail.

### (c) The Delaware Police Adapted A
### False Description of the Facts

81.    The Delaware Police Department, and the defendants specifically, adapted a narrative of the events that day which was quite different from the truth. The story created by the Delaware Police altered specific facts in order to remove culpability from Defendant Mattingly, and place it on the Plaintiff. The Delaware Police Department version of the story was not based upon the evidence. It was motivated by an anxious desire to prosecute Jim Stillwagon.

82.    Under the scenario created that day by the Delaware Police Department, Mr. Stillwagon was not the victim of several separate assaults by Defendant Mattingly and his truck. Rather, the events on Route 42 had been a "mutual road rage" situation, in which Mr. Stillwagon had threatened the truck driver by following close behind, cutting in front of the truck and "brake checking", and other aggressive driving toward the truck. In the police version, Mr. Stillwagon had not sought to get away from the truck and end the contact.

28

Rather, he had purposely maintained contact with the truck, pursuing it in a continuous pattern of road rage for more than ten miles before entering Delaware.

83.     According to the police, the incident continued into Delaware because of Mr. Stillwagon and his aggressive actions, rather than those of Mattingly.  Mattingly undeniably was driving on Route 23 in the left lane, at a snail's pace, and swerved sharply onto the exit ramp in front of Mr. Stillwagon, but the police attributed this to Mattingly having mechanical trouble with his truck, rather than an effort by Mattingly to continue harassing the motorcyclist.   Under the police version, Mr. Stillwagon pulled up directly behind Mattingly's truck at the bottom of the ramp, pulled out his firearm and, without any provocation, fired multiple times attempting to shoot Mattingly.   They claimed Mr. Stillwagon did this because he was angry.

84.     The Delaware Police theory went on to suggest that, rather than Mattingly waiting for the Plaintiff on William Street, and then charging into the Autozone lot when he saw that Mr. Stillwagon was going that way, it was the opposite.  Mattingly had driven into the lot to flee the Plaintiff, because he was fearful of the Plaintiff.  Mr. Stillwagon had not entered the lot in order to find protection from the truck, but rather he was pursuing Mattingly in order to shoot him.  In other words, the police claimed Stillwagon was the aggressor.

85.     As the truck was circling around in the lot, the police claimed that the three rounds fired by Mr. Stillwagon were not defensive shots intended to protect the Plaintiff, repel the attacker, or disable the truck.  Instead, according to the theory adapted by Delaware Police, these shots were unprovoked, unsuccessful efforts by Mr. Stillwagon to shoot Defendant Mattingly.

86.     The Delaware Police narrative posited that Mr. Stillwagon had not walked up to Mattingly after the truck stopped. They had not stood face-to-face by the driver's door of the truck. The Plaintiff had not kicked Mattingly and struck him on the back of the head with the gun, causing Mattingly to fall to the ground. The gun had not accidently discharged into the air. Instead, the police version was that Stillwagon had stopped his approach when he was still some distance away from Mattingly, still behind the back of the truck. The Plaintiff had then aimed the gun directly at Mattingly and fired in cold blood, shooting the defendant in the head and causing him to drop to the ground.

87.     This, then, was the scenario that the Delaware Police decided was their theory of the case. Jim Stillwagon had become infuriated with road rage, had pursued the other driver for many miles until they reached Delaware, and had intentionally shot the man in the head from a distance. The Delaware Police Department released this story to the media only hours after the event had occurred. The Delaware Police Defendants adopted this story as the basis for arresting and charging Mr. Stillwagon that same evening. But the allegations were entirely false.

### (d) The Evidence Directly Contradicted the Allegations of the Delaware Police

88.     In addition to Mr. Stillwagon's statements, there was other evidence known to the defendants which overwhelmingly confirmed the Plaintiff's description of the events, and proved his innocence of all crimes. Much of this evidence was physical or forensic, and much of it was in the form of personal eyewitness testimony. Taken as a whole this exculpatory evidence could not logically be ignored. The following are numerous examples of such evidence.

### (1) Events on Route 42

89.     Regarding each of Defendant Mattingly's successive efforts to strike Mr. Stillwagon with his truck, independent evidence immediately surfaced which supported Mr. Stillwagon's statement. At the same time, this evidence entirely contradicted the Delaware Police theory that the Plaintiff had himself engaged in road rage behavior.

90.     Concerning the first incident, at the Route 33 bridge, when Mr. Mattingly was interviewed he claimed that the motorcyclist had come up on his truck from the rear at a high rate of speed. The bike had pulled up next to him on the left and Mr. Stillwagon made obscene gestures at him. Mattingly denied that he had nearly run over the Plaintiff, then brake checked him, then stopped in the road and threatened the Plaintiff with a baseball bat. The video obtained from the Marathon station, however, verified that the motorcycle had been in front of the truck, not behind it. And police did find a blue metal baseball bat in the cab of Mattingly's truck. The evidence all supported Mr. Stillwagon.

91.     Concerning Mattingly's second assault, at Watkins/Moore Road, a critical eyewitness voluntarily came forward to the Delaware Police on the very next day after the events. This woman confirmed that the truck came speeding up behind her, passing northbound vehicles in the left lane, causing oncoming vehicles to swerve off the road to avoid a collision. The truck passed her, accelerated at a high rate of speed to overtake a motorcycle that was up ahead, and she saw the truck "swoop in front of the motorcycle" and slam on its brakes, nearly causing the motorcyclist to wreck. She told the Delaware Police that Mr. Stillwagon pulled his motorcycle off the road and the truck took off, running a red light. She also confirmed the Plaintiff's statement that he waited several minutes there at the roadside, that she and a male witness also stopped to help the Plaintiff, and

31

that the police were called but said they could do nothing except take a report. This independent witness told police that Mr. Stillwagon waited long enough that she believed the truck to be many miles away, that Mr. Stillwagon was "not enraged" when he got back on the road, and that he drove away at a normal rate of speed. The information from this witness, a farmer named Ms. Reninger, was highly exculpatory. She confirmed that this was assaultive action by the truck rather than mutual road rage. She confirmed that Mr. Stillwagon had, in fact, stopped and waited several minutes while the truck was presumably continuing away, thus putting distance between the vehicles.

92.     The next series of assaults by Defendant Mattingly occurred several miles north on 42, after the Plaintiff passed Section Line Road. Mr. Stillwagon reported that Mattingly had hidden at this intersection, and come after him again when he rode by. An ambush by Mattingly was not a part of the Delaware Police Department narrative. Nevertheless, three independent eyewitnesses came forward to verify Mr. Stillwagon's statement that this had occurred. One of those witnesses was Ms. Reninger. She had pulled away from the gravel lot at Watkins/Moore Road just behind Mr. Stillwagon, who was 30-60 seconds ahead of her. When they got to Section Line Road, the Plaintiff had gone straight ahead on Route 42, and Ms. Reninger was turning left. Just as she was making her turn she saw the silver truck pull back onto Route 42 from somewhere off the road, and turn north in a direction following Mr. Stillwagon's motorcycle. In short, she actually saw the ambush commence, and she told the Delaware Police about that.

93.     Another witness named Ms. Sayre also called the Delaware Police. She had seen Defendant Mattingly on the news, giving a statement that blamed Mr. Stillwagon and she said she called because "he's not telling the truth." She had witnessed the attacks

near Section Line Road.  She said the truck passed her at a high rate of speed, and he "came after the motorcycle.  And he was bound and determined he was going to get in front of the motorcycle and that's how he almost caused an accident" with vehicles "coming the opposite direction."  She saw the truck cut in front of the motorcycle, immediately slam on his brakes, and the motorcycle "went off the side of the road", with gravel and dirt flying in the air.

94.     A third independent eyewitness to Mattingly's attempts to wreck the motorcycle near Section Line Road was a Mr. Cogan.  This gentleman and his 13-year-old son were nearly victims themselves.  Mr. Cogan contacted the Delaware Police by email less than 48 hours after the event.  Mr. Cogan was driving southbound on Route 42.  He passed a motorcycle going the opposite direction.  Shortly thereafter, he looked ahead and saw a silver pickup truck, headlights on, coming directly at him as it passed seven or more vehicles.  The pickup truck made no effort to return to its lane, never slowed down, and continued to drive straight towards Mr. Cogan, forcing him to slam on his brakes and drive off the road to avoid a head-on collision.  Mr. Cogan estimated the truck passed him at 85 m.p.h.

95.     The statements of these three witnesses taken together verified exactly what Mr. Stillwagon had told the Delaware Police about the events at Section Line Road.  Although the Plaintiff had given Mattingly lots of time to drive on down the road to wherever he was going, Mattingly had stopped, concealed his truck from view, waited until the motorcycle went by, chased it at a high rate of speed, endangering other innocent motorists, and then intentionally driven his truck at the motorcycle in such a way as to injure the rider. This was not mutual road rage, it was an ambush followed by an assault.

None of the witnesses who came forward described Mr. Stillwagon as having engaged in any type of road rage driving behavior whatsoever.

## (2) Events in the City of Delaware

96.    The next incident Mr. Stillwagon had described to the Delaware Police was at the William Street exit ramp. Notably, the police would not even have been aware of shots fired at this location if Mr. Stillwagon had not volunteered the information within five minutes of them arriving.  In this way the police were able to locate bullet casings and photograph the area immediately.

97.    The Delaware Police theory on this portion of the story was that Mr. Stillwagon had "caught up with Mattingly on the exit ramp, intentionally." The Plaintiff claimed the opposite, that he got in the exit lane before Mattingly, who was ahead of him driving very slowly in the left lane of Route 23.  Plaintiff stated that when Mattingly saw him getting off at William Street, the defendant swerved his truck across two lanes and cut onto the exit ramp in front of the motorcycle.  The underlying issue, of course, was who was following whom?  There were no eyewitnesses but when the Delaware Police did speak to Mattingly he made important admissions.  He admitted that he was driving as slow as 20 miles per hour on Route 23 as he passed the William Street exit, before turning down the ramp in front of Mr. Stillwagon.  Mattingly denied that this was because he was waiting to see which way the motorcycle went.  He attributed this unusual driving pattern to mechanical failures with his truck.  However, no mechanical problems were ever found on the truck, the Delaware Police Defendants themselves admitted that they did not believe this story, and it was later stipulated in the criminal case that no such mechanical problems with the truck existed.  The evidence thus supported Mr. Stillwagon.

98.     What happened when the vehicles were on the exit ramp was also disputed. The Delaware Police theorized that Mr. Mattingly did not activate his reverse lights or begin backing his truck toward Mr. Stillwagon. Rather, they speculated Mr. Stillwagon followed the truck to the bottom of the ramp, pulled out his gun and fired it in an attempt to cause physical harm to the driver Mr. Mattingly. Three important bits of exculpatory evidence contradicted this theory. First, Mr. Stillwagon had stopped his bike a sizeable distance back from the truck and the intersection, and the shots were fired from that location further up the ramp, as evidenced by the fact that this was where the shell casings were all found. (See Exhibits 2 and 8). Second, the bullet holes were in a tight pattern located in the rear of the truck bed, by the tailgate latch, down and to the right of the location where the driver would have been visibly seated in the cab. No shots had been fired into the truck cab. Third, when the Delaware Police did speak to Mattingly he conceded that he "may have" put his reverse lights on while on the exit ramp.

99.     Concerning the events in the Autozone parking lot, the version adapted by the Delaware Police was that Mattingly was a terrified victim. Mr. Stillwagon was intent on shooting Mattingly because he was enraged. Mr. Stillwagon fired at Mattingly three times in the parking lot while Mattingly was still in the truck, but he missed each time. When Mattingly stopped and got out of the truck, Mr. Stillwagon stood at a distance, pointed the gun directly at his victim and shot him in the head. The police theory was dramatic, but it was contradicted by every bit of physical and forensic evidence, as well as eyewitness testimony. The evidence was overwhelmingly exculpatory, it was known to the Delaware Police, and it fully supported every detail of Mr. Stillwagon's statement of the events.

100.    When he entered the lot, Mr. Stillwagon parked his bike as close as possible to the concrete pillar; put down the kickstand, and remained stationary at or near the bike while Mattingly's truck made its various movements in and around the lot.  As Mattingly brought his truck to a position close by, the driver's side was closest to Plaintiff.  Mr. Stillwagon said that he made no effort to shoot at the driver, who was right in front of him, only a few feet away.  Rather, he aimed for the rear tire in order to disable the truck.  The physical evidence all confirmed this.  The shell casings were found immediately adjacent to the area where the motorcycle was parked.  The two bullets entered (1) the right rear tire, puncturing it, and (2) the side of the truck, about two inches behind the tire. (See Exhibit 4).  Those forensic facts, the location of the casings and the location and close pattern of the two bullet holes, were consistent with Mr. Stillwagon's statement, and directly contradictory to the theory that he was firing up at the driver in the truck cab.

101.    The Autozone parking lot was also shared by an Eagles Club located next to the store.  The Eagles Club had a security camera which was directed at the parking lot area.  This camera was operating on the afternoon of September 30, 2012.  It recorded the incident herein, including the movements of Defendant Mattingly's truck.  The Delaware Police had obtained a copy of this "Eagles video" on the same evening of the incident. This video provided highly probative documentation that Defendant Mattingly was the aggressor in this matter, as it captured in full Defendant Mattingly's final attack on Mr. Stillwagon.

102.    The Eagles video showed that, after the Plaintiff shot the truck tire, he simply stopped firing and stood still.  The truck pulled out onto William Street heading east.  Mr. Stillwagon made no movement to pursue.  The truck suddenly turned back into the lot,

circled around to where it had a clear angle toward the Plaintiff, and accelerated directly at Mr. Stillwagon. When the truck was nearly to the Plaintiff, Mr. Stillwagon fired one, and only one, shot. It was fired from a position where the Plaintiff had a clear view of Mattingly up in the driver's seat, getting closer and closer. It was fired downward at the bottom of the engine, actually striking the lowest point on the front bumper.

103.    The Eagles video, the location of the casing next to the motorcycle, and most critically the location of the bullet hole (See Exhibits 5, 6 and 7), were all evidence so exculpatory as to render the theory that the Plaintiff was attempting to shoot the driver a near impossibility. It certainly was highly unlikely. The Delaware Police narrative regarding the incident wilfully disregarded all of this exculpatory evidence.

104.    The final contested issue was how Defendant Mattingly went to the ground. If Mr. Stillwagon stopped, aimed, and fired from behind the truck, and if Mr. Mattingly had actually suffered a gunshot wound, these facts taken together would support the Delaware Police accusation that the Plaintiff had "knowingly caused serious physical harm to Richard Mattingly" by intentionally shooting him. On the other hand, Mr. Stillwagon was firm in his statement that this never happened. He said he had walked up to Mattingly, kicked him, struck him in the head and pushed him to the ground physically. The gun had discharged into the air and the bullet never struck Mattingly at all. A review of all physical and forensic evidence proved beyond dispute that Mr. Stillwagon was telling the truth.

105.    There was one bit of physical evidence which was, by itself, essentially determinative of the question. When police arrived at the scene and recovered Mr. Stillwagon's firearm, a .45 caliber Glock semi-automatic handgun, they found that there was an empty shell casing still in the chamber. This meant that when the last bullet fired,

the weapon had not done what it normally did automatically, slide open and eject the empty casing from the chamber.  The only reasonable explanation for this was that the slide mechanism was in contact with something when the gun fired.  Even modest exterior pressure against the slide would restrict it from opening, and the casing would not be ejected.  If the gun were held out, aimed, and fired from a distance, as the police claimed, the casing would have been ejected.  If the gun were being pressed against Mr. Mattingly's head at the time it discharged, then the slide would be restricted and the casing would remain in the gun.

106.   The only other conceivable explanation for the presence of this shell casing in the weapon was some mechanical failure in the weapon itself.  But the weapon had been fired six times in the minutes before this last round was fired, and it operated perfectly.  Every casing was ejected properly.  The day after the incident, Defendant Radabaugh took this same firearm to the Delaware County Firearms Range and test fired it to make sure it worked.  He examined it closely and then fired it several times.  It worked perfectly, and the shell casing discharged after each round was fired.  There was no mechanical malfunction.

107.   The presence of the last shell casing within the firearm was entirely consistent with Mr. Stillwagon's statement, and essentially impossible under the scenario adapted and acted upon by the Delaware Police.  The defendants wilfully disregarded this highly exculpatory evidence.  It was never even mentioned by the defendants in their official Investigative Report or their Grand Jury Packet.

108.   The second item of exculpatory evidence was Mr. Mattingly's head injury itself.  Defendant Mattingly simply did not suffer a gunshot wound.  A bullet wound to the

38

head from a .45 caliber hollow point round, even a so-called "grazing wound", would have carved out a wide, canal-shaped area where it passed through the body tissue. Mr. Mattingly sustained only a tiny, straight-line cut which was closed with two sutures. At the hospital, the injury was described by the medical staff not as a gunshot wound, but as "a small laceration". The discharge instructions stated "you have been seen today and treated for a laceration (cut) to your scalp." This cut was caused by the metal gun, most likely the rear site, making forcible contact with the back of Defendant Mattingly's head. The nature of the wound was powerful exculpatory evidence, inconsistent with the allegations of the Delaware Police and fully consistent with Mr. Stillwagon's statements.

109.    The third relevant bit of evidence was the testimony of an eyewitness named Mr. Powell, who had been in the Autozone parking lot at the exact moment when Mattingly got out of his truck and Mr. Stillwagon approached. Witness Powell said it happened exactly as Mr. Stillwagon described. Mr. Powell had seen the Plaintiff fire his last shot at the truck before it came to a stop. He said it looked like the motorcyclist "was shooting the motor, trying to stop the truck." Mr. Powell was watching closely what happened next, after the truck stopped.

110.    This witness said that he saw Mr. Stillwagon walk around the rear of the truck, approach the driver who had come out of the truck, and they were "face-to-face at that point." He saw Mr. Stillwagon hit the other man on the head, with the weapon in his hand, and the gun went off. Mr. Powell said he saw the muzzle flash, and it was pointing straight up when it discharged. He saw the man from the truck fall. Mr. Powell told the Delaware Police what he had witnessed when they came to the scene, and he gave them his contact information. The investigating detectives never did a follow-up interview of this

witness.  They did not include him in their list of grand jury witnesses.  They did not mention anywhere in their Investigation Report that this witness confirmed Mr. Stillwagon's statement about what caused Mattingly to go to the ground.  The defendants simply buried this witness, suppressed his observations and disregarded this evidence of the Plaintiff's innocence.

111.    There was yet another significant bit of exculpatory evidence which the Delaware Police learned the next day, when they went to see Defendant Mattingly.  He was limping.  He had soreness and swelling to his left leg, exactly where Mr. Stillwagon indicated he had kicked Mattingly.  When the detective asked him about it, Mattingly was vague about how he got it: "I must have fell."  Once again, another fact had come to the attention of the Delaware Police Defendants which appeared to confirm Mr. Stillwagon's description of the events.  This particular exculpatory evidence was neither addressed nor even mentioned in the Investigation Report or the Grand Jury Packet.

112.    Finally, there was the Eagles video.  This video had no sound, and the camera was a long distance from the location of Defendant Mattingly's truck. As originally recorded, the interaction between Mr. Stillwagon and Mattingly was too small to see. However, immediately after they got the recording the Delaware Police began the process of having it enlarged and enhanced.  The enhanced version was eventually produced to Mr. Stillwagon's legal team, and it was shown by the defense during Plaintiff's criminal trial. In the enhanced format the viewer can clearly see that Mr. Stillwagon did, in fact, go on around the truck, walk right up to Mattingly, engage in a kicking motion and downward arm motion, and at that point the defendant went to the ground.  The Eagles video visually confirmed Mr. Stillwagon's statement, and contradicted the Delaware Police allegations.

113.    In spite of this evidence, Defendants Segaard, Gerke, Radabaugh and Willauer caused Mr. Stillwagon to be charged with four counts of felonious assault. Each count had an added firearm specification.  These four charges were based upon the Plaintiff's use of his weapon on the William Street exit ramp (1st Count), and his shooting of the truck and alleged shooting of Defendant Mattingly in the Autozone lot (2nd, 3rd and 4th Counts).   In each of these charges the defendants alleged that Mr. Stillwagon "knowingly attempted to cause" or "knowingly caused" serious physical harm to Mattingly. There was no probable cause for any of these charges.  The evidence contradicted the elements of each offense alleged, and the evidence also strongly supported the affirmative defense of self-defense.   Nevertheless, the defendants had decided to prosecute Mr. Stillwagon and had crafted a narrative which would appear to justify the prosecution. They immediately began to bend the evidence to match their theory.

### FACTS REGARDING THE DEFENDANTS' MANIPULATION, MANUFACTURING, SUPPRESSION AND DESTRUCTION OF EVIDENCE

114.    After they had arrested, charged and jailed Mr. Stillwagon, Defendants Gerke and Segaard headed for the Ohio State University Hospital to meet Defendant Mattingly, whom they had now dubbed as their "victim." They called ahead to the hospital to let them know that they were coming.  They took along an alcohol testing kit which they intended to use on Mattingly.

115.    Defendant Mattingly had arrived at the hospital fully conscious, oriented and alert, speaking clearly.   He acknowledged at the hospital that he had never lost consciousness, not even briefly, at any time throughout the entire day.  He had been talking when police first arrived at the Autozone lot, and he had been fully awake and

41

aware on his trip to the hospital.  There was no reason why Mattingly would have suffered any memory loss or selective amnesia.

116.    In truth, Mattingly remembered exactly what had happened that day.  He knew that he had pursued and terrorized the guy on the motorcycle, he knew the man had fired only at his truck, and he knew that he had been kicked and knocked to the ground rather than shot.  But Mr. Mattingly was on parole.  He faced returning to prison for the remaining 12 years of a previous sentence if the truth about this incident with Mr. Stillwagon came out.  At the same time, he had heard some of the police at the scene speculate that he had been shot.  Being perceived as a gunshot victim might help him to escape the consequences of his violent acts toward Mr. Stillwagon.  He did not know what evidence the Delaware Police had, so Mattingly decided to claim memory loss.

117.    Because of the insignificant nature of the injury, Mattingly was questioned about its origin on multiple occasions while at the hospital.  He repeatedly said <u>he did not remember how the cut had occurred</u>.  The notes of one doctor state: "He . . .relates that he was hit to his head. . . He does not remember the entire event, and does not recount if it was a GSW to his head or a blunt trauma. . . findings, laceration over occiput, repaired in trauma bay with two staples."  The emergency room records further state: "He does not remember the entire incident.  <u>He is unsure if he was shot</u>, but he was hit on the back of the head."  The physical exam noted that he had "a small laceration to the back of his head." (See Exhibit 9) Thus, it was not the purported victim who was claiming Stillwagon stopped at a distance, took aim, and shot him intentionally. That story was initially coming only from the Delaware Police.

42

118. At some time after 6:00 p.m. the hospital staff told Defendant Mattingly that the Delaware Police had called, and were on their way to interview him. Mattingly's reaction to that information is summarized in the following notations from the hospital charts: "Pt. got up and said he was going to leave. . . Pt. ripped IV out and walked out." Mattingly fled the hospital without being discharged or receiving his paperwork.

119. When the detectives arrived, Defendant Mattingly was gone. They did obtain his telephone number. They called and left a message for him to contact them. When he called back late that evening, he was at his home near Dayton. They asked to see him, but Mattingly indicated that he really did not wish to speak to them or to do anything about the incident. The detectives were insistent, and Mattingly reluctantly told them they could come to his home the next day, but Defendant Segaard noted at the time that "it did not appear that he was particularly interested in participating in the investigation." The fact that Defendant Mattingly had run from the hospital, and the fact that he did not wish to participate in the investigation, were remarkable. This was not the way that a victim of a shooting would normally act. These facts logically suggested guilty knowledge. The Delaware Police disregarded the implications of this conduct by their purported crime victim.

### (1) Manufacturing Mattingly's Testimony

120. The Delaware Police conducted two interviews of Mr. Mattingly, each one lengthy, on October 1 and October 2, 2012. From the very beginning it was obvious to the detectives that Defendant Mattingly was a dishonest person, and that he was lying to them about his interaction with Jim Stillwagon. Mattingly told a wild and incredible story about Mr. Stillwagon being infuriated at him for no known reason, and about his truck having a

43

long list of alleged mechanical problems which made it slow down uncontrollably at times, speed up uncontrollably at other times, and at other times it would stall, or the steering would pull the truck sideways.  He denied that he ever pulled in front of the motorcycle and braked.  Mattingly claimed that he never engaged in any assaultive driving at all, and that Stillwagon must have simply misinterpreted the aberrant movements of the truck as intentional.  Mattingly denied that he had consumed any alcohol that day.  He denied ever threatening Mr. Stillwagon with a baseball bat.  He denied waiting in ambush for the motorcycle.  He denied putting his truck in reverse on the exit ramp.  He denied that he had ever left the Autozone lot, and then returned and driven at Mr. Stillwagon.  He said that he had stopped and gotten out of the truck merely to apologize.  As he had at the hospital, Mattingly never said "I remember being shot" or similar words.  Rather, he said that Mr. Stillwagon was coming at his truck "shooting into the passenger side" and yelling, and then "that's all I remember."

121.    Probable cause must be based upon "reasonably trustworthy information." The detectives knew immediately upon meeting and speaking with Mr. Mattingly that he was certainly not a source of reasonably trustworthy information.   They have since admitted that they doubted his truthfulness.  They could not lawfully rely upon anything Mattingly said as a basis for prosecuting Mr. Stillwagon because it would not meet the legal requirement of trustworthiness. Moreover, Mattingly's completely fabricated story to the police, containing lie after lie about the subject of the police investigation, was itself criminal conduct in violation of the statutes prohibiting "falsification", "obstructing justice" and "obstructing official business."

44

122.    In addition to his absence of credibility, a second thing about Mattingly became clear to the detectives during these interviews.  Defendant Mattingly sincerely believed that he was going to be arrested and charged for his actions toward the motorcyclist.  At one point he put his hands out in a handcuff position and told the detectives "I'll tell you everything.  You got to arrest me, you can arrest me."  This conduct logically suggested that Mattingly had committed crimes and he knew it.  He admitted that he had never intended to contact police about the incident: "I was so scared I was getting arrested, I wouldn't have called."  Actually, the Delaware Police should have arrested Mattingly but they were not interested in him.  They had already decided to prosecute Jim Stillwagon, and obtaining a conviction of the Plaintiff was their only goal.

123.    In order to convict Mr. Stillwagon the police defendants first had to somehow force Mattingly to cooperate.  They were eventually able to coerce Mr. Mattingly to "be a cooperative victim", and say what they wanted him to say, by using a series of techniques during these two meetings.  First and foremost was a promise of leniency in return for testimony implicating Mr. Stillwagon.  Additionally, the police defendants suggested to Mattingly that there might be some personal financial benefit to him if he helped to convict Mr. Stillwagon. And when necessary, the detectives also used anger, threats and pressure at times.

124.    The Delaware Police understood that Defendant Mattingly was their star witness.  If they were going to obtain the conviction of Mr. Stillwagon as they hoped, they needed Mattingly to testify to the scenario that they had adapted as the basis for their charges. They referred in these meetings with Mattingly to "the success of their case," which actually meant falsely convicting an innocent crime victim. They explained to

Defendant Mattingly that they were only after Jim Stillwagon, that this case was very important to them, and they needed Mattingly's testimony to conform to their narrative or they might lose the case. Defendant Segaard told Mattingly, "this is an important case. . . . we're trying to make a case saying, you know, Mr. Stillwagon shot Mr. Mattingly in cold blood just because he was angry about something that happened." Segaard told Mattingly, "we arrested him, and we're charging him, okay? We're going to take it to trial, and regardless of what may have led up to this conflict."

125. Defendant Gerke explained it this way to Mattingly: "I am on your side regardless, because you are the victim in my case . . . we're on your side . . . I am your friend, sir." Defendant Gerke explained that "I cannot proceed with any type of prosecution without having my victim, the man who got shot in the head. . . I can't proceed with anything unless I have a cooperative victim."

126. The detectives told Defendant Mattingly that it was critical for success that he alter his testimony to be consistent with the police version. Only one day after the incident occurred the Delaware Police were already concerned about how Mattingly would come across at trial. Defendant Segaard told him this: "But it is going to go to court and it's going to be a big deal. The guy's famous . . . So he's going to a have a very good attorney and we have to make sure that we have all our ducks in a row. . . that's how the defenses to these types of cases work because this guy's attorney wants to make it look like his client did this for a justifiable reason. . I know it might be hard for you to remember but it's important . . . if we want to prove to a jury that this guy shot you and had no - - had no right to, his attorney is going to say, well Richard was trying to kill him with his truck and that's why my client shot at him . . . there was a pattern of aggression." Defendant Gerke

46

was more blunt. If Mattingly didn't cooperate with the police narrative, he said, "this case is going to fall apart."

127. Mr. Mattingly was not initially persuaded, and he persisted in his own self-serving but unbelievable story. The detectives responded by offering him complete amnesty, and promised Mattingly that he would not be held accountable for his truck attacks on Mr. Stillwagon or for any of his other misdeeds that day, if he would say what they wanted him to say. When Mattingly asked if there was any chance he was going to be arrested, Detective Segaard said unconditionally "no". Segaard elaborated, "it does not matter what you may have done. It will not change the way we prosecute this shooting incident." Defendant Gerke was as clear as he could be on the point, promising Mattingly that "no matter what is said here today, no matter what you state to us, no matter where this goes, you will still be listed as the victim. We are not prosecuting you or coming after you. Okay?" And Segaard added, "We just don't care about other crimes."

128. In reality, as the Plaintiff and the witnesses confirmed, the vehicular attacks by Mattingly had come very close to causing Mr. Stillwagon and other innocent drivers serious injury or death. The Delaware Police detectives, however, trivialized these felonious assaults by a drunk driver as mere traffic violations. They told Defendant Mattingly that "even if you passed him and brake-checked him or whatever", even if you were "being a jackass driver" it is "okay if you were." Defendant Segaard stated that "I'm a detective that investigates major crimes like this, so I don't care if you had an open container and I don't care if you were drinking in the truck," and "We're not traffic cops." Defendant Gerke said "I'm not here to convict you on OVI. I'm not here to, you know, write you a ticket." Gerke tried repeatedly to assure Mattingly that if he cooperated he was safe:

47

"what you did was traffic. I don't do traffic"; "you're not going to jail bro, I don't write fucking tickets."

129.    Defendant Mattingly expressed concern that, even if he wasn't prosecuted, his parole might be revoked. The Delaware Police detectives promised that they would not cooperate with the parol authorities or provide them any information. The following conversation was only one of many to that effect:

> Mattingly: I can get revoked on any of those things.
> Gerke: I'm not calling. I don't even know what parole office you're out of. I'm not looking into it. I'm not going to call your parole officer. . . I'm not mailing anything, sending anything to your parole officer. You understand me?
> Mattingly: Yeah.
> Gerke: Bro, you have to understand me. I'm not turning this in to the parole board. I'm not turning this in to your parole officer. This is my report.
> Mattingly: That's fine.

130.    One additional coercive influence employed by the Delaware Police Defendants was financial. The detectives suggested to Mattingly that there might be a money motivation for him to get on board with their effort to have Mr. Stillwagon convicted of felonious assault. On the more modest level, this involved direct payments of money through the victims' assistance program. Defendant Segaard took a victims' assistance representative to the first interview with Mattingly, and the detective assured Mattingly that "we're going to make sure that you're done right by" financially. He offered to provide money for travel to Delaware for an interview, money for Mattingly to come to the grand jury, "we'll buy you Wendy's or something", and even an offer to purchase Mattingly a new hat.

131.    On a much larger scale, however, the detectives discussed the fact that Mattingly was injured by a man who was wealthy. They brought this up with Mattingly over

48

and over again, in explicit terms that had nothing to do with their investigation.  A few examples are Defendant Segaard advising Mattingly "he's like a millionaire", "he's got money", "this guy has money" and his lawyers are getting paid "big bucks"; and Defendant Gerke volunteering "this guy has a lot of money."  Defendant Mattingly clearly understood this to mean that a conviction of Jim Stillwagon could put money in his pocket.  During the pendency of the criminal charges, Mattingly filed a civil suit against Mr. Stillwagon, in which he sought a large award of money damages for physical and emotional injuries he claimed to have suffered from allegedly being shot.  Mattingly was able to obtain counsel to pursue his bogus lawsuit because of the false charges filed by the defendants herein.  Shortly after Mr. Stillwagon's trial, however, Mattingly's civil attorney purchased the trial transcript, read it, and dropped the lawsuit against Mr. Stillwagon immediately.  Nonetheless, the Plaintiff was forced to spend thousands of dollars defending that frivolous litigation.

132.    The coercive efforts of the Delaware Police did have the desired effect of convincing Defendant Mattingly to change his testimony, and to say the things that the detectives wanted him to say.  The police defendants now began to coach their "victim" as to specifically how he should testify.  There were four primary areas where Mattingly's story required serious adjustment, in order to strengthen and "improve" the case against Jim Stillwagon.  The first was Mattingly's alcohol consumption.  The second was getting Mattingly to adapt the "mutual road rage" narrative.  Third, they had to come up with some explanation for Mattingly's final attack on Mr. Stillwagon in the Autozone lot.  Fourth, Mattingly would have to swear that he was definitely shot by the Plaintiff, and he would need to have a clear and specific memory of it.

133.    Once Mattingly had demonstrated his willingness to change his testimony, the Delaware Police began to teach him the details of the story they wanted him to swear to.  This was a two-step process.  First, they revealed to Mattingly what all of the other evidence showed.  Then they worked with him and coached him on the various things he needed to say in order to conform to the known evidence, and still implicate Mr. Stillwagon as the culprit.  Basically, they were getting Mattingly's story straight, and manufacturing false testimony that would support the police narrative.

134.    On the question of alcohol consumption, Mattingly's first statement to the Delaware Police was a complete denial of any consumption of alcohol that day, at home or on the road: "Segaard: Had you had anything at all to drink earlier that day? Mattingly: No."; Segaard: . . . coming up 42, did you stop anywhere? Mattingly: I don't think so."  Then the detective revealed to Mr. Mattingly that they had video of his stop at the Marathon station by the Route 33 bridge.  Mattingly got the hint: "Segaard: So did you stop at that gas station and buy beer? Mattingly: I bought a six pack."  Then Defendant Segaard told him that officers on the scene would testify to significant alcohol consumption: "The officer who. . . was attending to you smelled alcoholic beverage on your person. . . You don't smell that just from one beer."  Defendant Gerke suggested how Mattingly should say it: ". . . this is my opinion. . . You tell me whether it's true or not. I think you. . . buy some beer. . . you probably had a few drinks before that. . . and all of a sudden this crazy ass on a motorcycle is coming up on your ass. Mattingly: Yeah. Gerke: And he starts fucking with you. . ."  Mattingly subsequently adapted this story and testified that he had consumed about four beers or so before driving.  In this way he did not appear dishonest at trial, in the face of the other evidence.

50

135.    Next the Delaware Police needed Mattingly to conform to their "mutual road rage" theory.  His initial statement completely contradicted the police narrative, in which both men had supposedly engaged in following each other closely, hitting their brakes suddenly in a manner that was dangerous to the other, and similar forms of aggressive driving, in an ongoing and continuous escalation over a 10-14 mile stretch.  Defendant Mattingly specifically denied that he had done any of those things: "Segaard: I really need to know that. If there was any kind of jockeying and passing, or - - Mattingly: No."; "Segaard: Was there ever a time when you passed him and slammed on your brakes? Mattingly: No. . . At no time did I do that. Because he could have been injured if I did that, you know."

136.    Once again, the detectives revealed to Mr. Mattingly what the independent, irrefutable evidence was going to be, and they instructed him to say what the other witnesses were saying.  They told him frankly that if he didn't change his testimony it would jeopardize their goal of convicting Jim Stillwagon:

> Segaard: If we get to court. . . and you continue to say that you made no aggressive driving maneuvers, they're going to crucify you. . I have five witnesses who say you did. Okay? I can't - - it's completely unbelievable that you were not participating in this road rage in some way. . You haven't said that and you need to. . . Five motorists saw you guys. . . I have people who have written page-long descriptions of what you were doing and they all say that you were in the wrong. . . [mechanical problems] does not explain driving into oncoming traffic for an extended period of time running more than one car off the road and pulling in front of the motorcycle slamming on the brakes.  Two women saw you do that.
> Mattingly: Wow.
> Segaard: So don't say wow.  Remember doing it, and tell us about it. You have to.  This case is - - it's going to get all screwed up if you get up there. . . and you still sit there and say well, I didn't do it. They're going to - - it's not - - we're going to lose.  We'll lose the case.

137.    Defendant Gerke also participated fully in this coercive coaching.  Knowing that no independent witness had reported seeing Mr. Stillwagon ever drive improperly, a part of molding and creating Defendant Mattingly's new story was to develop false details of road rage behavior on the part of Mr. Stillwagon:

> Gerke: So . . . you fucked up and you engaged in some retarded - -
> Mattingly: Back and forth?
> Gerke:  - - back and forth with this guy and you were jamming on your brakes.  We've all done it.  All right?  And you were fucking with this dude and he lost his cool and shot you.  That's the facts.  Okay? . . .
>     Mr. Mattingly, I am asking you for the last time, I need you to please be a cooperative witness. . . you need to include the details of what led up to you becoming a victim.  That includes you acting like an asshole on the road. . .
>     You pulled to the Marathon station and you buy some beer. . . and all of a sudden this crazy ass on a motorcycle is coming up on your ass.
> Mattingly: Yeah.
> Gerke: And he starts fucking with you. . . Am I right?
> Mattingly: Well, I was yelling back off, back off.
> Gerke: Yeah.  And he's probably thinking . . . you're telling him to fuck off, fuck off.  Here comes the miscommunication, and he's pissed off at you and he starts doing stupid shit to you.  You get pissed off at him, and you start doing stupid shit to him. Alright?

Having gone over the details of what they wanted Mr. Mattingly to say in support of their "mutual road rage" story, Defendant Gerke told Mattingly "So, sir, let's start over. Alright. Let's start over with your statement."  The questioning was clearly biased to obtain the desired result, however.  At no time during their entire investigation, for example, did the Delaware Police even ask Mattingly if he had hidden in waiting at Section Line Road in order to go after the motorcycle again.  This would have contradicted their theory.

138.    As to the third issue, it was critical to the Delaware Police that they be able to portray Jim Stillwagon as the aggressor during the time when the gunfire occurred.  This was a mandatory element of each of the four felonies they had filed against him.  If

Mattingly had been the aggressor, then Mr. Stillwagon was just defending himself. In the police report, the defendants stated that from the time they were on the exit ramp forward, Defendant Mattingly was trying to get away from the Plaintiff and in "fear in light of being shot at." Mr. Stillwagon, on the other hand, had described a clearly aggressive attack by the truck in the Autozone lot, which would fully undercut the police theory.

139. Defendant Mattingly's first story about that final attack was that it never happened. He told the detectives that he pulled into the Autozone lot, parked his truck facing back toward William Street, exactly where police found it when they arrived, and never moved it again. He even drew this false story onto a diagram provided for him by the detectives. It was at this point that the Delaware Police told Mattingly about the existence of the Eagles video:

> Segaard: I watched - - this lodge right here, it's an Eagles Lodge. They have a video camera . . . So I got to see you pull in there . . . But what really perplexed me is . . . you came down and pulled in just like you said. . . but then you went out, acted like you were going to leave, came back in and then went like that.
> Mattingly: Really?
> Segaard: Yeah. Blows my mind. I don't know why you did that and I'm trying to - - I was hoping you could help me understand. . . I'm just trying to understand. Because . . . driving back towards the guy shooting at you is something that people are going to go, why the hell did he do that?

The detectives' coaching point was crystal clear. Mattingly could not say that Stillwagon was lying. He could not simply deny that this final charge toward the Plaintiff ever happened. It had been recorded. It would need to be justified or explained somehow.

140. Defendant Mattingly abandoned his first story, and tried a second one. He no longer claimed he had just pulled in and parked. He now agreed that he apparently had driven out onto the street and away, then circled back into the lot, then driven straight

toward Mr. Stillwagon.  But his story switched from "I didn't do that" to "I have no memory of doing that, or why I did it."  The following conversations demonstrate Mattingly's change of position:

> Mattingly: You said I went down to some other place, came back.  I just don't remember doing that.
> Segaard: . . . the video shows you driving into here, kind of facing him, driving back out, and then driving back in. . . And that's what we don't understand. . . You pulled in here.  He pulled in here.  You drove towards him. . . then you drove out.  Could have gone away, but then drove back.
> Mattingly:     Really?
> Segaard: Yeah.
> Mattingly: . . .did he pursue?
> Segaard: No. He stayed there.  He stayed right where he was and you left.
> Mattingly: It doesn't make any sense.
> Segaard: I know.  We're trying to find out why you might have done that.
> Mattingly: I don't know. I wish I had a good answer for you.  I mean, I don't recall it is the thing.
>
> Segaard: We know because there's a video camera shooting out this way. . . This is where everybody in the police department goes, what the fuck, because you pull out, drive a tiny little circle, come back right where you were.  And he's still there.  Then you drive towards him. . .
> Mattingly: Uh-huh.

The detectives were not pleased with Mattingly's second story either.  They needed Mattingly to say he <u>did remember</u>, and to give some plausible justification.  The only rational, obvious explanation was that Mr. Stillwagon was telling the truth, he really was under attack by the drunk driver in the truck.  The Delaware Police did not want this explanation to remain uncontested.

141.    The detectives told Mattingly he could not testify that he did not remember. Defendant Gerke told him they wanted him to give a statement "without any of the BS about haze, and forgetting stuff, and you know, memory loss."  What followed was a brainstorming session in which the detectives and Defendant Mattingly talked through a

variety of possible excuses that Mattingly might give, and how each one would sound. The Delaware Police were helping Mattingly to fabricate false testimony. They explored several options:

> Mattingly: Got to be fear. Got to be fear.
>
> Mattingly : Probably scared out of my mind.
> Segaard: . . . did you just not know what to do, or did you just freak out, or - - ?
> Mattingly: Yeah. I was freaking out.
>
> Mattingly: If it seemed like I was driving towards him, I didn't see that he was there.
>
> Mattingly: Where was he? I didn't even know where he was.
> Gerke: So at no point when you did the circling of your parking lot, and correct me if I'm wrong, did you ever see his motorcycle or him?
> Mattingly: No. And I was looking for him, too.
> Gerke: Could the behavior of your driving, could it be you pulled into the parking lot, you didn't see him, and you did another loop and said maybe I shouldn't be going back out just in case he's still there?
> Mattingly: He's gone. Where is he? He's gone.

The defendants were never able to concoct any sensible alternative explanation for Mattingly's videotaped final attack on the Plaintiff. The Delaware Police eventually opted to try and hide or minimize the issue. In their conclusions in the Investigation Report, they briefly referenced this event as merely "panicked confusion."

142.    In addition to the Eagles video, the defendants also had the problem of numerous eyewitnesses to contend with. Several witnesses in the area had come forward, reporting that they had seen the truck drive away, then come back and make one more run at Mr. Stillwagon. The witnesses generally perceived this as an aggressive act. These witnesses were named Tonya Keeran, Christian Mallory, Frank Orcena and Daniel Powell. These witnesses were simply buried by the defendants. None of those witnesses was put

on the grand jury witness list. Most were never even interviewed, and none was called by the City of Delaware at trial.

143.    The last point on which the Delaware Police sought to change Defendant Mattingly's testimony was central to their whole narrative. He had to say he had been shot in the head. The police defendants had announced this "fact" to the media and the public before they even met Mattingly or saw his injury. They had alleged this in the criminal charges against Mr. Stillwagon. But at the same time that the police were taking these steps, Mattingly himself was telling people he did not remember whether he had been shot or merely struck in the head. When they did meet with him, Mattingly told the police repeatedly that he only remembered the Plaintiff shooting at the passenger side of the truck, coming to the rear of the truck bed, yelling, and then his memory ended:

> <u>Mattingly</u>: He was firing at me on the passenger side yelling at me the whole time you're dead. . . I got out on the driver's side kind of ducking out of it like this and I put my hands up and he was coming around the back . . . of the truck . . . <u>That's all I remember.</u> (First interview).

> <u>Mattingly</u>: First I saw him was bam, bam, bam, coming to the passenger side. . . I get out of the truck like this and he's right there. . . as I was making that motion, his motion was back towards there and he's yelling. . . and I'm like this and <u>that's all I remember.</u> (Second interview)

As he had been at the hospital, Defendant Mattingly was unwilling to commit to saying that he had been shot and that he remembered it.

144.    When the detectives asked Defendant Mattingly about Mr. Stillwagon's statement that he had hit the defendant, not shot him, Mattingly's response was revealing. He wanted to know what the video showed. The detectives, who had not yet seen the enhanced video, were all too happy to reassure Mattingly that he could safely adapt their story:

<u>Segaard</u>: Because. . . the guy's saying that he hit you with the gun.
<u>Mattingly</u>: Right. Right. .  What's interesting, you said that the video got most of that. If he had come forward and struck me with the gun, wouldn't that be . . . on the video?
<u>Segaard</u>: . . . you can't see you get out . . . or him walk up to the driver's side.
<u>Mattingly</u>: You can't tell if he actually struck me?
<u>Segaard</u>: You can't . . .

With that said, the detectives told Mr. Mattingly to abandon his earlier statement that he could not recall, and to fully support the Delaware Police narrative:

<u>Segaard</u>: . . . the prosecutor puts you on the stand and says, Mr. Mattingly, tell us what happened on the date of September 30th, 2012, and you're going to say I was driving to see my dad, the dude shot me.  Well, the defense team is going to say. . . he hit you with the gun, he didn't shoot you. . . You're going to say, no, he shot me.

145.    Defendant Gerke emphasized to Mr. Mattingly that he should not testify to or even mention his earlier versions of the story, but rather he should testify to the new details that they had been coaching him to say.  Gerke told him: ". . . the only fact here is, you know, you got shot in the head, and the events leading up to it.  So when the Grand Jury. . . when you go there you go exactly - - <u>minus the beginning of our talk</u> - - everything that you stated."

146.    By the time he testified, Defendant Mattingly swore to everything he was coached to say.  He acknowledged he had been drinking.  He fully adapted the mutual road rage scenario. He conceded and tried to explain his final assault upon Mr. Stillwagon in the Autozone lot.  And he swore that he had a clear memory of being shot: "Q. When you said he shot you, did you - - do you remember the actual impact of the shot? A. Yeah."

## 2.  Destroying Exculpatory Physical Evidence

147.    The defendants intentionally destroyed, discarded or caused to be destroyed, exculpatory evidence in this case.   Most significantly the defendants destroyed DNA evidence.  The cut on the back of Defendant Mattingly's head was caused by sharp contact with Mr. Stillwagon's firearm, when Mr. Stillwagon used the weapon to strike the defendant and then push him downward.  This caused Mattingly to bleed.  It was a near certainty that blood was deposited on the weapon, as well as other DNA source material such as hair or sweat, during the time when the gun was pressed against the defendant's head.  The firearm was taken from the scene and continuously in the custody of the defendants thereafter.  The defendants failed to test the surface of the gun for DNA, although they knew that such a test was important in light of the disputed facts.  If Mattingly's DNA was found on the gun, then the Plaintiff had to be telling the truth, and the "shot from a distance" story had to be false.  By the time that Mr. Stillwagon's legal team got access to the firearm it had been wiped clean.

148.    During Mr. Mattingly's two interviews, the defendants provided him with paper and prepared maps, upon which Mr. Mattingly made several drawings and diagrams. These documents were known to the defendants to be evidence, and specifically valuable exculpatory and impeachment evidence for the Plaintiff and his counsel.  The defendants destroyed the Mattingly drawings and diagrams before the Plaintiff could obtain them.

149.    During Mr. Stillwagon's interview, the defendants provided him paper and prepared maps, upon which Mr. Stillwagon also created drawings and diagrams explaining the facts of what had happened to him that day.  The defendants similarly destroyed this exculpatory evidence without providing copies to the Plaintiff or his counsel.

### 3.  Failing to Preserve Evidence, and
### Failing to Disclose Evidence

150.    During his interview, Mr. Stillwagon told the defendants that a witness had stopped, and had made a phone call to police on the Plaintiff's behalf, at the intersection of Watkins/Moore Road and Route 42.  This was an important witness whose identity was unknown, but who could be found through police call records.  The defendants promised Mr. Stillwagon that they would take steps to obtain and preserve this information as a part of their investigation.  The defendants did not obtain or preserve this known exculpatory evidence.  As a result, this unknown male witness was never identified.

151.    During his interview, Mr. Stillwagon told the defendants about the existence of, and location of, skid marks on Route 42.  These marks would match Defendant Mattingly's truck, and confirm the extreme nature of Mattingly's driving, and efforts to hit the Plaintiff on his motorcycle.  The defendants told Mr. Stillwagon that they would take steps to obtain and preserve this evidence as a part of their investigation.  The defendants did not obtain or preserve this known exculpatory evidence.

152.    The defendants told both Mr. Mattingly and the Plaintiff's legal team that they were going to have a forensic mechanic examine Mr Mattingly's truck, to confirm or contradict his claim of serious mechanical failings on the date of the incident herein.  The truck remained in the defendants' custody for months, but they never had it examined, thus failing to obtain or preserve this known exculpatory evidence.

153.    During his interview Mr. Stillwagon told the defendants that Defendant Mattingly had waited in ambush at the intersection of Route 42 and Section Line Road, and that Mattingly likely had pulled in and concealed himself at or near a gas station located

59

at that corner. Witness Reninger confirmed seeing the truck pull out from that area. The defendants knew or should have known that witnesses and security video from that business would be exculpatory evidence. The defendants failed to obtain and preserve this evidence.

154. In addition the defendants concealed, and failed to disclose to either the prosecutor or Mr. Stillwagon, important exculpatory documents. These documents did not come to light until the criminal trial of Mr. Stillwagon had begun. These documents included a report from an investigating agent of the Ohio Bureau of Criminal Investigation, and supplemental investigation reports by the detectives herein which contained, among other exculpatory information, an admission by the Delaware Police that the evidence did not support a conclusion that Mr. Mattingly's injury was a gunshot wound. The failure to disclose these document was a clear <u>Brady</u> violation.

155. Using the manufactured final version of Defendant Mattingly's testimony, and selectively relying upon evidence which supported their theory and ignoring the evidence which contradicted it, the Delaware Police Defendants created materially false and misleading documents, including the official Investigation Report, Grand Jury Packet, and a Grand Jury video powerpoint presentation regarding the alleged facts of the case. These documents were then used to obtain, support, pursue and justify the prosecution of Mr. Stillwagon. For example, the defendants falsely and inaccurately described all of the events prior to Mr. Stillwagon shooting at the truck as "the reckless driving incidents", "the reckless operation events" and the "road rage portion", specifically for the purpose of concealing Mr. Stillwagon's valid self-defense position. Those prior events were not merely reckless driving, nor were they mutual road rage. They were events which would establish

that Defendant Mattingly was the aggressor, and that the Plaintiff had a reasonable belief that he was in imminent danger from the truck, both of which were elements of a self-defense claim.

## EVIDENCE OF MALICE, BIAS AND BAD FAITH

156.    The groundless arrest and prosecution of Mr. Stillwagon was itself objective evidence of malice on the part of the defendants.    Similarly, the fabrication and manipulation of evidence and the other due process violations by the defendants constituted evidence of malice, bias and bad faith by the defendants toward the Plaintiff. In addition, the defendants made specific statements which were disparaging toward Mr. Stillwagon, and evidenced malice.  They discussed the Plaintiff's personal history, and his athletic achievements, in insulting ways.  When Mr. Mattingly mentioned that the Plaintiff had played the position of "nose guard" on his football teams, Mattingly said that "you have to be half nuts to be a nose guard."  Defendant Segaard responded, "well, it looks like he's all the way nuts now."  They spoke about Mr. Stillwagon in his "riding leather" thinking he was "Billy Badass out on the road," and sarcastically referred to him as "this poor football hero grandpa."  These comments occurred only one day after the incident, in their very first meeting.

157.    On the next day, during Mattingly's second interview, he and the detectives continued their personal attacks on Mr. Stillwagon's character.  Defendant Segaard again referred to the Plaintiff as "nuts."  Defendant Gerke stated "you want to know my honest opinion, that motherfucker is crazy."  They were critical of the Plaintiff's athletic and business accomplishments, saying that "he has a lot of sympathy for who he is and has been in the past", and "he's got money, people are going to take his side right away."

158.    Defendants Mattingly, Segaard and even the Delaware Chief of Police, all made public statements in the media within the first 24 hours or so of the event, all declaring Mr. Stillwagon's guilt and putting forth the false police narrative.  Defendant Segaard gave a media statement to television stations, in violation of departmental regulations, declaring that Mr. Stillwagon had shot a man without any justification.  The Delaware Police encouraged Defendant Mattingly to engage in publicity in order to effectively try their case in the media.  When television crews arrived at Mattingly's home, Detective Segaard told him it wouldn't hurt to give an interview.  Segaard told him to "focus on how much it hurt getting shot", and to "cry a little bit if you want to."

## THE OUTCOME - FAVORABLE TERMINATION

159.    As the criminal trial approached various plea bargains were offered to Mr. Stillwagon, but the Plaintiff insisted upon going to trial.  At that trial, which occurred on October 1 - October 4, 2013, the truth came out. Ms. Reininger, Ms. Sayre, Mr. Cogan and Mr. Powell all testified.  Mr. Stillwagon testified on his own behalf.  The case brought by the Delaware Police fell apart completely.  Defendant Mattingly admitted that he had nearly killed Mr. Stillwagon with his truck, and that he knew he was engaging in life-threatening conduct at the time he did those things.  Defendant Mattingly further admitted that he had been lying from the very beginning.  Detective Segaard admitted that the Delaware Police knew from the beginning that Mattingly was an untrustworthy witness who was lying to them.  The enhanced video of the events in the Autozone lot was shown to the Court and jury. There was no evidence presented to prove that Mr. Mattingly had been shot, and by the end of the case the prosecutors adapted an alternative theory that Mattingly had suffered a "hearing loss" constituting serious physical harm.

160.    The case never even made it to the jury. The Court dismissed all counts, entering an order of judgment of acquittal pursuant to Ohio Criminal Rule 29, finding that the evidence was clearly insufficient to sustain a conviction of Mr. Stillwagon on any of the alleged offenses.  The Court pointed out that even Detective Segaard conceded he was unable to find any evidence confirming that Mr. Mattingly's head wound was from a gunshot. The Court stated "It is very clear to the Court that . . . the only participant in this incident, series of incidents, seven or eight, that is credible in any way, is Mr. Stillwagon. The quote, alleged victim, is not credible in any way."

161.    Regarding the elements of the four counts of felonious assault alleged against the Plaintiff, the Court was quite clear that no credible evidence supported those charges.  He held as follows:

> The Court: . . . Mr. Stillwagon, if he wanted to shoot someone, as he said, he would have shot him. . There is no evidence in this record that this defendant knowingly attempted to cause or caused physical harm by a deadly weapon.
> Assuming there was, and there isn't, then we have the issue of self defense.  I don't care what the definition of self defense is that you use, the Court is of the opinion that reasonable minds cannot differ, that if the first hurdle as to cause or attempt to cause could be jumped, you can have a hurdle of self defense.
> This Court is of the opinion reasonable minds can't disagree as to this issue, with the facts of this case. Based on those findings, the Court is going to dismiss the remaining charges against this defendant. . . Mr. Stillwagon, you have handled yourself admirably throughout this whole process. You are free to go, sir.
> Mr. Stillwagon: Thank you, sir.

162.    The criminal charges were all terminated favorably to the Plaintiff, but the damages that he suffered and continues to suffer have been immense.  The experience of September 30, 2012, was a nightmare for Mr. Stillwagon from beginning to end.  From the near-death attacks on the road, through the Autozone lot, the Plaintiff was in fear for

his life. Then the police arrived, pointing their guns at him and screaming, putting him right back into a fearful situation. Being forced to the ground, locked in a cruiser, handcuffed and taken to jail, were all physically painful and personally humiliating experiences.

163. Thereafter, the Delaware Police Defendants treated Mr. Stillwagon as a dangerous criminal. Wearing an orange jumpsuit, handcuffed and shackled, locked in a jail cell, formally arrested, and forced to appear at a public arraignment in jail clothes and handcuffs, all of these experiences were the source of embarrassment to Mr. Stillwagon. He was forced to call his wife, ask her to arrange bail and a lawyer, and try to explain what was going on.

164. The intentional, incessant and sensationalistic media campaign by the defendants caused a huge portion of the public to hear the false allegations against Mr. Stillwagon. The defendants packaged the story in the dramatic and memorable narrative which was the untrue basis for their charges: a local football legend became infuriated with road rage at another driver, then chased him down and shot him in the head in cold blood. This story was spread so far and wide, so quickly, that actual and potential business contacts for the Plaintiff's business knew about it in other states and other countries. This horrible accusation will live forever on the internet, and always be an unfair attack on the Plaintiff's character. The prosecutor in Delaware County still posts Mr. Stillwagon and the false accusations against him on her "Wall of Shame" to this day, almost a year after he was found innocent.

165. For more than a year after his arrest, the Plaintiff had four serious felony charges hanging over his head. He knew that he was facing a maximum penalty of over 40 years in prison, which was a life sentence for a man in his sixties. He lived with the

daily fear that a judge and jury would be swayed by the defendants' orchestrated presentation of false charges, and that he would be wrongly convicted. He was forced to watch his wife, daughters and even grandchildren labor under that same fear, and know that friends and strangers alike were routinely asking his family members about what the Delaware Police claimed he had done. Even after his acquittal these highly embarrassing inquiries continue, and they will continue for the rest of his life.

166.    Financially, the acts of the defendants have proximately caused the Plaintiff and his business enterprises to suffer immense expense and lost income, past and future. They have caused the Plaintiff great anxiety and mental anguish, and a huge amount of time and inconvenience. These damages are ongoing.

## NO QUALIFIED IMMUNITY DEFENSE

167.    The individual police defendants are not entitled to avoid liability for their actions based upon the defense of qualified immunity. The legal rights which the defendants violated herein were clearly and particularly established prior to September 30, 2012. Any reasonable police officer would have understood as of that date that it was unlawful to engage in the types of conduct alleged above. Additionally, these police defendants were trained in the relevant topics such as the definition of probable cause, the need for trustworthy information to support probable cause, the requirement that exculpatory evidence be included in the probable cause analysis, the need to preserve exculpatory evidence, the prohibitions against manufacturing false evidence or suppressing known evidence, and the other matters alleged. Further, the police defendants were subject to departmental rules and regulations setting out these various duties and standards.

65

168.    Even more pointedly, in the years 2008-2012, the City of Delaware, Delaware Police Department, Police Chief, and Defendant Gerke had been named as defendants in a lawsuit in this Court, entitled Foos v. City of Delaware, et al., Case 2:08-cv-00873. In the Foos case, Defendant Gerke had been confronted by a man, apparently under the influence of some intoxicant, who was behind the wheel of a pickup truck. Defendant Gerke smashed the truck window and used force upon the driver to subdue him. The driver of the truck subsequently died. The Delaware Police Defendants, including Mr. Gerke, successfully argued that the use of force was necessary because Defendant Gerke was reasonably concerned that the driver might use his truck as a weapon and cause him harm, and because he was reasonably apprehensive that the driver of the truck might have a weapon on his person. These were the exact arguments asserted by Mr. Stillwagon.

## FIRST CLAIM - FOURTH AMENDMENT, FALSE ARREST

169.    Said acts by the defendants constituted an arrest of Mr. Stillwagon without probable cause, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SECOND CLAIM - FOURTH AMENDMENT, MALICIOUS PROSECUTION

170.    Said acts by the defendants constituted a malicious prosecution without probable cause, in violation of the Fourth Amendment and 42 U.S.C.§1983. The defendants initiated the prosecution, continued the prosecution, made the decision to prosecute, participated in the decision to prosecute and/or influenced the decision to prosecute Mr. Stillwagon, all without probable cause.

## THIRD CLAIM - FOURTEENTH AMENDMENT, DUE PROCESS

171.    The said acts by the defendants constituted deprivations of liberty without

due process, in violation of the Fourteenth Amendment Procedural Due Process Clause, violations of substantive due process, and 42 U.S.C. §1983. Defendants' due process violations included manufacturing and fabricating evidence, the knowing use of false or fabricated evidence, coercing false testimony, knowingly creating false and materially misleading reports and other official documents used to support a prosecution, suppressing and destroying exculpatory evidence, deliberate omission of material evidence, failing to gather or preserve known exculpatory evidence, engaging in improper investigatory techniques so coercive and abusive that they would be known to yield unreliable and false information, providing details and information to a witness to bolster false testimony, and other similar actions.

## FOURTH CLAIM - §1983 CONSPIRACY

172.    The said acts by all defendants, including Defendant Mattingly, constituted conspiracy to violate the Plaintiff's constitutional rights. The defendants combined and acted in concert, and entered into an agreement to injure the Plaintiff by unlawful means. A plan was put in place to arrest, prosecute, and convict the Plaintiff, the defendants shared the objective to engage in these unlawful acts, and overt acts were committed in furtherance thereof. A party alleging a §1983 conspiracy must plead their claim with a substantial amount of specific detail. This complaint meets the legal requirement.

## FIFTH CLAIM - SUPERVISORY LIABILITY

173.    In addition to their direct personal participation in the constitutional violations herein, Defendants Radabaugh and Willauer were at all times relevant supervisors of the Delaware Police Department. These defendants are also liable as supervisors, in that they

were aware of and/or present for the unconstitutional acts of the other defendants, but failed to prevent them. They further failed to exercise their appropriate command functions, failed to properly train and supervise their subordinates, and approved or ratified the unconstitutional acts of their subordinates.

## SIXTH CLAIM - MUNICIPAL LIABILITY

174. The said unlawful acts by the individual defendants herein were proximately caused by certain customs and policies existing in the City of Delaware, and the Delaware Police Department. These customs and policies include, but are not limited to, failure to adequately and properly train police officers regarding the constitutional rights of citizens, proper investigation techniques and proper handling of evidence, and other related topics; failure to adequately and properly hire, screen and select persons for employment as police officers and detectives; failure to adequately and properly supervise and discipline employees. Additionally, in this case the Police Chief and supervisory officers personally participated in, acquiesced in, ratified, encouraged and/or approved the alleged unconstitutional conduct.

## SEVENTH CLAIM - MALICIOUS PROSECUTION
## UNDER OHIO LAW

175. Said acts by the defendants constituted the tort of malicious prosecution under Ohio law.

## EIGHTH CLAIM - CIVIL CONSPIRACY UNDER
## OHIO LAW

176. Said acts by the defendants constituted the tort of civil conspiracy under Ohio law.

## NINTH CLAIM - ABUSE OF PROCESS
## UNDER OHIO LAW

177.    The filing by Defendant Mattingly of the false and groundless damage action against the Plaintiff constituted abuse of process, and the malicious pursuit of civil litigation, in violation of Ohio law.

## TENTH CLAIM - DEFAMATION

178.    Said acts by the defendants, including Defendant Mattingly constituted defamation under Ohio law.

## ELEVENTH CLAIM - ASSAULT

179.    The said acts by Defendant Mattingly constituted assault under Ohio law.

## TWELFTH CLAIM - SPOLIATION OF EVIDENCE

180.    The said acts by the defendants constituted spoliation of evidence under Ohio law.

WHEREFORE, the Plaintiff demands judgment against the defendants, jointly and severally, for compensatory damages, punitive damages, reasonable attorney fees and other costs incurred herein, and such other relief as may be proper.

Respectfully submitted,

James D. McNamara        (0002461)
Trial Attorney for Plaintiff
88 E. Broad St., Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

69

## JURY DEMAND

The Plaintiff hereby demands a jury of eight (8) persons to hear and decide this case.

_____
James D. McNamara          (0002461)
Trial Attorney for Plaintiff
88 E. Broad St., Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

70