UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES R. STILLWAGON,

      Plaintiff,

      v.

THE CITY OF DELAWARE, et al.,

      Defendants.

Case No. 2:14-cv-807
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

**OPINION AND ORDER**

      This matter is before the Court on the Motion for Judgment on the Pleadings [ECF No. 29] filed by Defendants City of Delaware, Detective Benjamin Segaard, Former Detective Patrick Gerke, Officer Adam Willauer, and Detective Sergeant Jonathan Radabaugh (collectively, the "Municipal Defendants").[1] Plaintiff James R. Stillwagon's ("Plaintiff" or "Stillwagon") Motion to Strike [ECF No. 48] is also before the Court. For the following reasons, the Court **DENIES** the Motion to Strike [ECF No. 48] and **GRANTS IN PART** and **DENIES IN PART** the Motion for Judgment on the Pleadings [ECF No. 29].

## I.    BACKGROUND

      This case stems from a series of widely publicized events that occurred in Delaware, Ohio, and the surrounding highways on September 30, 2012. Given that the Court accepts all of Plaintiff's well-pleaded material allegations as true for purposes of a motion for judgment on the pleadings, the Court will outline the facts of this case as Plaintiff alleges them in his Complaint.

      The Court begins with some biographical information. This information is relevant, Stillwagon claims, because it was "the subject of discussion by the defendants, including critical

---

[1] This case involves an additional Defendant—Richard O. Mattingly ("Mattingly"). He is not currently moving for judgment on the pleadings.

or insulting comments, at the time when the decision was made to prosecute [him]." (Compl. ¶¶ 10–11 [ECF No. 2].) Stillwagon played football at The Ohio State University in the late 1960s. (*Id.* ¶ 10.) He excelled as a lineman. (*See id.*) After college, Stillwagon played professionally in the Canadian Football League. (*Id.*) Stillwagon has since retired from professional football. (*Id.* ¶ 11.) He and his wife now own and operate two businesses based out of Dublin, Ohio. (*Id.*)

## A.     Events on Route 42

On September 30, 2012, Stillwagon was driving northeast on Route 42 toward Delaware, Ohio. Stillwagon was riding his motorcycle. (*See* Compl. ¶ 19.) He was also carrying a handgun. (*Id.* ¶ 20.) He carried the weapon legally, as he had obtained a concealed carry permit several years earlier. (*Id.*) The pistol was stored in the tank bag of his motorcycle. (*Id.* ¶ 21.)

Defendant Mattingly was also driving on Route 42 on September 30. (*Id.* ¶ 22.) Mattingly had consumed "a large amount of alcohol at home." (*Id.*) He then continued drinking as he drove his pickup truck. (*Id.*)

Stillwagon and Mattingly first came into contact at a Marathon station located at the intersection of Routes 42 and 33. (*Id.* ¶ 23.) Stillwagon had stopped to buy gas; Mattingly had stopped for beer. (*Id.* ¶¶ 23–24.) Both Stillwagon and Mattingly were parked at pumps. (*Id.* ¶ 24.) Mattingly was parked behind Stillwagon. (*Id.*) As Stillwagon pulled out of the station, Mattingly followed. (*Id.* ¶ 25.)

Just northeast of the Marathon station, Route 42 narrows from four lanes to two lanes. (*Id.* ¶ 26.) As Stillwagon approached this merger, Mattingly "sped past him on the left, cutting off [Stillwagon] and nearly hitting him. The truck came within six inches of [Stillwagon's] motorcycle, startling [Stillwagon]." (*Id.*) As he made the pass, Mattingly was "looking directly at

[Stillwagon], laughing and grinning." (*Id.*) Mattingly then sped off out of Stillwagon's sight. (*Id.* ¶ 27.)

Less than two miles down the highway, Mattingly stopped his truck in the middle of the lane. "Mattingly was waving a blue metal baseball bat out of the driver's side window, and signaling for the motorcycle to go around him." (*Id.*) Stillwagon did not drive around the truck; instead, he stopped and waited 40 to 50 yards behind the truck. (*Id.* ¶ 28.) Eventually Mattingly started moving again. (*Id.*) He fell in behind a slower moving car. (*Id.*) Stillwagon took this opportunity to distance himself from Mattingly. Stillwagon passed Mattingly and the slower moving car. (*Id.*)

Moments later, Mattingly also passed the car. (*Id.* ¶ 29.) After passing, Mattingly continued driving in the left lane of the two-lane highway. (*Id.*) Several vehicles traveling in that lane (the southbound lane) had to swerve off the road to avoid a head-on collision with Mattingly's truck. (*Id.* ¶ 31.) Mattingly pulled up next to Stillwagon and shook the baseball bat at him. (*Id.* ¶ 29.) Mattingly then "made several cut-in moves into [Stillwagon's] bike, attempting to hit it." (*Id.*) On the third cut-in, Stillwagon braked. (*Id.*) Mattingly responded by making a sharp right turn immediately in front of Stillwagon and slamming on his brakes. (*Id.*) Stillwagon braked again, just in time to avoid colliding with the back of Mattingly's truck. (*Id.*)

Mattingly and Stillwagon were approaching a traffic light by this point. (*Id.* ¶ 32.) The light was red. (*Id.*) Mattingly drove through the red light and continued toward Delaware. (*Id.*) Stillwagon stopped at the light and then, after the light turned green, pulled into a gravel parking area. (*Id.*) Stillwagon wanted to distance himself from Mattingly. (*Id.*) While Stillwagon waited in the parking area, two motorists who had witnessed Mattingly's maneuvers stopped to ask if Stillwagon was alright. (*Id.*) One of the motorists called the police at Stillwagon's request. (*Id.* ¶

3

33.) The police indicated that there was nothing that they could do other than take a report. (*Id.*) Stillwagon and the other motorists "felt that this would be pointless" and decided against filing a report. (*Id.*) Stillwagon waited for approximately ten minutes and then continued on his way. (*Id.* ¶ 34.) Stillwagon did not expect to see Mattingly again. (*Id.*) "As a precaution, however, [Stillwagon] removed his firearm from the tank bag and secured it on his person" before leaving the parking area. (*Id.*)

Mattingly, meanwhile, had circled his truck behind a building four miles down the road; he was waiting for Stillwagon. (*Id.* ¶ 35.) Stillwagon passed the building and Mattingly pulled onto the road behind him. (*Id.* ¶ 36.) There were several cars between the two of them. (*Id.*) To catch up to Stillwagon, Mattingly entered the southbound lane and passed approximately eight cars. (*Id.* ¶ 37.) At least three cars in that lane had to pull off the road to avoid a head-on collision with Mattingly's truck. (*Id.*) "Mattingly then pulled back into the right lane and accelerated his truck in an attempt to strike [Stillwagon] from behind." (*Id.*) The truck came within inches of Stillwagon's motorcycle. (*Id.*) To avoid being rammed by Mattingly, Stillwagon sped up to almost 85 miles per hour. (*Id.*)

Mattingly slowed down and backed away from the bike. (*Id.* ¶ 38.) However, he soon accelerated into the southbound lane and "started his cut-in moves again." (*Id.*) Stillwagon braked. (*Id.*) Mattingly then cut in front of Stillwagon and slammed on his brakes, "causing [Stillwagon] to nearly crash into the back of Mattingly's truck for the second time." (*Id.*) Stillwagon narrowly avoided a collision by swerving and braking hard. (*Id.*)

Stillwagon attempted to distance himself from Mattingly, once again, by slowing down. (*Id.*) And once again, Mattingly continued down the road until he was out of Stillwagon's sight. (*Id.*)

**B.     Events on the Exit Ramp and in the AutoZone Parking Lot**

Route 42 turns into a four-lane divided highway as it approaches Delaware. (Compl. ¶ 39 [ECF No. 2].) An exit ramp to the right leads to William Street. (*Id.*) As Stillwagon came to this portion of Route 42, he kept to the right to take the William Street exit. (*Id.* ¶¶ 40–41.) Mattingly, at this point, was ahead of Stillwagon and driving in the far left lane. (*Id.* ¶ 41.) Mattingly was traveling slowly—10 to 20 miles per hour. (*Id.*) Mattingly had almost passed the William Street exit. (*Id.* ¶ 42.) But when Mattingly noticed that Stillwagon was exiting the highway, he made a sudden right turn, crossing two lanes of traffic to merge onto the ramp. (*Id.*)

When Mattingly got to the bottom of the exit ramp, the traffic light was green. (*Id.* ¶ 43.) Mattingly, however, stopped his truck in the middle of the exit lanes and looked back toward Stillwagon. (*Id.*) The ramp is enclosed to the left by a concrete wall and to the right by a heavily wooded hill and a guardrail. (*Id.* ¶ 44.) Rather than drive past Mattingly, Stillwagon decided to wait on the right side of the exit ramp. (*Id.*)

Seeing that Stillwagon had stopped, Mattingly put his truck in reverse and started backing up. (*Id.* ¶ 45.) Stillwagon "retrieved his pistol and pointed it at the oncoming truck. He did not intend or wish to shoot the driver, only to make the truck stop, so he aimed for an area on the rear of the truck bed by the tailgate latch, to the right of the driver's position. [Stillwagon] fired three times." (*Id.*) Responding to the shots, Mattingly took his truck out of reverse, drove through a red light, and turned right onto William Street. (*Id.*)

After waiting at the light, Stillwagon turned right onto William Street. (*Id.* ¶ 46.) Once again, Mattingly was waiting. (*Id.*) Mattingly was stopped in the right lane of the street. (*Id.*) Stillwagon again attempted to avoid Mattingly. (*Id.* ¶ 47.) Stillwagon began to turn left into an AutoZone parking lot. (*Id.* ¶ 48.)

Mattingly preempted Stillwagon's escape though. Mattingly "turned sharply to the left across William Street, and cut in front of the motorcycle, into the parking lot." (*Id.*) Mattingly started to loop around toward Stillwagon. (*Id.* ¶ 49.) To protect himself from the truck, Stillwagon quickly parked next to a 2-foot high concrete light pole stand near the lot's entrance. (*Id.*) Stillwagon retrieved his pistol and held it visibly in his hand. (*Id.*)

Mattingly finished his loop and drove by Stillwagon and the concrete pillar at a distance of only a few feet. (*Id.* ¶ 50.) The driver's side of the truck was facing Stillwagon. (*Id.*) Stillwagon "had no desire or intention to harm [Mattingly], only to disable the truck," so he "pointed his firearm downward, toward the rear of the truck, [and] fired two rounds, [shooting] out the left rear tire." (*Id.*) Mattingly drove past Stillwagon and back toward William Street. (*Id.* ¶ 51.) "His truck exited the parking lot, turned left, and began to head east down the street." (*Id.*)

But rather than driving away, Mattingly reentered the parking lot and stopped his truck such that it was aimed directly at Stillwagon; there was nothing between Stillwagon and the truck. (*Id.* ¶ 52.) "Then Mattingly revved his engine loudly, pushed the accelerator to the floor and, with his tires squealing, sped across the lot directly toward [Stillwagon]." (*Id.*)

"When the truck got dangerously close, [Stillwagon] fired once." (*Id.* ¶ 53.) "His purpose in firing was only to disable the vehicle, and deter [its driver]." (*Id.*) He "aimed specifically for the lowest portion of the truck engine, as far from the driver as possible." (*Id.*) The truck swerved to the left after being shot. (*Id.*) It came to a stop about ten feet in front of Stillwagon. (*Id.*)

"Mattingly kicked open the driver's door of the truck in an aggressive manner." (*Id.* ¶ 54.) Stillwagon approached from the passenger side and circled around the rear of the truck. (*Id.*) Mattingly was standing by the driver's side door. (*Id.*) "When Mattingly began to turn, [Stillwagon] kicked him once, forcefully, in the left leg. This caused Mattingly to bend over.

6

[Stillwagon] then struck him once on the back of the head with the gun, and pushed Mattingly down to the ground." (*Id.* ¶ 56.) As Stillwagon pressed Mattingly down, with the pistol still in his hand, "he unintentionally squeezed the trigger and the weapon discharged. The shot fired up into the air and away from Mattingly, never touching him at all." (*Id.* ¶ 57.) Mattingly attempted to stand up again, but Stillwagon ordered him to stay on the ground. (*Id.* ¶ 58.) Stillwagon asked bystanders to call the police. (*Id.*) He then set his pistol down on a nearby planter. (*Id.*)

## C.      Stillwagon's Arrest

When the police arrived, Stillwagon waved them over, acknowledged that he had fired the weapon, and indicated that Mattingly had just tried to kill him several times. (Compl. ¶ 58 [ECF No. 2].) Stillwagon pointed out where he had set down his firearm. (*Id.* ¶ 62.) He did everything that the officers instructed him to do. (*Id.* ¶ 63.) "He was handcuffed, led to a cruiser[,] and locked in the back seat." (*Id.*)

While sitting in the cruiser, Stillwagon described for the police the details of what had happened—from his first encounter with Mattingly to the final showdown in the parking lot. (*Id.* ¶¶ 65–66.) "[T]he uniformed Delaware Police on the scene concurred with [Stillwagon's] statements based upon their own observations." (*Id.* ¶ 67.) One officer, referring to Mattingly, noted that "he just looks like he wasn't shot." (*Id.*) Another officer observed that "with the way the shots are, it's almost like [Stillwagon] was just trying to scare [Mattingly]." (*Id.*) Defendants Gerke, Radabaugh, and Willauer were present at the parking lot; Defendant Segaard was not. (*Id.*)[2]

Stillwagon was eventually transported to the Delaware Police Department. (*Id.* ¶ 68.) At the station, Gerke and Segaard interviewed Stillwagon. (*Id.*) Stillwagon once again explained

---

[2] The Court refers to Defendants Gerke, Radabaugh, Willauer, and Segaard collectively as the "Police Defendants."

what had happened from beginning to end. (*Id.* ¶ 69.) Stillwagon "denied any road rage,

retaliatory conduct or other improper action." (*Id.* ¶ 78.) He explained that he only fired his

weapon to protect himself, and that he had intentionally aimed for the truck, not at the driver."

(*Id.* ¶¶ 71, 73–74.) "I was in fear for my life," Stillwagon attested. (*Id.* ¶ 71.) "The detectives

asked explicitly whether [Stillwagon] had intentionally shot, or attempted to shoot, at Mattingly.

[Stillwagon] was equally explicit that he did not, even though he certainly had the opportunity to

do so numerous times." (*Id.* ¶ 76.) The police at the scene were able to confirm Stillwagon's

statements regarding the shots that he fired at the truck. (*Id.* ¶¶ 73–74.) During the interview,

Gerke even "acknowledged receiving a text from the officers at the scene, confirming exactly

what [Stillwagon] had said." (*Id.* ¶ 73.) As to the last shot fired, Stillwagon explained that he had

inadvertently fired his pistol when he was pushing Mattingly to the ground. (*Id.* ¶ 75.)

At the conclusion of the interview, Gerke thanked Stillwagon for his honesty in relating

his account of the incident and answering the detectives' questions. (*Id.* ¶ 76 ("I'm just going to

tell you I appreciate you being honest about it.").)

By the end of the interview, the police already knew several other facts. (*Id.* ¶ 79.)

"[T]hey knew that [Mattingly] had been under the influence of alcohol that day," had a "serious

criminal background," and was currently on parole. (*Id.*) They knew that Stillwagon had no

criminal record. (*Id.*) They knew the location of the shell casings at both the AutoZone parking

lot and the William Street exit ramp. (*See id.* ¶ 100.) They knew the location and close pattern of

the bullet holes on Mattingly's truck. (*See id.* ¶¶ 73, 100.) They knew that Mattingly's head

injury was inconsistent with a gunshot wound. (*See id.* ¶ 67.) They knew that an empty shell

casing was stuck in the chamber of Stillwagon's pistol—indicating that the pistol's slide was in

contact with something when the gun was fired. (*See id.* ¶ 105.) And they had the testimony of

"Mr. Powell," an individual who observed the events in the parking lot beginning with Stillwagon's firing his last shot at Mattingly's truck. (*See id.* ¶¶ 109–110.) From Mr. Powell's perspective, it appeared that Stillwagon "'was shooting the motor, trying to stop the truck.'" (*Id.* ¶ 109.)

That same evening, and potentially before Stillwagon was placed under arrest, the police also obtained the footage from an Eagles Club security camera overlooking the AutoZone parking lot. (*See id.* ¶ 101.) The camera recorded the events in the parking lot, including Mattingly's feigned retreat and final charge toward Stillwagon. (*See id.* ¶¶ 101–102.) During that sequence of events, the footage revealed that Stillwagon had remained stationary by the concrete pillar; he "made no movement to pursue" Mattingly. (*See id.* ¶ 102.) Also, before Stillwagon was arrested, the police found a blue metal baseball bat in Mattingly's truck. (*See id.* ¶ 90.)

After the interview—but before they had left to speak with Mattingly—Gerke and Segaard informed Stillwagon that he was under arrest for crimes that he had allegedly committed against Mattingly. (*Id.* ¶ 80.)[3]

## D.    Stillwagon's Indictment and Trial

According to Stillwagon, the Delaware Police obtained additional information in the days following the arrest that further confirmed his story. A witness—Ms. Reninger—corroborated significant portions of Stillwagon's narrative. (*See* Compl. ¶ 91 [ECF No. 2].) Ms. Reninger informed the police that she was driving northeast on Route 42 on September 30 when a truck came speeding up behind her in the left lane. (*Id.*) To avoid the truck, vehicles in the southbound lane were swerving off the road. (*Id.*) She saw the truck "'swoop in front of the motorcycle' and slam on its brakes, nearly causing the motorcyclist to wreck." (*Id.*) Ms. Reninger stopped to talk with Stillwagon when he pulled off the road to distance himself from Mattingly. (*Id.*) She told

_____

[3] Stillwagon considers this to be the point at which he was falsely arrested. (*See* Compl. ¶¶ 64, 80.)

the police that Stillwagon waited long enough to put many miles between himself and the truck. (*Id.*) She also observed that Stillwagon was "'not enraged'" when he got back on the road. (*Id.*) Several witnesses, including Ms. Reninger, also observed Mattingly's subsequent "ambush." (*See id.* ¶¶ 92–95.) Taken together, those witness statements supported Stillwagon's account of Mattingly hiding near an intersection on Route 42, reemerging onto the highway, passing numerous vehicles, and slamming on his brakes after passing Stillwagon. (*See id.*) The police also obtained additional information regarding Mattingly's purported gunshot wound. Mattingly's injury description from the hospital, for example, indicated that Mattingly had suffered a cut, not a gunshot wound. (*See id.* ¶¶ 105–108.) And from observing Mattingly at the hospital, where he was limping due to "soreness and swelling to his left leg," the police could purportedly deduce that Stillwagon had kicked Mattingly in the parking lot and, thus, had not shot him from a distance (as the police had speculated). (*Id.* ¶ 111.) Lastly, the police eventually admitted that Mattingly's erratic driving on September 30 was not the result of mechanical failings. (*See id.* ¶ 97.)[4] No mechanical problems were ever found on the truck. (*Id.*)

Irrespective of this alleged exculpatory evidence, Stillwagon was indicted by a grand jury and charged with four counts of felonious assault. (*See id.* ¶¶ 113, 155.) To obtain this indictment, the Police Defendants relied heavily on Mattingly's testimony. (*See id.* ¶¶ 123–124, 145–146, 155.) Stillwagon alleges, however, that "[t]he detectives knew immediately upon meeting and speaking with [Mattingly] that he was certainly not a source of reasonably trustworthy information." (*Id.* ¶ 121 ("[The detectives] have since admitted that they doubted [Mattingly's] truthfulness.").) Moreover, Stillwagon alleges that Defendants Gerke and Segaard conspired with Mattingly to "manufactur[e] false testimony that would support the police

---

[4] When Gerke and Segaard interviewed Mattingly on October 1 and 2, 2012, Mattingly attributed his erratic driving to "a long list of alleged mechanical problems." (Compl. ¶ 120.)

narrative" and lead to Stillwagon's indictment. (*Id.* ¶ 133.) Specifically, Gerke and Segaard allegedly pressured Mattingly to fabricate (i) his being shot in the head, (ii) Stillwagon's road rage, and (iii) Stillwagon's status as the aggressor on the exit ramp and in the parking lot. (*See id.* ¶¶ 123–146.)

In addition to manufacturing testimony, the Police Defendants also allegedly destroyed, failed to preserve, and failed to disclose exculpatory evidence. (*Id.* ¶¶ 147–154.) Specifically, the officers purportedly destroyed DNA evidence on Stillwagon's pistol, destroyed drawings and diagrams prepared by Mattingly during his interviews with the police, refused to follow up on an exculpatory witness's phone call to the police, disregarded skid marks from Mattingly's truck on Route 42, failed to have Mattingly's truck examined for mechanical problems, failed to obtain witness and security camera evidence regarding Mattingly's ambush, and neglected to share with Stillwagon reports indicating that Mattingly's head injury was not a gunshot wound. (*See id.*) By ignoring exculpatory evidence and relying only upon evidence that supported their theory, the Police Defendants allegedly "created materially false and misleading documents" to present to the grand jury. (*See id.* ¶ 155.)

Stillwagon's case went to trial on October 1, 2013. (*Id.* ¶ 159.) Finding no evidence in the record that could support a conviction, the trial court dismissed each of the counts brought against Stillwagon and entered a judgment of acquittal pursuant to Ohio Criminal Rule 29. (*Id.* ¶ 160.)

From Stillwagon's perspective, the Municipal Defendants acted with "malice, bias and bad faith" in arresting and prosecuting him. (*Id.* ¶ 156.) In support of this allegation, Stillwagon identifies various pejorative statements that Defendants Segaard and Gerke made as they interviewed Mattingly. (*See id.* ¶¶ 156–158.) They ridiculed Stillwagon's clothing and athletic

accomplishments. (*Id.* ¶¶ 156–157.) They referred to him as "nuts" and "crazy." (*Id.*) And they criticized his standing in the community. (*Id.* ¶ 157.) Additionally, Segaard and the Delaware Chief of Police both made purported false "public statements in the media [declaring Stillwagon's guilt] within the first 24 hours or so of the [September 30 incident]." (*Id.* ¶ 158.) Prompted by the Delaware Police, Mattingly also provided an alleged false statement to the media soon after the incident. (*Id.*)

E.     **The Current Civil Case**

        Stillwagon filed his Complaint in the current case on July 10, 2014. (*See* Compl. at 1 [ECF No. 2].)[5] Stillwagon asserts twelve claims: claims under 42 U.S.C. § 1983 for (1) false arrest; (2) malicious prosecution; (3) due process violations; (4) civil conspiracy; (5) supervisory liability (only against Radabaugh and Willauer); and (6) municipal liability (only against the City of Delaware);[6] as well as claims under Ohio law for (7) malicious prosecution; (8) civil conspiracy; (9) abuse of process (only against Mattingly); (10) defamation (only against Mattingly);[7] (11) assault (only against Mattingly); and (12) spoliation of evidence. (*Id.* ¶¶ 169–180.)[8]

---

[5] On September 18, 2014, Stillwagon filed a related case, *Stillwagon v. Ailes, et al.*, S.D. Ohio Case No. 2:14-cv-1606, which is also currently pending in this Court. The motions presently under review do not deal with the related case.

[6] Stillwagon brings some of his claims against "the defendants" or "all defendants." (*See* Compl. ¶¶ 169–172, 175–176, 180.) Stillwagon has subsequently clarified though that he does not bring § 1983 claims against the City of Delaware under a respondeat superior theory. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 30 [ECF No. 40].) The Court interprets this clarification to mean that Stillwagon does not bring his § 1983 claims for false arrest, malicious prosecution, due process, and civil conspiracy (Claims 1, 2, 3, and 4) against the City.

[7] In his Complaint, Stillwagon noted: "Said acts by the defendants, including Defendant Mattingly constitute defamation under Ohio law." (Compl. ¶ 178.) However, Stillwagon has since clarified that his defamation claim is brought solely against Mattingly. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 38.)

[8] Stillwagon brings his § 1983 civil conspiracy claim (Claim 4) against the Police Defendants and Mattingly. (*See* Compl. ¶ 172; Mem. in Opp'n to Mot. for J. on the Pl'gs at 30.)

        Stillwagon brings his § 1983 claims for false arrest, malicious prosecution, and due process (Claims 1, 2, and 3) against the Police Defendants. (*See* Compl. ¶¶ 169–171; Mem. in Opp'n to Mot. for J. on the Pl'gs at 30.) Defendants Gerke and Segaard allegedly arrested and participated in prosecuting

On July 28, 2015, the Municipal Defendants filed their Motion for Judgment on the Pleadings. (*See* Mot. for J. on the Pl'gs at 42 [ECF No. 29].) Stillwagon submitted a Memorandum in Opposition [ECF No. 40] to the Motion, and the Municipal Defendants filed a Reply [ECF No. 46]. Contending that the Municipal Defendants' Reply improperly introduces new arguments and legal citations, Stillwagon subsequently moved to strike portions of the Reply. (*See* Mot. to Strike at 3–4 [ECF No. 48].)

The Court first considers Stillwagon's Motion to Strike. The Court will then address the Municipal Defendants' Motion for Judgment on the Pleadings.

## II. MOTION TO STRIKE

Stillwagon insists that the Municipal Defendants' Reply in Support of their Motion for Judgment on the Pleadings [ECF No. 46] contains "extensive authority and argument which was not contained in their initial motion, and which is not truly responsive" to the arguments raised in Stillwagon's Memorandum in Opposition [ECF No. 40]. (*See* Mot. to Strike at 2 [ECF No. 48].) The Municipal Defendants, for example, purportedly offer new arguments when they contend that Stillwagon feloniously assaulted Mattingly by pistol whipping him (rather than shooting or attempting to shoot him) and when they assert that Stillwagon's statements to the arresting officers tracked the elements of Ohio's felonious assault statute. (*See id.* at 5–6.) To remedy this situation, Stillwagon requests (1) that the Court disregard "the non-rebuttal authorities and

---

Stillwagon without probable cause. (*See* Compl. ¶¶ 68, 80, 126, 145–146, 155, 169.) Defendants Radabaugh and Willauer purportedly had a "direct personal participation in the constitutional violations." (*Id.* ¶ 173.) Moreover, they are allegedly liable as Gerke and Segaard's supervisors. (*Id.*) Stillwagon presents this supervisory liability as a separate claim (Claim 5). (*Id.*) It is uncertain whether Stillwagon brings his § 1983 claims for false arrest, malicious prosecution, and due process (Claims 1, 2, and 3) against Mattingly. Stillwagon specifically identified Mattingly as a defendant to the § 1983 civil conspiracy claim. (*Id.* ¶ 172.) But Stillwagon did not do the same with respect to these other § 1983 claims. (*See id.* ¶¶ 169–171.)

     Stillwagon appears to bring his Ohio law claims for malicious prosecution, civil conspiracy, and spoliation of evidence (Claims 7, 8, and 12) against all of the defendants (i.e., the City of Delaware, the Police Defendants, and Mattingly). (*See id.* ¶¶ 175–176, 180.)

13

arguments" contained in the Reply and (2) that the Court "strike those matters which are raised

for the first time [in the Reply], and those which do not strictly address the issue of the Plaintiff's

pleading itself." (*Id.* at 6–7.) Stillwagon's requests are not well taken.

Stillwagon presumably moves to strike under Federal Rule of Civil Procedure 12(f). (*See

generally* Mot. to Strike.) Rule 12(f), however, does not authorize the Court to strike arguments

made in a brief. *Nelson v. Clermont Cnty. Veterans Serv. Comm'n*, No. 1:11-cv-335, 2013 WL

5934393, at *5 (S.D. Ohio Nov. 1, 2013) ("Fed. R. Civ. P. 12(f), which governs motions to

strike, authorizes the Court to strike 'any redundant, immaterial, impertinent, or scandalous

matter' from a pleading, but does not authorize the Court to strike from the record affidavits or

statements made in a brief."); *see also Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 599 (S.D.

Ohio 2003) (emphasizing that Rule 12(f) only permits courts to strike material from *pleadings*).

The Court can disregard arguments that are made for the first time in a reply brief. *See

Baker v. Union Twp., Ohio*, No. 1:12-cv-112, 2013 WL 4502736, at *13 (S.D. Ohio Aug. 22,

2013) ("An issue raised for the first time in a reply brief has not been fully briefed, and thus, is

not appropriate for decision."); *see also Nelson*, 2013 WL 5934393, at *5 (noting, in response to

a motion to strike, that the more accurate "issue is whether the Court should *disregard*, rather

than *strike*" the challenged material). But here the Municipal Defendants properly limited their

Reply to rebuttal arguments. In his Memorandum in Opposition to the Motion for Judgment on

the Pleadings, Stillwagon assumes that he could only have committed a felonious assault by

shooting or attempting to shoot Mattingly. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 15–16

[ECF No. 40].) To rebut this argument, the Municipal Defendants assert that Stillwagon could

have feloniously assaulted Mattingly by hitting him on the head with a pistol. (Reply in Supp. of

Mot. for J. on the Pl'gs at 8–13 [ECF No. 46].)

Continuing this rebuttal, the Municipal Defendants analyzed why Stillwagon might be guilty of felonious assault for pistol whipping Mattingly. (*See id.*) The Municipal Defendants noted that Stillwagon's admissions to the arresting officers tracked the elements of Ohio's felonious assault statute. (*See id.* at 8–9.) The Municipal Defendants then cited a Sixth Circuit decision: "'when the facts known to the officer **track the elements of an offense**, we routinely grant qualified immunity on false-arrest claims even when the suspect asserts, or circumstances suggest, an applicable affirmative defense.'" (*Id.* at 9 (quoting *Harvey v. Carr*, 616 F. App'x 826, 829 (6th Cir. 2015))). Stillwagon insinuates that this citation constitutes a new argument—an assertion of a qualified immunity defense. (*See* Mot. to Strike at 6.) The Court disagrees. The Municipal Defendants only use the phrase "qualified immunity" when quoting *Harvey*. (Reply in Supp. of Mot. for J. on the Pl'gs at 9, 15.) And nowhere in their Reply do the Municipal Defendants affirmatively assert a qualified immunity defense. (*See generally id.*)[9]

The Municipal Defendants cite new authorities in support of these rebuttal arguments. *See Bishop v. Children's Ctr. For Developmental Enrichment*, No. 2:08-cv-766, 2011 WL 5506105, at *2 (S.D. Ohio Nov. 10, 2011) ("While it is true that in their reply memorandum Defendants relied upon several cases to which they had not previously cited, those cases were in support of arguments that had been previously made."). Simply citing new "case law does not amount to the raising of new arguments." *Keith v. Aerus, LLC*, No. 2:09-cv-297, 2010 WL 3883434, at *3 (E.D. Tenn. 2010 Sept. 29, 2010). Accordingly, Stillwagon's Motion to Strike [ECF No. 48] is denied.

---

[9] If the Municipal Defendants' citations actually do represent an attempt to assert a qualified immunity defense, the Court disregards the defense as improperly asserted for the first time in a reply brief. *See Baker*, 2013 WL 4502736, at *13.

## III. MOTION FOR JUDGMENT ON THE PLEADINGS

A court reviews a motion for judgment on the pleadings, brought under Federal Rule of Civil Procedure 12(c), in the same manner as a court would review a motion brought under Federal Rule 12(b)(6). *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006). Rule 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted. Generally, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Natural Res. Conservation Serv.*, No. 2:12-cv-299, 2013 WL 4517825, at *3 (S.D. Ohio Aug. 26, 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.* Federal Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To meet this standard, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). When considering a Rule 12(c) or 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).

### A.   Timeliness of the Motion

Before addressing the merits of the Municipal Defendants' Motion for Judgment on the Pleadings, the Court will first consider Stillwagon's assertion that the Motion is untimely.

16

Stillwagon initiated this case in July 2014. Since then, "the parties have engaged in extensive and wide-ranging discovery." (Mem. in Opp'n to Mot. for J. on the Pl'gs at 8–9 [ECF No. 40].) The Municipal Defendants waited over a year (until July 2015) before moving for judgment on the pleadings. (*Id.* at 9.) Stillwagon questions the utility of testing "the sufficiency of the pleadings" under Rule 12(c) when the parties, through extensive discovery, have already begun developing the facts that support those pleadings. (*Id.* at 11.) Given the amount of discovery that already took place prior to the Municipal Defendants filing their Motion, and the potential delay to the trial schedule that the Motion could cause, Stillwagon insists that the Court should deny the Motion for untimeliness. (*Id.* at 12.)

From the Municipal Defendants' perspective, Rule 12(c)'s lack of a specific time limit resolves the issue. (*See* Reply in Supp. of Mot. for J. on the Pl'gs at 2 [ECF No. 46].) Rule 12(c) states that a party may bring a motion for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The Municipal Defendants note that they filed their Motion "well before the dispositive motion deadline of April 15, 2016" and that "no trial date has yet been set in this case." (Reply in Supp. of Mot. for J. on the Pl'gs at 3 (emphasis deleted).) As such, they argue, the Motion will not delay trial. (*Id.*) Finally, the Municipal Defendants contend that Stillwagon "cannot demonstrate that he would be prejudiced by the Court's consideration of the [Motion]." (*Id.*) Without a showing of prejudice or delay to the trial date, Stillwagon's assertion of untimeliness purportedly fails.

The Court does not consider the Motion to be untimely. As the Municipal Defendants correctly observe, Rule 12(c) allows a party to move for judgment on the pleadings at any point after the pleadings are closed, provided that the motion does not delay trial. Fed. R. Civ. P. 12(c).

17

And here, the Motion will not delay trial. The Municipal Defendants filed their Motion considerably in advance of even the dispositive motion deadline.

Stillwagon's timeliness objection appears to stem partly out of his concern that the Court might dismiss a claim on the pleadings even though subsequent discovery has uncovered additional facts to bolster the claim. (*See* Mem. in Opp'n to Mot. for J. on the Pl'gs at 11 (citing *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324–26 (2d Cir. 2011).) The Court can, however, consider the Motion for Judgment on the Pleadings and allay Stillwagon's concerns by permitting Stillwagon to amend any claims that he has inadequately pleaded. The Court will address the possibility of amendment on a claim by claim basis.[10]

## B.  Federal Law Claims

Stillwagon brings several claims under § 1983: false arrest; malicious prosecution; due process violations; civil conspiracy; supervisory liability; and municipal liability (Claims 1 through 6).

### 1.  *False Arrest*

The Municipal Defendants move for judgment on the pleadings on Stillwagon's § 1983 false arrest claim (Claim 1), arguing that the arresting officers had probable cause to arrest Stillwagon and that Stillwagon's Complaint, even if accepted as true, fails to plausibly allege a lack of probable cause. The Court, however, disagrees with this assessment. Stillwagon's Complaint states a plausible allegation that Stillwagon was arrested without probable cause.

To prevail on a claim brought under § 1983, a plaintiff must prove (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the

---

[10] Stillwagon has requested that the Court consider the possibility of amendment as an alternative to dismissing his municipal liability and spoliation of evidence claims. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 35–37, 39.) The Municipal Defendants did not address Stillwagon's request in their Reply. (*See generally* Reply in Supp. of Mot. for J. on the Pl'gs.)

deprivation was caused by a person acting under color of law. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). A false arrest claim implicates "the Fourth Amendment right to be arrested only upon probable cause." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579–80 (6th Cir. 2003). Prevailing on a § 1983 false arrest claim thus "'requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005)).

Probable cause exists when the police have "'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gardenire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "No overly burdensome duty to investigate applies to officers faced with the prospect of a warrantless arrest." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007). Nonetheless, "[p]robable cause determinations involve an examination of all [the] facts and circumstances within an officer's knowledge at the time of an arrest." *Gardenhire*, 205 F.3d at 315. That is, "the initial probable cause determination must be founded on 'both the inculpatory *and* exculpatory evidence' known to the arresting officer." *Logsdon*, 492 F.3d at 341 (quoting *Gardenhire*, 205 F.3d at 318). An officer "cannot simply turn a blind eye toward potentially exculpatory evidence." *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999). With respect to affirmative defenses, "where a reasonable police officer would conclusively know that [a suspect's] behavior is protected by a legally cognizable affirmative defense, that officer lacks a legal foundation to arrest that person for that behavior." *Painter v. Robertson*, 185 F.3d 557, 571 & n.21 (6th Cir. 1999) ("[A] peace officer, in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an

19

affirmative legal justification for his suspected criminal actions."). "[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

As a general rule, when a plaintiff is arrested pursuant to a grand jury indictment, "'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause.'" *Webb*, 789 F.3d at 660 (quoting *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006)); *see Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 n.13 (6th Cir. 2005). "An exception to this general rule applies when defendants knowingly or recklessly present false testimony to the grand jury to obtain the indictment." *Webb*, 789 F.3d at 660 (citing *Martin v. Maurer*, 581 F. App'x 509, 511 (6th Cir. 2014)). Additionally, when a plaintiff is arrested and *subsequently* indicted by a grand jury, the indictment does not conclusively establish probable cause for the earlier arrest. *Radvansky*, 395 F.3d at 307 n.13; *Caudill v. Owen*, No. 1:02-cv-663, 2005 WL 2654228, at *6 (S.D. Ohio Oct. 17, 2005).

### a.    The Grand Jury Indictment

Here, Stillwagon was indicted by a grand jury after he was arrested. (*See* Compl. [ECF No. 2] ¶¶ 145–146, 155.) The Municipal Defendants argue that this indictment—regardless of the fact that it occurred after the arrest—conclusively establishes that the police had probable cause to arrest Stillwagon. (Mot. for J. on the Pl'gs at 6 [ECF No. 29].) The Municipal Defendants imply that the Sixth Circuit's holding in *Davis v. McKinney*, 422 F. App'x 442, 443 (6th Cir. 2011), overruled that court's prior statements regarding subsequent grand jury indictments as articulated in *Radvansky*, 395 F.3d at 307 n.13. (*See* Reply in Supp. of Mot. for J. on the Pl'gs at 6 [ECF No. 46].) The Municipal Defendants are mistaken.

20

In *McKinney*, a three-judge panel of the Sixth Circuit recited the general rule that "the issuance of an indictment by a grand jury conclusively determines the existence of probable cause." 422 F. App'x at 443. *McKinney* involved federal and state law claims for malicious prosecution. *Id.* at 442. By contrast, the relevant language from *Radvansky* discussed the implications of a grand jury indictment on a *false arrest* claim. *Radvansky*, 395 F.3d at 307 n.13. Like many plaintiffs alleging malicious prosecution, the plaintiff in *McKinney* was indicted by a grand jury before the alleged malicious prosecution commenced. *See McKinney*, 422 F. App'x at 442–43. Given that *McKinney* did not involve a false arrest claim, the court in *McKinney* did not consider the implications of a grand jury indictment made subsequent to the plaintiff's arrest. *See id. McKinney* does not contradict *Radvansky*. But even if the two cases conflicted, *McKinney* could not overrule *Radvansky*. "[A]bsent an intervening Supreme Court decision or a change in the applicable law," published Sixth Circuit precedent can only be overruled through an en banc decision. *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004). *McKinney* is not an en banc decision.

The Municipal Defendants also cite *Moore v. Pielech*, No. 2:10-cv-453, 2012 WL 4482991, at *4–6 (S.D. Ohio Sept. 27, 2012), for the proposition that the subsequent grand jury indictment in this case conclusively establishes that the police had probable cause to arrest Stillwagon. (*See* Reply in Supp. of Mot. for J. on the Pl'gs at 4–5.) But like *McKinney*, *Moore* did not address the effect of a grand jury indictment made subsequent to a plaintiff's arrest. *See Moore*, 2012 WL 4482991, at *4–6. In *Moore*, the court considered a malicious prosecution claim, not a claim for false arrest. *Id.*

### b.    Conclusive Knowledge of Self-Defense

Irrespective of the grand jury indictment, the Municipal Defendants still insist that the

Court should dismiss Stillwagon's § 1983 false arrest claim. The Municipal Defendants argue that "the only reasonable determination possible at the time of the Plaintiff's arrest, based upon the pleadings, was that there was probable cause to arrest him for felonious assault, in violation of [O.R.C.] § 2903.11." (Reply in Supp. of Mot. for J. on the Pl'gs at 8 (emphasis removed).)[11] An individual violates § 2903.11 if he knowingly "[c]ause[s] or attempt[s] to cause physical harm to another or another's unborn by means of a deadly weapon or dangerous ordinance." O.R.C. § 2903.11(A)(2). In his Complaint, Stillwagon purportedly admits to conduct that violates that statute. (*See* Reply in Supp. of Mot. for J. on the Pl'gs at 13.)

As to Stillwagon's claim of self-defense, the Municipal Defendants contend that the arresting officers were "under no obligation to give any credence" to Stillwagon's story, (*id.* (emphasis deleted) (quoting *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988))), because the arresting officers did not "conclusively know" that Stillwagon acted in self-defense, (*id.* at 15 (emphasis deleted) (quoting *Harvey v. Carr*, 616 F. App'x 826, 829 (6th Cir. 2015))). Stillwagon purportedly fails to even allege that the arresting officers "conclusively knew" that he acted in self-defense. (*Id.* at 16.) "The Plaintiff merely alleged that '[i]f the Plaintiff's statements were true, then there was no basis to charge him with any crime.'" (*Id.* (quoting Compl. ¶ 78).)

Stillwagon responds by outlining the exculpatory evidence known to the police at the time of his arrest. Stillwagon's statements to the police, along with all of the "independent facts and circumstances known to the [police] at the time [of arrest,] overwhelmingly confirmed that [Stillwagon's] conduct was justifiable and lawful rather than criminal." (Mem. in Opp'n to Mot. for J. on the Pl'gs at 38 [ECF No. 40].) The police officers' knowledge of this exculpatory

---

[11] "'Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law.'" *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

22

information at the time of arrest purportedly creates a plausible allegation that the police lacked probable cause to arrest Stillwagon. (*See id.* at 16–18.)

As an initial matter, the Court agrees with the Municipal Defendants that Stillwagon's statements to the arresting officers—setting aside any consideration of Stillwagon's self-defense claim—would have established probable cause to arrest him for felonious assault. Stillwagon admitted to the arresting officers that he hit Mattingly in the back of the head with a gun. (Compl. ¶ 75.) This admission constituted reasonably trustworthy information sufficient to warrant a prudent person in believing that Stillwagon had feloniously assaulted Mattingly. *See State v. Horne*, 8th Dist. Cuyahoga No. 91797, 2009-Ohio-4199, ¶¶ 23–24, 29 (affirming a conviction for felonious assault where the victim was struck on the head with a gun).

An officer, however, cannot completely disregard an assertion of self-defense when determining whether probable cause exists to make an arrest. *See Painter*, 185 F.3d 557, 571 & n.21. "[W]here a reasonable police officer would conclusively know that [a suspect's] behavior is protected by a legally cognizable affirmative defense," that officer lacks probable cause to arrest the suspect. *Id.* at 571 n.21. Thus, the Court will deny the Municipal Defendants' Motion as to the false arrest claim if, based on the factual allegations contained in Stillwagon's Complaint, the Court can plausibly infer that the arresting officers conclusively knew that Stillwagon's behavior constituted self-defense. *See Iqbal*, 556 U.S. at 678; *Lewis v. Taylor*, No. 1:10-cv-00108, 2010 WL 3785109, at *3 (S.D. Ohio Sept. 21, 2010) (determining that the plaintiff set forth sufficient factual allegations in his complaint from which the court could plausibly infer a valid claim for relief).

Prior to his arrest, Stillwagon allegedly explained to the arresting officers all of the events leading to the confrontations on the exit ramp and in the parking lot. (*See* Compl. ¶¶ 65–78 [ECF

No. 2].) Stillwagon informed the arresting officers of Mattingly's erratic driving, Mattingly's

cut-in maneuvers, Mattingly's brake checks, Mattingly's attempt to back his truck into

Stillwagon on the exit ramp, Mattingly's circling and head-on charge in the parking lot, and

Mattingly's possession of a baseball bat. (*See id.*) Stillwagon informed the arresting officers that

he had acted in self-defense and out of fear for his life. (*See id.* ¶¶ 66, 71.) He denied shooting

Mattingly. (*Id.* ¶¶ 66, 75–76.) At the time of arrest, the officers also knew that Mattingly had

been under the influence of alcohol that day, that Mattingly had a "serious criminal background,"

that Stillwagon had no criminal record, that Stillwagon had fired his pistol from the middle of the

exit ramp and from a position adjacent to a concrete pillar in the parking lot, that Stillwagon had

shot the truck in areas far from where Mattingly was seated, that Mr. Powell had interpreted

Stillwagon's last shot at the truck as an attempt to hit the engine and disable the vehicle, that

Mattingly's head injury was inconsistent with a gunshot wound, and that an empty shell casing

was stuck in the chamber of Stillwagon's pistol—suggesting that the pistol's slide was in contact

with Mattingly's head when the gun was fired. (*See id.* ¶¶ 67, 73–74, 79, 98, 100, 105, 109–110.)

Additionally, prior to arrest, the officers might have retrieved a blue metal baseball bat

from Mattingly's truck and viewed footage from the Eagles Club security camera prior to

arresting Stillwagon. (*See id.* ¶¶ 90, 101.) Stillwagon does not explicitly allege that the officers

discovered these two pieces of evidence prior to his arrest, which is significant. (*See id.*) The

Complaint's timeline, however, suggests that the officers may have uncovered this evidence

prior to the arrest. (*See id.*)[12] Given that the Court must construe the Complaint in the light most

---

[12] While Stillwagon was providing his second statement at the police station, Defendant Gerke was receiving text messages from officers inspecting Mattingly's truck. (Compl. ¶ 73.) During that inspection, the police may have found the blue metal bat. And with respect to the security camera footage, Stillwagon alleges that "[t]he Delaware Police had obtained a copy of [the] 'Eagles video' on the same evening of the incident." (*Id.* ¶ 101.) Stillwagon spent several hours at the Delaware Police Station on September 30, 2012. (*Id.* ¶ 68.) During that time, the arresting officers could have viewed the security camera footage.

favorable to Plaintiff for purposes of a motion for judgment on the pleadings, the Court will assume that the arresting officers discovered the bat and viewed the security camera footage prior to arresting Stillwagon.

Accepting Stillwagon's allegations as true, and viewing those allegations in the most favorable light, the Court can plausibly infer that the arresting officers conclusively knew that Stillwagon had acted in self-defense.

To establish a claim of self-defense under Ohio law, the accused must prove by a preponderance of the evidence that (1) he was not at fault in creating the violent situation, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that he did not violate any duty to retreat or avoid the danger. *State v. Parks*, 10th Dist. Franklin No. 11AP-98, 2011-Ohio-4056, ¶ 19. Self-defense also involves a proportionality requirement: the accused "'is privileged to use only that force that is reasonably necessary to repel the attack.'" *In re C.L.*, 197 Ohio App. 3d 514, 2011-Ohio-6892, ¶ 24 (4th Dist.) (quoting *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 23). Clarifying the second element of a self-defense claim, the Ohio Supreme Court has explained that courts analyzing an accused's fear of imminent harm must apply a combined subjective and objective test. *State v. Thomas*, 77 Ohio St. 3d 323, 326, 673 N.E.2d 1339 (1997). "The person's belief must be objectively reasonable under the circumstances, and he must subjectively believe he needed to resort to force to defend himself." *In re C.L.*, 2011-Ohio-6892, ¶ 23.

Based on Stillwagon's detailed explanation of the incident and the Eagles Club security camera footage, the arresting officers could have conclusively known that Stillwagon was not at fault in creating the confrontation with Mattingly. (*See* Compl. ¶¶ 65–66, 69, 101–102.)

25

Stillwagon described Mattingly's numerous unprovoked attacks. (*See id.* ¶¶ 65–66, 69.) He described several instances in which he attempted to distance himself from Mattingly. (*See id.*) And he described his attempt to shelter himself near a concrete pillar in the parking lot. (*See id.*) The security camera recorded Stillwagon's attempt to take shelter in the parking lot. (*See id.* ¶¶ 101–102.) Moreover, Stillwagon specifically "denied any road rage, retaliatory conduct or other improper action." (*Id.* ¶¶ 66, 78.) The bullet hole patterns on Mattingly's truck and the location of the shell casings reinforced this assertion. The casings were discovered in defensive positions: toward the middle of the exit ramp and next to a concrete pillar in the parking lot. (*See id.* ¶ 100.) The bullet holes found on Mattingly's truck also evidenced defensive action: Stillwagon was attempting to disable the vehicle rather than injure its driver. (*See id.* ¶¶ 73, 100.)

Based on much of the same information, the arresting officers could have also conclusively known that Stillwagon had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. Stillwagon informed the officers that he was afraid for his life and that Mattingly had nearly killed him multiple times. (*Id.* ¶¶ 58, 65–66, 69–71, 74.) The security camera footage supported those statements, as it revealed Mattingly's maneuvers in the parking lot, Mattingly's feigned retreat from the parking lot, and Mattingly's final charge toward Stillwagon. (*See id.* ¶¶ 101–102.) The presence of a baseball bat in Mattingly's truck bolsters the conclusion that Stillwagon's fear for his life was objectively reasonable. (*See id.* ¶ 90.) Wielding a baseball bat, Mattingly could have seriously injured or killed Stillwagon even after the truck was disabled.

The arresting officers could have conclusively known that Stillwagon did not violate any duty to retreat or avoid the danger posed by Mattingly. In his statements to the arresting officers, Stillwagon described his multiple efforts to distance himself from Mattingly while on

26

Route 42, his attempt to distance himself from Mattingly on the exit ramp, and his attempt to shelter himself from Mattingly in the parking lot. (*See id.* ¶¶ 65–66, 69.) And again, the shell casings reinforced this conclusion. The shell casings were found toward the middle of the exit ramp and adjacent to a concrete pillar in the parking lot—positions from which retreat was unlikely or improbable. (*See id.* ¶ 100.) The exit ramp was bounded to the left by a concrete wall and to the right by a heavily wooded hill and a guardrail. (*Id.* ¶ 44.) And in the parking lot, Stillwagon had no time or opportunity to retreat beyond the concrete pillar. As described by Stillwagon and recorded by the security camera, Mattingly entered the parking lot immediately before Stillwagon and promptly began looping the truck around toward the pillar. (*See id.* ¶¶ 48–50, 101–102.)

Finally, the arresting officers could have conclusively known that Stillwagon used only the amount of force reasonably necessary to repel Mattingly's attacks. As an initial matter, the officers could have conclusively known that Stillwagon did not shoot Mattingly in the head based on the appearance of the wound, the presence of an empty shell casing in the chamber of Stillwagon's pistol, and Stillwagon's assertion that he never shot Mattingly. (*See id.* ¶¶ 67, 75–76, 105.) With respect to the shots that Stillwagon fired at the truck, the officers could have also conclusively known that Stillwagon used only the amount of force reasonably necessary. Stillwagon informed the officers that he purposefully avoided shooting at Mattingly when he shot the truck. (*See id.* ¶¶ 71, 73–74, 76.) The physical evidence once again supported this assertion. Stillwagon shot the truck's tire and engine—to presumably disable the vehicle rather than harm Mattingly. (*See id.* ¶¶ 67, 71, 73–74.) And when Stillwagon shot at the truck bed, he aimed at a location far from Mattingly's seat in the cab and he did so while trapped in the middle of an exit ramp. (*See id.*) Lastly, the officers could have conclusively known that Stillwagon used

a proportionate amount of force in kicking and pistol whipping Mattingly. Stillwagon told the officers that Mattingly had just tried to kill him and that he feared for his life. (*Id.* ¶¶ 58, 65–66, 69–71, 74.) The officers could have known that this fear was reasonable given that Mattingly had brandished a baseball bat earlier in the encounter (evidenced by the bat found in Mattingly's truck) and that Mattingly had just attempted to ram Stillwagon with a truck (evidenced by Mr. Powell's statement and the security camera footage). (*See id.* ¶¶ 90, 101–102.)

In sum, Stillwagon states sufficient factual allegations to overcome the Municipal Defendants' Motion for Judgment on the Pleadings as to the § 1983 false arrest claim. The Court emphasizes that the conclusions reached herein are based upon the pleadings only and not a review of testimony or exhibits, as the motion at issue tests only the Complaint. From reading the Complaint, the Court can plausibly infer that the officers conclusively knew at the time of arrest that Stillwagon's behavior constituted self-defense. Consequently, Stillwagon has plausibly alleged that he was arrested without probable cause.

### 2.    *Malicious Prosecution*

The Municipal Defendants also move for judgment on the pleadings on Stillwagon's § 1983 malicious prosecution claim (Claim 2) against the Police Defendants. To succeed on a malicious prosecution claim under § 1983, a plaintiff must prove that "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Webb*, 789 F.3d at 659 (citing *Sykes*, 625 F.3d at 308–09).

According to the Municipal Defendants, Stillwagon was prosecuted based upon probable cause and an indictment issued by the Delaware County Grand Jury. (Mot. for J. on the Pl'gs at 8

28

[ECF No. 29].) As the Municipal Defendants point out, "'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause' for purposes of a § 1983 claim." (*Id.* at 7–8 (emphasis deleted) (quoting *Barnes*, 449 F.3d at 715–16).) Stillwagon counters by highlighting the primary exception to the grand jury rule: a grand jury indictment does not conclusively determine the existence of probable cause "when defendants knowingly or recklessly present false testimony to the grand jury to obtain the indictment." *Webb*, 789 F.3d at 660. The Complaint, Stillwagon insists, contains plausible allegations that Mattingly and the Police Defendants presented false testimony to the grand jury and that the Police Defendants lacked probable cause to prosecute Stillwagon. (*See* Mem. in Opp'n to Mot. for J. on the Pl'gs at 20–22 [ECF No. 40].) The Court agrees with Stillwagon.

    As discussed in the previous section, Stillwagon alleges sufficient facts for the Court to plausibly infer that he was *arrested* without probable cause. However, when determining the existence of probable cause with respect to a malicious prosecution claim, courts in the Sixth Circuit "must consider not only whether probable cause existed to arrest the [plaintiff] but also whether probable cause existed to initiate the criminal proceeding against the [plaintiff]." *Sykes*, 625 F.3d at 310–11 (citing *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)). That is, the Court considers not only the information that the Police Defendants knew at the time of arrest but also the information that they knew when they prosecuted Stillwagon.

    In the days following Stillwagon's arrest, prior to trial and likely before the grand jury indictment, Stillwagon alleges that the Delaware Police obtained additional information bolstering his self-defense claim and thus undermining the existence of probable cause to prosecute him. Ms. Reninger corroborated significant portions of Stillwagon's self-defense narrative. (Compl. ¶ 91 [ECF No. 2].) Other witnesses corroborated Stillwagon's account of

Mattingly's ambush. (*See id.* ¶¶ 92–95.) The police admitted that Mattingly's erratic driving was not the result of mechanical failings. (*See id.* ¶ 97.) And the police obtained more information about Mattingly's injuries—information allegedly further disproving the theory that Stillwagon shot Mattingly. (*See id.* ¶¶ 108, 111.) The hospital records revealed that Mattingly had a cut rather than a gunshot wound on his head. (*Id.* ¶ 108.) And Mattingly had a sore leg when Defendants Gerke and Segaard interviewed him on October 1 and 2, potentially demonstrating that Mattingly was kicked at a close range, not shot from a distance. (*See id.* ¶ 111.)

In the absence of a grand jury indictment, Stillwagon's assertions would amount to a plausible allegation that the Police Defendants lacked probable cause to prosecute him. Because he was indicted by a grand jury, however, Stillwagon must overcome a presumption that the Police Defendants had probable cause to prosecute him. To overcome this presumption, Stillwagon must state a plausible allegation that the Police Defendants knowingly or recklessly presented false testimony to the grand jury to obtain his indictment. *See Webb*, 789 F.3d at 660.

Stillwagon devotes an entire subsection of his Complaint to the Police Defendants' efforts at manufacturing false testimony for the grand jury. (*See* Compl. ¶¶ 120–146.) The Police Defendants allegedly presented Mattingly's false testimony to the grand jury and then used this false testimony to create "materially false and misleading documents" for the grand jury's review. (*See id.* ¶ 155.) As alleged by Stillwagon, Mattingly initially provided Gerke and Segaard with an unbelievable story of Stillwagon "being infuriated at him for no reason, and about his truck having a long list of alleged mechanical problems which made it slow down uncontrollably at times, speed up uncontrollably at other times, and at other times it would stall, or the steering would pull the truck sideways." (*Id.* ¶ 120.) In that initial narrative, Mattingly never claimed to have been shot; "he said that [Stillwagon] was coming at his truck 'shooting

into the passenger side' and yelling, and then 'that's all I remember.'" (*Id.*) According to Stillwagon, Gerke and Segaard doubted Mattingly's truthfulness; they "knew immediately upon meeting and speaking with [Mattingly] that he was certainly not a source of reasonably trustworthy information." (*See id.* ¶ 121.) Nonetheless, to further Stillwagon's prosecution, Gerke and Segaard allegedly pressured Mattingly to further falsify his story. At Gerke and Segaard's insistence, Mattingly purportedly invented (i) his being shot in the head, (ii) Stillwagon's road rage, and (iii) Stillwagon's status as the aggressor on the exit ramp and in the parking lot. (*See id.* ¶¶ 123–146.)

These assertions, if accepted as true, establish a plausible allegation that the Police Defendants knowingly or recklessly presented false testimony to the grand jury to obtain Stillwagon's indictment. The Police Defendants purportedly knew, or were at least reckless to the possibility, that Mattingly had falsified key elements of his testimony. (*See id.* ¶¶ 120–146, 155.) Nonetheless, the Police Defendants still presented Mattingly's testimony to the grand jury. (*See id.* ¶¶ 145–146, 155.) Stillwagon can thus overcome the presumption of probable cause created by the grand jury indictment. His § 1983 malicious prosecution claim survives judgment on the pleadings.

### 3.    *Fourteenth Amendment Due Process*

Stillwagon asserts a claim under the Due Process Clause of the Fourteenth Amendment (Claim 3). The Police Defendants allegedly violated Stillwagon's procedural and substantive due process rights by

> manufacturing and fabricating evidence, [knowingly using] false or fabricated
> evidence, coercing false testimony, knowingly creating false and materially
> misleading reports and other official documents used to support a prosecution,
> suppressing and destroying exculpatory evidence, [deliberately omitting] material
> evidence, failing to gather or preserve known exculpatory evidence, engaging in
> improper investigatory techniques so coercive and abusive that they would be

> known to yield unreliable and false information, providing details and information
> to a witness to bolster false testimony, and [undertaking] other similar actions.

(Compl. ¶ 171 [ECF No. 2].) Stillwagon admits that he cannot assert a *Brady* claim (e.g., a claim

premised on the Police Defendants' failure to disclose exculpatory evidence) given that he was

acquitted at trial. (*See* Mem. in Opp'n to Mot. for J. on the Pl'gs at 22 [ECF No. 40].) Stillwagon

insists, however, that the other activities engaged in by the Police Defendants (the "non-*Brady*

acts") form the basis of a Fourteenth Amendment due process claim. (*See id.* at 24.) Citing

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), Stillwagon contends that the Sixth

Circuit has "recognized distinct due process violations for 'fabricating evidence[,]' 'destruction

of evidence[,]' and 'failure to preserve evidence.'" (Mem. in Opp'n to Mot. for J. on the Pl'gs at

25.)

The Municipal Defendants request the dismissal of Stillwagon's due process claim. They

argue that in the criminal context, "the Due Process Clause of the Fourteenth Amendment does

not require any additional procedures beyond those mandated by the Fourth Amendment." (Mot.

for J. on the Pl'gs at 11–12 [ECF No. 29].) In any event, Stillwagon received the due process to

which he was entitled, the Municipal Defendants assert. (*See id.* at 12–13.)[13]

The Municipal Defendants have the better of this argument: Stillwagon's due process

claim fails. To begin, the Court disagrees with Stillwagon's interpretation of *Moldowan*. In

*Moldowan*, the Sixth Circuit recognized that the "constitutional concerns underlying *Brady* reach

more broadly to preclude other governmental 'authorities' from making a 'calculated effort to

circumvent the disclosure requirements established by *Brady* . . . and its progeny.'" *Moldowan*,

578 F.3d at 379. As the *Moldowan* court noted while discussing the plaintiff's *Brady* claims, the

---

[13] Stillwagon contends that "the Motion for Judgment on the Pleadings does not address or challenge the
legal viability of [the] non-*Brady* violations." (Mem. in Opp'n to Mot. for J. on the Pl'gs at 25.) The
arguments described above belie Stillwagon's assertion. (*See* Mot. for J. on the Pl'gs at 11–13.)

government's *Brady* obligations encompass a requirement that the police preserve exculpatory evidence. *See id.* at 380–81. Later, the *Moldowan* court discussed the plaintiff's allegation that one of the defendants violated his constitutional rights by destroying evidence. *See id.* at 391–92. The court, however, never explicitly recognized destruction of evidence as a distinct constitutional claim under the Fourteenth Amendment. *See id.* Instead, the court referred readers to its earlier discussion regarding the government's obligation under *Brady* to preserve exculpatory evidence. *See id.* The *Moldowan* court also discussed the plaintiff's allegation that one of the defendants violated the plaintiff's constitutional rights by fabricating evidence. *See id.* at 396–97. The court did not recognize fabrication of evidence as a distinct constitutional claim under the Fourteenth Amendment. *See id.* Rather, the court declined to actually determine whether the plaintiff had stated a claim. *Id.* at 397.

As this analysis illustrates, if fabricating, destroying, or failing to preserve evidence constitutes a due process violation, the violation is likely remedied through a *Brady* claim. *See id.* at 379–81, 391–92, 396–97. The Court does not interpret *Moldowan* as establishing new, stand-alone due process claims for fabricating evidence, destroying evidence, or failing to preserve evidence. *See id.* Rather, the Court interprets *Moldowan* as a clarification from the Sixth Circuit that *Brady* claims "reach more broadly" than some parties had assumed. *See id.* at 379.

Under the Court's reading of *Moldowan*, the Police Defendants' alleged non-*Brady* acts (i.e., fabricating, destroying, and failing to preserve evidence) fall within the purview of a *Brady* claim. *See id.* at 379–81, 391–92, 396–97. And, as Stillwagon admits, he cannot assert a *Brady* claim given that he was acquitted at trial. (*See* Mem. in Opp'n to Mot. for J. on the Pl'gs at 22.) Thus, to the extent that Stillwagon attempts to state a procedural due process claim premised on the alleged non-*Brady* acts, Stillwagon's claim fails. *See Moldowan*, 578 F.3d at 377 n.6

33

(explaining that *Brady* claims are "more properly . . . understood as procedural due process violations").

As to Stillwagon's assertion that the Police Defendants violated a *substantive* due process right through their non-*Brady* acts, the Court again disagrees. "The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007) (quoting *Palk v. Connecticut*, 302 U.S. 319, 325–26 (1937)). "Such rights include 'the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion.'" *Bigi v. Large*, No. 3:11-cv-229, 2011 WL 6813163, at *6 (S.D. Ohio Dec. 28, 2011) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Here, none of the non-*Brady* acts highlighted by Stillwagon implicates a recognized substantive due process right. *See Bigi*, 2011 WL 6813163, at *6. Nor is the Court inclined to recognize a new substantive due process right to guard against the non-*Brady* acts purportedly undertaken by the Police Defendants. *See Glucksberg*, 521 U.S. at 720 (The Supreme Court has "'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992))). In sum, Stillwagon fails to state a claim under the Due Process Clause of the Fourteenth Amendment, and the claim is therefore dismissed.

### 4. *Civil Conspiracy*

Stillwagon brings a § 1983 civil conspiracy claim (Claim 4) against Mattingly and the Police Defendants. The Municipal Defendants request the dismissal of this claim on several grounds. First, they contend that the claim is inadequately pleaded. (Mot. for J. on the Pl'gs at 17

[ECF No. 29].) Second, the Municipal Defendants assert that the alleged conspirators did not engage in any "unlawful action" because probable cause existed to arrest and prosecute Stillwagon. (*Id.* at 18.) Third, and relatedly, the Municipal Defendants argue that no underlying constitutional injury exists in this case because Stillwagon's federal constitutional claims all purportedly fail. (*Id.*) Lastly, the Municipal Defendants contend that Stillwagon's civil conspiracy claim is barred by the intra-corporate conspiracy doctrine, which provides that "'members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment.'" (*Id.* at 19 (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999)).) The Municipal Defendants' arguments are not well taken.

A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action. *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the alleged coconspirator shared in the general conspiratorial objective, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* Civil conspiracy claims must be pleaded with some degree of specificity. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). Vague and conclusory allegations unsupported by material facts are insufficient to state a claim. *Id.* A plaintiff, however, need not allege or produce direct evidence of a conspiracy; "circumstantial evidence may provide adequate proof." *Id.* (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

Here, Stillwagon has pleaded his § 1983 civil conspiracy claim with sufficient specificity. Stillwagon alleges, for example, that "Defendants Segaard, Gerke, Radabaugh and Willauer caused Mr. Stillwagon to be charged with four counts of felonious assault" even though "[t]he evidence contradicted the elements of each offense alleged, and the evidence also strongly

35

supported the affirmative defense of self-defense." (Compl. ¶ 113 [ECF No. 2].) Stillwagon

continues: The Police Defendants "had decided to prosecute Mr. Stillwagon and had crafted a

narrative which would appear to justify the prosecution. They immediately began to bend the

evidence to match their theory of the case." (*Id.*) Mattingly was also a part of this conspiracy,

Stillwagon alleges. Through various "coercive efforts," the Police Defendants allegedly

convinced Mattingly "to change his testimony, and to say the things that the detectives wanted

him to say" to further Stillwagon's prosecution. (*Id.* ¶ 132.) Based on these and numerous other

allegations, (*see id.* ¶¶ 120–146), the pleadings are sufficient to plausibly infer that Mattingly and

the Police Defendants engaged in a civil conspiracy to maliciously prosecute Stillwagon.

As the Court explained above, Stillwagon has adequately pleaded claims for false arrest

and malicious prosecution under § 1983. Accordingly, the Municipal Defendants' objections

regarding the absence of an underlying constitutional injury or the lack of an unlawful action are

unfounded.

Finally, the intra-corporate conspiracy doctrine is inapplicable here. The Complaint

alleges that the Police Defendants conspired with Mattingly to falsely arrest and prosecute

Stillwagon. (*See* Compl. ¶¶ 120–146.) Mattingly is not, and was not, a member of the Delaware

Police Department. (*See id.* ¶ 12.) Thus, the Police Defendants and Mattingly are not a part of

"the same legal entity" as envisioned by the intra-corporate conspiracy doctrine. *See Jackson*,

194 F.3d at 753.[14] Stillwagon's § 1983 civil conspiracy claim survives judgment on the

pleadings.

---

[14] It is also uncertain whether the intra-corporate conspiracy doctrine even applies to municipal
government officials in a § 1983 action. *See DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 615–16 (6th
Cir. 2015) (declining to hold that the intra-corporate conspiracy doctrine applies to municipal
governmental officials in a § 1983 action and instructing the district court to make that determination on
remand); *see also Kinkus v. Vill. of Yorkville*, 476 F. Supp. 2d 829, 839–40 (S.D. Ohio 2007) ("The
intracorporate conspiracy doctrine, however, is not applicable in this case. . . . Defendants do not cite any

### 5.  *Supervisory Liability*

Stillwagon asserts a § 1983 supervisory liability claim (Claim 5) against Defendants Radabaugh and Willauer. The Municipal Defendants seek the dismissal of Stillwagon's supervisory liability claim on the basis that Stillwagon has failed to allege an underlying constitutional violation (i.e., a § 1983 claim for false arrest or malicious prosecution). *See Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 530 (6th Cir. 2010) (indicating that a supervisory liability claim fails in the absence of an underlying constitutional violation). Given that Stillwagon has properly alleged underlying constitutional violations, the Court denies the Municipal Defendants' Motion for Judgment on the Pleadings as to the supervisory liability claim.

### 6.  *Municipal Liability*

Stillwagon brings a § 1983 municipal liability claim (Claim 6) against the City of Delaware. He contends that certain customs and policies existing in the City of Delaware and the Delaware Police Department proximately caused the constitutional violations allegedly committed by the Police Defendants. (*See* Compl. ¶ 174 [ECF No. 2].) According to Stillwagon,

> [t]hese customs and policies include, but are not limited to, failure to adequately and properly train police officers regarding the constitutional rights of citizens, proper investigation techniques and proper handling of evidence, and other related topics; failure to adequately and properly hire, screen and select persons for employment as police officers and detectives; [and] failure to adequately and properly supervise and discipline employees.

(*Id.*) Additionally, Stillwagon alleges that "the Police Chief and supervisory officers personally participated in, acquiesced in, ratified, encouraged and/or approved the alleged unconstitutional conduct." (*Id.*)

---

precedent that supports Defendants' position that the intracorporate conspiracy doctrine can be applied to a civil conspiracy claim under § 1983.").

The Municipal Defendants move for judgment on the pleadings on Stillwagon's municipal liability claim. The claim fails for two reasons, they argue. Stillwagon has purportedly failed to allege a cognizable, underlying violation of his constitutional rights. (*See* Mot. for J. on the Pl'gs at 26 [ECF No. 29].) Stillwagon also purportedly fails to adequately allege the elements of a municipal liability claim. (*See id.* at 27–28.) Specifically, Stillwagon has not "alleged deliberate indifference, or prior instances of unconstitutional conduct demonstrating that the City 'ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" (*Id.* at 27 (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)).) As noted above, Stillwagon has properly alleged underlying constitutional violations. The Court will thus focus its attention on the Municipal Defendants' second argument.

"[A] municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). A plaintiff may attempt to prove a municipality's illegal policy or custom by alleging: "'(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Stillwagon pursues his municipal liability claim under options (2) and (3). (*See* Compl. ¶ 174.)[15]

---

[15] Stillwagon indicates that his municipal liability claim involves an amalgamation of various theories, including "retention of bad detectives, and deliberately indifferent training of detectives, and grossly

38

###### a.    Ratification by a Final Decision Maker

Under a ratification theory, a single decision can constitute a municipal policy or custom, "if that decision is made by an official who 'possesses final authority to establish municipal policy with respect to the action ordered,' which means that his decisions are 'final and unreviewable and are not constrained by the official policies of superior officials.'" *See Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013) (internal citations omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005)). An official with final decision making authority ratifies a subordinate's action if the decision maker provides "affirmative approval of a particular decision made by [the] subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). However, even if an official with final decision making authority ratifies a decision, a plaintiff must still "prove that the ratification was a 'moving force' in causing the constitutional violation." *Id.* at 656 n.6 (quoting *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991)).

Stillwagon argues that Defendant Radabaugh, a detective division sergeant supervising Defendants Segaard and Gerke, ratified and participated in the constitutional violations that Stillwagon allegedly suffered. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 33–34.) But nowhere in his Complaint does Stillwagon allege that Radabaugh had authority to make final and unreviewable decisions such that Radabaugh would constitute an official with final decision making authority. (*See generally* Compl.) Nor does Stillwagon cite to any cases in which a court has determined that a detective division sergeant is an official with final decision making

---

inadequate supervision, <u>and</u> a severe failure to properly discipline." (Mem. in Opp'n to Mot. for J. on the Pl'gs at 34 [ECF No. 40].) Aside from its ratification component, Stillwagon's municipal liability claim resembles a claim for inadequate training and supervision. The Court thus analyzes his claim under that framework.

authority for municipal liability purposes. (*See* Mem. in Opp'n to Mot. for J. on the Pl'gs at 30–34.)

Stillwagon also argues that the Delaware Chief of Police ratified the alleged unconstitutional conduct. (Compl. ¶ 174.) A police chief is often an official with final decision making authority. *See Robinson v. City of Middletown*, No. 1:09-cv-00005, 2010 WL 3780985 at *8 (S.D. Ohio Sept. 23, 2010). Stillwagon, however, has not offered sufficient factual allegations to support his ratification argument. The only relevant, non-conclusory allegation that Stillwagon makes regarding the Police Chief is that Mattingly, Segaard, and the Police Chief "all made public statements in the media within the first 24 hours or so of the event, all declaring Mr. Stillwagon's guilt and putting forth the false police narrative." (Compl. ¶ 158.) This allegation, without more, is insufficient for the Court to plausibly infer that the Police Chief ratified the Police Defendants' alleged unconstitutional conduct. Stillwagon, for example, has not alleged that the Police Chief investigated the basis for Stillwagon's arrest and actually approved of it. *See Feliciano*, 988 F.2d at 656 ("Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate."). The media statement allegation is also inadequately tied to the actual harm that Stillwagon suffered. Stillwagon offers no allegations to indicate how the Police Chief's statements to the media were a moving force behind the alleged constitutional violations committed by the Police Defendants. *See Phillips v. Stevens*, No. 2:04-cv-207, 2007 WL 2359758, at *12 (S.D. Ohio Aug. 16, 2007) ("[S]ubsequent ratification of the officers' conduct in this case cannot logically be the moving force behind the alleged constitutional violation.").

### b.    Inadequate Training and Supervision

Inadequate supervision and training will give rise to municipal liability "[i]n limited

circumstances, [where] a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights . . . rise[s] to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Sweat v. Butler*, 90 F. Supp. 3d 773, 779–86 (W.D. Tenn. 2015) ("The legal standards for a claim of inadequate supervision and one of inadequate training are essentially the same."). To state a claim for failure to adequately train or supervise, a plaintiff must sufficiently plead that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014). To establish deliberate indifference, the plaintiff ordinarily "'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Sanilac Cnty.*, 606 F.3d at 255 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, Stillwagon has offered only conclusory allegations regarding the City's purported failure to adequately train and supervise its police officers. (Compl. ¶¶ 167, 173–174 (referencing the City's police training only three times: (1) ¶ 167, alleging that the Police Defendants are not entitled to qualified immunity; (2) ¶ 173, stating that Radabaugh and Willauer "failed to properly train and supervise their subordinates"; and (3) ¶ 174, indicating that the City and the Delaware Police Department have a custom or policy of failing to properly train, supervise, and discipline employees).)

Moreover, Stillwagon has failed to allege prior instances of unconstitutional conduct demonstrating that the city has ignored a history of abuse and was clearly on notice that training

in a particular area was deficient. Stillwagon makes several allegations regarding Segaard and

Gerke's work history. Prior to the incidents involved here, Segaard "had been subject to repeated

criticism in his evaluations for low rates of criminal enforcement, low rates of solving cases, and

lack of thoroughness and follow-through on investigations." (*Id.* ¶ 14.) Likewise, Gerke

> had been subject to repeated criticism in his evaluations for failure to pay
> attention to detail in his cases, cutting corners with his reports, failure to stay on
> top of his investigations, not documenting his investigations, and failure to
> complete investigations. [Gerke] is no longer a police officer. He was indicted for
> both felony and misdemeanor charges involving dishonesty. This included the use
> of computers at the Delaware Police Department to engage in illegal activities. He
> subsequently pled guilty to the felony offense of 'identity fraud' and the
> misdemeanor offense of 'attempted forgery.' As part of the plea bargain, [Gerke]
> surrendered his certification as a police officer, and he will never be permitted to
> work in law enforcement again.

(*Id.* ¶ 15.) These allegations, however, do not involve any prior instances of unconstitutional

conduct. *Cf. Sweat*, 90 F. Supp. 3d at 781 ("Complaints that 'concern unrelated allegations of

misconduct' will not support a failure to train or supervise claim." (quoting *Smith v. City of

Akron*, 476 F. App'x 67, 70 (6th Cir. 2012))). Stillwagon identifies a prior lawsuit that had been

brought against the City, the Police Chief, and Gerke. (Compl. ¶ 168.) But as Stillwagon admits,

in that case "[t]he Delaware Police Defendants, including [Gerke], successfully argued that the

use of force was necessary because [Gerke] was reasonably concerned that the driver might use

his truck as a weapon and cause him harm." (*Id.* (citing *Foos v. City of Delaware*, No. 2:08-cv-

0873, 2010 WL 3489384, at *12 (S.D. Ohio Aug. 31, 2010)).) Additionally, nothing in the

Complaint suggests that the City deliberately ignored Segaard and Gerke's unsatisfactory work.

*Cf. Sweat*, 90 F. Supp. 3d at 781–82. Instead, both Segaard and Gerke were subjected to

"repeated criticism" for their purported failures. (*See* Compl. ¶¶ 14–15.) And with respect to

police training, Stillwagon alleges that the officers were trained in the relevant topics such as

"the definition of probable cause, the need for trustworthy information to support probable cause,

the requirement that exculpatory evidence be included in the probable cause analysis, the need to preserve exculpatory evidence, the prohibitions against manufacturing false evidence or suppressing known evidence, and the other matters alleged." (*Id.* ¶ 167.) Gerke's "use of computers at the Delaware Police Department to engage in illegal activities" is similarly irrelevant to the current analysis. (*See id.* ¶ 15.) Gerke's illegal behavior does not relate to false arrest or malicious prosecution; Gerke was indicted and convicted after the events at issue in this case; and Stillwagon admits that the City confronted Gerke's behavior with a criminal prosecution—not indifference. (*See id.*)

**c.      Stillwagon's Request for Leave to Amend**

Stillwagon's Complaint, as currently written, fails to adequately plead a municipal liability claim. As noted earlier, however, Stillwagon requested leave to amend that claim in the event that the Court found the claim to be inadequately pleaded. (Mem. in Opp'n to Mot. for J. on the Pl'gs at 35.) Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be freely given when justice so requires. However, a motion to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, the Municipal Defendants have not offered any arguments in opposition to Stillwagon's request for leave to amend. (*See generally* Reply in Supp. of Mot. for J. on the Pl'gs [ECF No. 46].) Stillwagon has not acted out of bad faith or dilatory motive. And the Court cannot discern any undue delay or undue prejudice that might accrue as a result of this amendment. Finally, amendment would not be futile here. Stillwagon has submitted an

attachment to his Memorandum in Opposition to the Motion for Judgment on the Pleadings that

"contains only a small sample of the factual support for [his] municipal liability claim." (Mem.

in Opp'n to Mot. for J. on the Pl'gs at 37.) Stillwagon indicates that he will amend his Complaint

with those allegations, among others, if the Court permits him to do so. (*Id.*) Many of the

allegations contained in the attachment relate to Stillwagon's inadequate training and supervision

theory. (*See generally* Attach. No. 2 [ECF No. 40-2].) The Court does not consider these

additional allegations in analyzing the present Motion for Judgment on the Pleadings. The Court

notes, however, that several of the allegations, if added to the Complaint and viewed in the light

most favorable to Stillwagon, would permit the Court to plausibly infer that the City of Delaware

inadequately supervised Segaard and Gerke. For example, Stillwagon alleges that an Officer

Wadsworth filed a written complaint about Segaard in which she stated that "Segaard's actions

are commonly pushed under the rug or laughed off . . . ." (Attach. No. 2, ¶ 5 (emphasis deleted).)

Stillwagon also alleges that

> Defendant Gerke's supervisor received a report alleging that Gerke was habitually
> committing perjury in order to obtain convictions in his cases. A local prosecutor
> came to the police official and reported this. He said that Gerke had been
> observed by prosecutor staff and court personnel to be simply making up facts on
> the witness stand, under oath, in order to further the "success" of his case. This
> was an extremely serious violation of both departmental rules and the law . . . .
> The Delaware Police Department did essentially nothing, merely advising Gerke
> that it would be better if he not do this in the future.

(*Id.* ¶ 7.) These factual allegations support a plausible inference that (1) the supervision provided

to Segaard and Gerke by the City of Delaware was inadequate for the tasks that they performed;

(2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy

was closely related to or actually caused Stillwagon's injury. *See Regets v. City of Plymouth*, 568

F. App'x 380, 394 (6th Cir. 2014). Accordingly, the Court grants Stillwagon leave to amend his

municipal liability claim.

C.      **State Law Claims**

As relevant here, Stillwagon brings claims under Ohio law for malicious prosecution,

civil conspiracy, and spoliation of evidence (Claims 7, 8, and 12).

1.      *State Law Claims Against the City of Delaware*

The City of Delaware asserts a statutory immunity defense to Stillwagon's state law

claims. The Ohio Revised Code establishes a three-tier analysis for determining whether a

political subdivision is immune from liability:

> First, R.C. 2744.02(A)(1) sets forth the general rule that a political subdivision is
> immune from liability for acts or omissions connected with governmental or
> proprietary functions. Second, R.C. 2744.02(B) lists five exceptions to the general
> immunity granted to political subdivisions under R.C. 2744.02(A)(1). Finally,
> R.C. 2744.03(A) makes available further defenses and immunities that a political
> subdivision may assert if it is subject to liability under R.C. 2744.02(B).

*Frazier v. Clinton Cnty. Sheriff's Office*, 12th Dist. Clinton No. CA2008-04-015, 2008-Ohio-

6064, ¶ 28 (citations omitted); *see also Colbert v. Cleveland*, 99 Ohio St. 3d 215, 2003-Ohio-

3319, 790 N.E.2d 781, ¶¶ 7–9. "[R]elying on the statutory language of R.C. 2744.02(B), Ohio

courts consistently have held that political subdivisions are immune from intentional tort

claims." *Harris v. Sutton*, 183 Ohio App. 3d 616, 2009-Ohio-4033, 918 N.E.2d 181, ¶ 15 (8th

Dist.) (citing *Wilson v. Stark Cnty. Dep't of Human Servs.*, 639 N.E.2d 105, 107 (Ohio 1994));

*see also Zieber v. Heffelfinger*, 5th Dist. Richland No. 08CA0042, 2009-Ohio-1227, ¶ 27. And,

specifically, Ohio courts have held that political subdivisions are immune from intentional torts

such as malicious prosecution, civil conspiracy, and spoliation of evidence. *R.K. v. Little Miami*

*Golf Ctr.*, 2013-Ohio-4939, 1 N.E.3d 833, ¶ 49 (1st Dist.); *Walsh v. Village of Mayfield*, 8th Dist.

Cuyahoga No. 92309, 2009-Ohio-2377, ¶ 11; *Zieber*, 2009-Ohio-1227, ¶ 27.

A municipal corporation such as the City of Delaware is a political subdivision for immunity purposes. *See* O.R.C. § 2744.01(F). Further, "the operation of a police department and the enforcement of the law are governmental functions." *Harris*, 2009-Ohio-4033, ¶ 13.

Pointing to actions undertaken by the City's police officers, Stillwagon attempts to bring state law malicious prosecution, civil conspiracy, and spoliation of evidence claims against the City of Delaware under a respondeat superior theory. Under O.R.C. § 2744.02(A)(1), however, the City is immune from those intentional tort claims. Those claims (Claims 7, 8, and 12) are dismissed to the extent that Stillwagon brings them against the City of Delaware.

### 2. *State Law Claims Against the Police Defendants*

The Police Defendants do not contend that they are statutorily immune from Stillwagon's state law claims. (*See generally* Mot. for J. on the Pl'gs [ECF No. 29].) Accordingly, the Court need not delve into an immunity analysis for those defendants.

### a. Malicious Prosecution under Ohio Law

The Municipal Defendants have moved for judgment on the pleadings on Stillwagon's Ohio malicious prosecution claim (Claim 7) against the Police Defendants. As outlined by the Ohio Supreme Court, "the elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussel v. Gen. Motors Corp.*, 559 N.E.2d 732, 736 (Ohio 1990). For purposes of a malicious prosecution claim, "malice" is "an improper purpose, or any purpose other than the legitimate interest in bringing an offender to justice." *Anderson v. Eyman*, 5th Dist. Fairfield No. 07CA69, 180 Ohio App. 3d 794, 2009-Ohio-102, ¶ 40. Malice may be inferred from the absence of probable cause. *Id.* "A proceeding is 'terminated in favor of the accused' only when its final disposition indicates that the accused is innocent." *Ash v. Ash*, 651

46

N.E.2d 945, 947–48 (Ohio 1995) (indicating that "an unconditional, unilateral dismissal" generally constitutes a termination in favor of the accused whereas "a prosecution that is terminated by reason of a voluntary settlement or agreement of compromise with the accused is not indicative of guilt or innocence and, therefore, is not a termination in favor of the accused").

Ohio courts have defined probable cause as "'[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.'" *Anderson*, 2009-Ohio-102, ¶ 41 (quoting *Dailey v. First Bank of Ohio*, 10th Dist. Franklin No. 04AP-1309, 2005-Ohio-3152, ¶ 15). "Determining whether [a] criminal prosecution was undertaken in the absence of probable cause entails an inquiry into the facts and circumstances actually known to or reasonably within the contemplation of the defendants . . . at the time of the instigation of the criminal proceedings." *Thompson v. R & R Serv. Sys., Inc. v. Cook*, Nos. 96APE10-1277, 96APE10-1278, 1997 WL 359325, at *8 (Ohio Ct. App. June 19, 1997). Thus, "[t]he relevant inquiry is not whether the arresting officer had probable cause to arrest [the plaintiff], but whether [the defendants] had probable cause to institute criminal proceedings against [the plaintiff]." *Id.*

Under Ohio law, "[t]he return of an indictment by a grand jury raises a rebuttable presumption that probable cause exists." *Dailey*, 2005-Ohio-3152, ¶ 16. To rebut this presumption a plaintiff must produce "'substantial' evidence that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise 'significantly' irregular." *Id.* (quoting *Reinoehl v. Trinity Universal Ins. Co.*, 719 N.E.2d 1000, 1007 (Ohio Ct. App. 1998)).

Here, for the reasons described above in relation to the § 1983 malicious prosecution claim, Stillwagon has alleged sufficient facts for the Court to plausibly infer that he was prosecuted without probable cause. The Municipal Defendants argue that Stillwagon has failed to rebut the presumption of probable cause created by the grand jury indictment. (Reply in Supp. of Mot. for J. on the Pl'gs at 20 [ECF No. 46].) But the Court disagrees. As described above, Stillwagon devotes an entire subsection of his Complaint to the Police Defendants' efforts at convincing Mattingly to present false testimony to the grand jury. (*See* Compl. ¶¶ 120–146 [ECF No. 2].) The Police Defendants then allegedly presented that false testimony to the grand jury. (*See id.* ¶ 155.) Further supporting the notion that Mattingly provided perjured testimony to the grand jury is Stillwagon's allegation that Mattingly "admitted [at the trial] that he had nearly killed Mr. Stillwagon with his truck," that "he knew he was engaging in life-threatening conduct at the time he did those things," and that "he had been lying from the very beginning." (*Id.* ¶ 159.) Based on these allegations, the Court can plausibly infer that Stillwagon will be able to produce substantial evidence that the return of the grand jury indictment resulted from perjured testimony.

The Municipal Defendants also imply that Stillwagon's criminal prosecution was not terminated in his favor. (Mot. for J. on the Pl'gs at 10 [ECF No. 29] (noting that "[a]n acquittal . . . does not establish a defendant's innocence but only shows the prosecution's failure to prove the criminal defendant's guilty beyond a reasonable doubt").) This argument is not well taken. As the Ohio Supreme Court has explained, "an unconditional, unilateral dismissal" generally constitutes a termination in favor of the accused. *Ash*, 651 N.E.2d at 948. And here, Stillwagon alleges that an unconditional, unilateral dismissal occurred. (*See* Compl. ¶ 160 ("The case never even made it to the jury. The Court dismissed all counts, entering an order of judgment of

acquittal pursuant to Ohio Criminal Rule 29 . . . .") ("'There is no evidence in this record that this defendant knowingly attempted to cause or caused physical harm by a deadly weapon.'" (quoting the state trial court)).) The Court declines to grant judgment on the pleadings on Stillwagon's Ohio malicious prosecution claim against the Police Defendants.

### b. Civil Conspiracy under Ohio Law

The Municipal Defendants next move for judgment on the pleadings on Stillwagon's Ohio civil conspiracy claim (Claim 8) against the Police Defendants. Under Ohio law, the elements of a civil conspiracy are: "(1) a malicious combination; (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself." *Cantleberry v. Holbrook*, 5th Dist. No. 12CA75, 2013-Ohio-2675, ¶ 22. "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App. 3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 40 (10th Dist.). According to the Municipal Defendants, the Ohio civil conspiracy claim fails because (i) Stillwagon has not alleged an underlying tort and (ii) the intra-corporate conspiracy doctrine bars the claim. (Mot. for J. on the Pl'gs at 21–22.)

The Municipal Defendants are incorrect. Stillwagon has properly alleged several underlying torts. And, as explained above in relation to Stillwagon's § 1983 civil conspiracy claim, the intra-corporate conspiracy doctrine does not bar Stillwagon's claim. Accordingly, Stillwagon's Ohio civil conspiracy claim against the Police Defendants survives judgment on the pleadings.

### c. Spoliation of Evidence

Lastly, the Municipal Defendants request that the Court dismiss Stillwagon's spoliation

of evidence claim (Claim 12) against the Police Defendants. The Municipal Defendants challenge the spoliation claim on several grounds. The claim fails, they argue, because it "occurred in connection with a criminal proceeding not a 'prospective civil proceeding.'" (Mot. for J. on the Pl'gs at 33 (emphasis deleted).) The claim purportedly fails because "'[c]laims for spoliation of evidence may be brought after the primary action has been concluded only when evidence of spoliation is not discovered until after the conclusion of the primary action.'" (*Id.* at 34 (emphasis deleted) (quoting *Davis v. Wal-Mart Stores, Inc.*, 756 N.E.2d 657, 660 (Ohio 2001)).) And the claim purportedly fails because Stillwagon does not allege facts to support several elements of a spoliation claim. (*Id.*)[16]

In support of their first argument, the Municipal Defendants assert that "[n]either the Supreme Court of Ohio nor the Ohio General Assembly has extended a spoliation claim to criminal proceedings." (Reply in Supp. of Mot. for J. on the Pl'gs at 26 [ECF No. 46].) Granted, the Supreme Court of Ohio may not have *expressly* extended a spoliation claim to criminal proceedings. *See Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993). But the Supreme Court of Ohio has also never expressly indicated that a spoliation claim only applies to civil litigation or does not apply to criminal proceedings. *See id.* In 1993, this Court certified to the Supreme Court of Ohio the following question: "Does Ohio recognize a claim for

---

[16] The Municipal Defendants also request judgment on the pleadings to the extent that Stillwagon attempts to bring the spoliation claim based on actions other than "the willful destruction of physical evidence." (*See* Mot. for J. on the Pl'gs at 35–36 (emphasis deleted).) In making this request, however, the Municipal Defendants admit that Stillwagon has alleged that "'defendants intentionally destroyed, discarded or caused to be destroyed, exculpatory evidence in this case.'" (*Id.* at 35 n.4 (quoting Compl. ¶ 147 [ECF No. 2]).) Stillwagon alleged that "defendants destroyed DNA evidence" by wiping clean his pistol, and he alleged that "defendants destroyed . . . drawings and diagrams" created by Mattingly and Stillwagon during their interviews with the police. (Compl. ¶¶ 147–149.) Stillwagon responds by acknowledging that his spoliation claim "is limited to destruction of evidence." (Mem. in Opp'n to Mot. for J. on the Pl'gs at 38 [ECF No. 40].) Given that Stillwagon only alleges spoliation based on the destruction of evidence, the Municipal Defendants' request for a partial dismissal of the spoliation claim is denied as moot.

intentional or negligent spoliation of evidence and/or tortious interference with prospective civil litigation?" *Id.* The Supreme Court responded by stating that "[a] cause of action exists in tort for interference with or destruction of evidence." *Id.* Additionally, despite the Municipal Defendants' insistence that a spoliation claim cannot derive from destruction that occurs during a criminal proceeding, Ohio appellate courts have assumed that a spoliation claim can be stated under those circumstances. *See Caiazza v. Mercy Med. Ctr.*, 5th Dist. Stark No. 2013CA00181, 2014-Ohio-2290, ¶¶ 56–63 ("Appellant argues the spoliation occurred in relation to his criminal case."); *State ex rel. Hartman v. Tetrault*, 12th Dist. Clermont No. CA2012-03-021, 2012-Ohio-4646, ¶ 36 & n.3 ("Consider the scenario where the primary action is of a criminal nature but the spoliation of evidence claims must be alleged in a civil lawsuit."); *O'Brien v. Olmsted Falls*, 8th Dist. Cuyahoga Nos. 89966, 90336, 2008-Ohio-2658, ¶¶ 17–21 (assuming the existence of a spoliation claim based on actions taken during a criminal proceeding but dismissing the claim because the plaintiff failed to allege that the defendants "destroyed or altered physical evidence").

The Municipal Defendants next argue that Stillwagon's spoliation claim is untimely under the Ohio Supreme Court's decision in *Davis v. Wal-Mart Stores, Inc.*, 756 N.E.2d at 660. (Mot. for J. on the Pl'gs at 34.) In *Davis*, the Ohio Supreme Court analyzed the res judicata implications of a spoliation claim brought after the conclusion of the action in which the spoliation allegedly occurred. *See* 756 N.E.2d at 658–60. The plaintiff in *Davis* brought an action against Wal-Mart stemming from the death of her husband in a workplace accident. *Id.* at 658. The plaintiff tried one of her claims to a jury and prevailed. *Id.* "During the course of post-trial proceedings for prejudgment interest, [the plaintiff] came to believe that Wal-Mart had withheld certain evidence and documents and that several [Wal-Mart] employees" had provided false

testimony in their depositions. *Id.* As such, the plaintiff filed a new action, "alleging that Wal-

Mart's spoliation of evidence had led her to dismiss [one of her claims prior to trial]." *Id.* Citing

res judicata considerations, the trial court granted summary judgment on the spoliation claim. *Id.*

The court of appeals reversed. *Id.* And that reversal was then affirmed by the Ohio Supreme

Court. *Id.* at 658–59. The Supreme Court applied a res judicata analysis. *See id.* at 659. Holding

that the spoliation claim and the original, intentional tort claim might not have arisen "out of a

common nucleus of operative facts," the Supreme Court found that res judicata was inapplicable

and that the plaintiff should have been permitted to bring her spoliation claim. *See id.* "Res

judicata is not a shield to protect the blameworthy," the Supreme Court added. *Id.* (emphasis

deleted). It "'is to be applied in particular situations as fairness and justice require, and . . . not to

be applied so rigidly as to defeat the ends of justice or so as to work an injustice.'" *Id.* (emphasis

deleted) (quoting *Grava v. Parkman Twp.*, 653 N.E.2d 226, 232 (Ohio 1995) (Douglas, J.,

dissenting)). Turning to the second proposition of law offered on appeal by Wal-Mart, the

Supreme Court stated:

> Wal–Mart argues that "claims for spoliation of evidence should be brought at the
> same time as, or as an amendment to, the primary action." We stated in *Smith v.
> Howard Johnson Co., Inc.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038,
> that spoliation claims "may be brought at the same time as the primary action."
> "May" is permissive. Had we intended for all spoliation claims to be brought at
> the same time as the primary action we would have chosen "must" or "shall." We
> did not. To clarify *Smith,* today we hold that claims for spoliation of evidence
> may be brought after the primary action has been concluded only when evidence
> of spoliation is not discovered until after the conclusion of the primary action. We
> reject Wal–Mart's second proposition of law.

*Id.* at 660.

Based on *Davis*, the Municipal Defendants argue that Stillwagon cannot bring his

spoliation claim because he discovered the alleged spoliation during "'the primary action'" (the

criminal trial) but failed to bring his claim before that action had concluded. (Mot. for J. on the

52

Pl'gs at 34 (emphasis deleted) (quoting *Davis*, 756 N.E.2d at 660).) The Municipal Defendants'
argument once again misses the mark. As the Ohio Supreme Court indicated, the *Davis* decision
was not meant to establish a rigid rule that would "protect the blameworthy." *See Davis*, 756
N.E.2d at 659–60. Courts that have interpreted and applied the *Davis* decision have concurred, as
they have declined to interpret the decision as establishing a complete bar to subsequent
spoliation claims when evidence of the alleged spoliation is discovered prior to the conclusion of
the primary action. *See Quality Measurement Co. v. IPSOS S.A.*, 56 F. App'x 639, 648 (6th Cir.
2003); *Patriot Water Treatment, L.L.C. v. Ohio Dep't of Natural Res.*, 10th Dist. Franklin No.
13AP-370, 2013-Ohio-5398, ¶¶ 25–27. Rather, courts have interpreted *Davis* as establishing a
res judicata test for whether a plaintiff can state a subsequent spoliation claim. *See Patriot Water
Treatment*, 2013-Ohio-5398, ¶¶ 25–27. Thus, when a plaintiff could not have brought a
spoliation claim in the primary action, *Davis* does not bar a subsequent spoliation claim even if
the spoliation was discovered during the primary action. *See Quality Measurement Co.*, 56 F.
App'x at 648 ("A separate subsequent claim for the spoliation of evidence may be allowed 'only
when evidence of spoliation is not discovered until after the conclusion of the primary action.'
[*Davis*, 756 N.E.2d at 660.] The determinative issue is whether the plaintiff could have brought
its spoliation claim in the previous action. *Id.*"); *Patriot Water Treatment*, 2013-Ohio-5398, ¶¶
25–27 (concluding that *Davis* did not apply to the case at bar because the doctrine of res judicata
was not implicated: "the disposition of the ERAC [Ohio Environmental Review Appeals
Commission] appeals could not constitute a res judicata bar of a spoliation claim, regardless of
the time at which the spoliation was discovered, as ERAC lacks subject-matter jurisdiction to
adjudicate tort claims against the state").

Here, *Davis* does not apply because the doctrine of res judicata is not implicated. *See*

*Patriot Water Treatment*, 2013 WL 6506561, ¶¶ 25–27. Stillwagon could not have brought a tort

for spoliation of evidence in the primary action (the criminal case brought against Stillwagon).

*Cf. State v. Drummond*, 11th Dist. Ashtabula No. 2013-A-0055, 2015-Ohio-939, 31 N.E.3d

1216, ¶¶ 69–70 ("There is no indication that the state intentionally destroyed or concealed

evidence. In addition, *this case involves a criminal, not a civil matter*." (emphasis added)); *State*

*v. Pace*, 3d Dist. Hancock No. 5-12-30, 2013-Ohio-2143, ¶ 17 ("In *Smith*, the Ohio Supreme

Court held that a cause of action exists in tort for interference with or destruction of evidence

with prospective civil litigation. *Smith* at 29. *We fail to see how a tort claim is applicable in this*

*criminal case . . . .*" (emphasis added)).[17] Thus, even if Stillwagon discovered the alleged

spoliation during the criminal case, that discovery does not bar Stillwagon from bringing his

spoliation claim in his current civil case.[18]

---

[17] Ohio's Twelfth District Court of Appeals has suggested in dicta that if a party is unable to bring its spoliation claim in the primary action, the party may need to bring its spoliation claim in a separate lawsuit while the primary action is still pending. *Tetrault*, 2012-Ohio-4646, ¶¶ 35–36 & n.3. The *Tetrault* court, however, did not offer this suggestion in reference to the Ohio Supreme Court's decision in *Davis*. *See Tetrault*, 2012-Ohio-4646, ¶¶ 35–36 & n.3. Nor did the *Tetrault* court offer any analysis from a res judicata perspective as to why a party that is unable to assert a spoliation claim in its primary action would need to bring the spoliation claim in a separate lawsuit during the pendency of the primary action (as opposed to bringing a separate lawsuit at some point after the primary action has concluded) in order to properly state the claim. *See id.*

[18] A case from Ohio's Fifth District Court of Appeals suggests a different outcome on this issue. In *Caiazza v. Mercy Medical Center*, the Fifth District stated: "As indicated by the Supreme Court of Ohio, any spoliation claim must be brought in the original case i.e., the criminal case." 2014-Ohio-2290, ¶ 60. This statement, however, is dicta. The *Caiazza* court had already determined that the appellant, in failing to allege that the defendants destroyed physical evidence, had failed to state a valid spoliation claim. *See id.* Moreover, the Court declines to follow *Caiazza* for several other reasons. The *Caiazza* court did not provide any citation for its statement. *See id.* Presumably, the court made its statement in reference to *Davis*. But the *Caiazza* court does not offer any analysis of *Davis* or the context (i.e., res judicata) in which *Davis* was written. *See Caiazza*, 2014-Ohio-2290, ¶ 60; *see also Davis*, 756 N.E.2d at 658–60. Similarly, the *Caiazza* court did not offer any explanation as to how a defendant would bring a tort for spoliation of evidence in a criminal case. *See Caiazza*, 2014-Ohio-2290, ¶ 60. The Court finds the Tenth District's reasoning in *Patriot Water Treatment*, 2013-Ohio-5398, ¶¶ 25–27 (discussed above), more persuasive.

For their final argument, the Municipal Defendants contend that Stillwagon has pleaded inadequate facts to support his spoliation claim. (Mot. for J. on the Pl'gs at 34.) Under Ohio law, the elements of a spoliation of evidence claim are "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Smith*, 615 N.E.2d at 1038.

In support of his spoliation claim, Stillwagon alleges the following:

147. The defendants intentionally destroyed, discarded or caused to be destroyed, exculpatory evidence in this case. Most significantly the defendants destroyed DNA evidence. The cut on the back of Defendant Mattingly's head was caused by sharp contact with Mr. Stillwagon's firearm, when Mr. Stillwagon used the weapon to strike the defendant and then push him downward. This caused Mattingly to bleed. It was a near certainty that blood was deposited on the weapon, as well as other DNA source material such as hair or sweat, during the time when the gun was pressed against the defendant's head. The firearm was taken from the scene and continuously in the custody of the defendants thereafter. The defendants failed to test the surface of the gun for DNA, although they knew that such a test was important in light of the disputed facts. If Mattingly's DNA was found on the gun, then the Plaintiff had to be telling the truth, and the "shot from a distance" story had to be false. By the time that Mr. Stillwagon's legal team got access to the firearm it had been wiped clean.

148. During Mr. Mattingly's two interviews, the defendants provided him with paper and prepared maps, upon which Mr. Mattingly made several drawings and diagrams. These documents were known to the defendants to be evidence, and specifically valuable exculpatory and impeachment evidence for the Plaintiff and his counsel. The defendants destroyed the Mattingly drawings and diagrams before the Plaintiff could obtain them.

149. During Mr. Stillwagon's interview, the defendants provided him paper and prepared maps, upon which Mr. Stillwagon also created drawings and diagrams explaining the facts of what had happened to him that day. The defendants similarly destroyed this exculpatory evidence without providing copies to the Plaintiff or his counsel.

. . . .

180. The said acts by the defendants constituted spoliation of evidence under Ohio law.

(Compl. ¶¶ 147–149, 180.)

The Municipal Defendants' inadequate pleading argument rests largely on their assumption that that the elements of a spoliation claim relate only to "'prospective civil litigation.'" (Mot. for J. on the Pl'gs at 33–34 (quoting *Smith*, 615 N.E.2d at 1038).) That is, the elements of a spoliation claim purportedly include "knowledge on the part of defendant that **civil litigation** exists or is probable between the movant Defendants and the Plaintiff." (*Id.* at 34.) But as noted above, Ohio courts have assumed that a spoliation claim can derive from destruction of evidence that occurs during a criminal proceeding. *See Caiazza*, 2014-Ohio-2290, ¶¶ 56–63; *Tetrault*, 2012-Ohio-4646, ¶ 36 & n.3; *O'Brien*, 2008-Ohio-2658, ¶¶ 17–21. Ohio courts that have considered spoliation claims stemming from a prior criminal proceeding have not given any indication that the elements of a spoliation claim must relate to prospective civil litigation. *See Caiazza*, 2014-Ohio-2290, ¶¶ 56–63 (reciting the elements of a spoliation claim without any reference to civil litigation); *O'Brien*, 2008-Ohio-2658, ¶¶ 17–21 (same). Rather, those courts appear to assume that the claim's elements relate to the prior criminal proceeding. *See Caiazza*, 2014-Ohio-2290, ¶¶ 56–63; *O'Brien*, 2008-Ohio-2658, ¶¶ 17–21. The Municipal Defendants' assumption is misplaced; Stillwagon need not allege "knowledge on the part of defendant that **civil litigation** exists or is probable." (*See* Mot. for J. on the Pl'gs at 34.) Stillwagon must allege facts to support the elements (listed above) outlined by the Ohio Supreme Court in *Smith*, 615 N.E.2d at 1038 (referring to "pending or probable *litigation*" (emphasis added)).

Here, Stillwagon has met that threshold. Based on the allegations in his Complaint, the Court can plausibly infer that: (1) Stillwagon's criminal case was pending when the alleged spoliation occurred; (2) defendants knew that the criminal case was pending; (3) defendants

56

willfully destroyed DNA evidence, drawings, and diagrams in an effort to disrupt Stillwagon's criminal defense; (4) the destruction of that evidence disrupted Stillwagon's criminal defense; and (5) Stillwagon suffered damages that were proximately caused by the destruction of that evidence. (*See* Compl. ¶¶ 147–149, 180.) Accordingly, Stillwagon's spoliation claim against the Police Defendants survives judgment on the pleadings.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Stillwagon's Motion to Strike [ECF No. 48] and **GRANTS IN PART** and **DENIES IN PART** the Municipal Defendants' Motion for Judgment on the Pleadings [ECF No. 29]. Stillwagon's due process claim (Claim 3) is **DISMISSED WITH PREJUDICE**, as are Stillwagon's state law claims (Claims 7, 8, and 12) to the extent that he brings them against the City of Delaware. Stillwagon's municipal liability claim (Claim 6) is **DISMISSED WITHOUT PREJUDICE**. Stillwagon may amend his municipal liability claim within thirty (30) days of the issuance of this Opinion and Order.

**IT IS SO ORDERED.**

3-31-2016
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**