## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JAMES R. STILLWAGON,        )

        Plaintiff,         )

    v.                    )

THE CITY OF DELAWARE, et al.,     )

        Defendants.       )

Case No. 2:14-cv-807

CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

---

JAMES R. STILLWAGON,        )

        Plaintiff,         )

    v.                    )

OFFICER JAMES AILES, et al.,     )

        Defendants.       )

Case No. 2:14-cv-1606

CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

## **DECLARATION OF RON MARTINELLI, PH.D**

Now comes Ron Martinelli, Ph. D., who being first duly sworn according to law, deposes and states the following:

1.     I am over 18 years of age and have personal knowledge of all facts contained herein.

2.     I was retained by Mazanec, Raskin and Ryder Co., L.P.A. to provide expert testimony in this case.

3.     A true and accurate copy of my *curriculum vitae* is attached to this Declaration as Exhibit 1.

4.     A true and accurate copy of the expert report that I prepared, which contains a complete statement of all opinions that I have in this matter and the basis and reasons for those

Ex. A

opinions and the facts and data that I considered in forming my opinions, is attached to Declaration as Exhibit 2.

5.      The opinions rendered in my expert report are based upon the evidence produced and in the record as well as my education, training, knowledge and experience and all opinions are held to a reasonable degree of professional certainty.

6.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

Executed on May _____2_____, 2017.

_____

DR. RON MARTINELLI

SCOT-14C058/Declaration of Martinelli

2

**MARTINELLI & ASSOCIATES**
JUSTICE & FORENSIC CONSULTANTS, INC.

# Ron Martinelli, Ph.D., CMI-V, BCFT, CFA

## Professional Work Experience-

**Forensic Criminologist & Law Enforcement Training Consultant**
**Certified Medical Investigator**
**Federal/State Courts Qualified Police Practices & Premises Liability Expert**
Martinelli & Associates, Justice & Forensic Consultants, Inc.
Full-time: 05/1977 – Present    Part-time: 10/1978

Forensic criminologist, Certified Medical Investigator and private law enforcement training provider retained to develop and produce professional training and policies for law enforcement, corrections, criminal justice agencies and civilian personnel.

**Federal/State Courts Qualified Police Practices Expert:** Provide consultation, forensic analysis, investigative reports and expert testimony for agencies, associations, county counsels, state/city attorneys, law firms and plaintiffs involved in police/corrections practices and premises liability litigation.

**Team Leader, Multidisciplinary Forensic Death Investigations & Independent Review Team**. Certified Medical Investigator, managing a team of homicide, forensic investigations, medical and scientific experts in the investigation of complex death cases involving officer-involved shootings, in-custody deaths, suicides, self-defense shootings and other homicides and suspicious deaths. Significant portfolio of State Attorney Generals, municipal, plaintiff civil rights, criminal defense and corporate attorney and insurance company clients.

**Trial Consultant**
AnotherLook® (02/2015 – 10/2016)
27475 Ynez Road, Suite 716, Temecula, CA 92591 • (951) 719-1450
514 Marble Avenue NW, Albuquerque, NM 87102 • (505) 242-5777

Co-founder/Equity Partner in a litigation consulting firm which assists state, municipal and private attorneys in providing secondary evaluation and assessment of civil rights or tort cases in advance of trial. Company launched 10/2014.

27475 Ynez Road, Suite 716, Temecula, CA  92591
P  951.719.1450    F  951.501.2952
E-mail: code3law@martinelliandassoc.com
www.martinelliandassoc.com                    Exhibit 1

**Independent Special Investigator, Officer-Involved Shootings & In-Custody Deaths**
City of Riverside (CA) Office of the Mayor, Community Police Review Commission
Part-time: 04/2008 - 2013

Contract specialist and investigator working under the Manager of the Community Police Review Commission to independently investigate all officer-involved shootings (OIS) and in-custody death incidents involving the Riverside Police Department. Provide in-depth investigations, forensic analysis and reports, testimony, consultation and training to the City Attorney's Office, the commission, city agencies and administrators as requested.

**CEO/Director, Strategic Training & Consulting, LL** Part-time Contract 05/2008 – 06/2009
**Government Consultant/Chief Learning Officer**
1009 North Street, Suite B ● Christiansted, U.S. Virgin Islands 00820-5019

Administration of law enforcement and criminal justice training and consulting firm providing training and consulting services under contract to the government of the U.S. Virgin Islands and the Virgin Islands Police Department and offshore Caribbean Island nations. Oversee development and production of police practices training. Provide police practices consultation and training to USVI Governor's Office, VIPD Police Commissioner, police administration and department officers. Involved in budgeting, staff selection, appointments; supervision of training specialists; supervision and evaluation of training programs.

**Director, Criminal Justice Training Center & Fire Science Training Academy**
**Division Dean, Criminal Justice; Modesto Junior College**  01/1992 to 05/1993
201 Blue Gum Avenue, Modesto, California 95352

Interim contract administration and coordination of a California POST accredited law enforcement Basic Police Academy, Criminal Justice Training Center and Regional Fire Science Training Center serving eight counties.  Management and supervision of 105 full and adjunct faculty.  Program development and certification of basic academy and advanced officer courses; scheduling, budget, networking with law enforcement, fire and community public safety agencies.

**Police Officer/Field Training Officer/Detective**  07/1994 to 05/1997
Morro Bay Police Department
850 Morro Bay Blvd, Morro Bay, California 93442

Investigation of felonies, major crimes and narcotics violations.  Registered Sex Offender compliance officer. Investigations liaison with County District Attorney and CA Department of Justice on complex forensic cases; crime scene investigations. Uniformed patrol and Field Training Officer. Collateral responsibilities to include providing Spanish translation, officer safety and use of defensive force training to departmental personnel.  Developed training manual and instructed the city's Citizens Academy for community police volunteers. Reserve Police Officer status from November 1993 to July 1994.

**Police Officer/Senior FTO/Field Training Coordinator/Investigator** 01/1977 to 01/1992
San Jose Police Department
201 W. Mission Street, San Jose, California 95110

Diverse uniformed patrol and investigative assignments:  Administrative Assistant to District Supervisor, Senior Field Training Officer, Field Training Program Coordinator, police academy instructor, and investigator. Assignments included: felony suppression patrol,

Street Crimes Unit (undercover, vice, prostitution, narcotics, robbery suppression); Fraud Unit: Forgery and complex theft investigation; street gang investigations; juvenile Crimes Against Persons Unit. Developing, implemented and instructed various specialized enforcement programs for the Bureau of Field Operations and Bureau of Investigations. Department training liaison to various enforcement agencies within Santa Clara County to consult with and instruct street gang and child abuse and neglect investigations courses. Certified bilingual (Spanish-fluent) officer/translator.

**Police Officer:** 1975 to 1977
Redwood City Police Department
1301 Maple Street, Redwood City, California 94063
General patrol, enforcement and investigative functions. Department Spanish language translator.

## Education

**Certified Medical Investigator, CMI-V (Physician's Level)**
American College of Forensic Examiners Institute, Springfield, MO   2013 – 2015
Accreditation through Missouri State Medical Association and the
Accreditation Council for Continuing Medical Education,
Institute for International Medicine; Missouri State POST

**Doctor of Philosophy (Ph.D.), Criminology, Emphasis in Forensic Psychology**
Columbia Pacific University, San Rafael, California 1983 - 1986
(CA and United States Dept. Education Full Institutional Approval thru 1989)

**Masters Degrees, Public Administration & Justice Administration** 1979 - 1980
Golden Gate University, San Francisco, California (CA Dept. of Ed. Accredited)

**MPA Degree Program, Graduate Studies in Criminal Law and Public Administration**
John F. Kennedy University, Orinda, California 1978 - 1979
(CA Dept. of Ed. Accredited)

**Bachelor of Science Degree, Physical Education & History** 1969 - 1973
California Polytechnic State University, San Luis Obispo, California Recipient of California Secondary Teaching Credential 1974 (CA Dept. of Ed. Accredited)

## Faculty Memberships (Past – Present)

**Professor – Adjunct National University:** 2007 – Present
11255 No. Torrey Pines Road, La Jolla, California 92037-1011 (Accredited)
Forensic Science Masters Degree Program, Forensic Science Department

**Professor – Adjunct Argosy University:** 2004 – 2005
999-A Canal Boulevard, Point Richmond, California 94804  (Accredited)
Forensic Psychology Masters Degree Program, Forensic Psychology Department

**Professor – Adjunct • California Polytechnic State University** 1998 – 1999
1 Grand Avenue, San Luis Obispo, California 93407 (Accredited)
Criminology, Bachelors Degree Program, Social Science Department

**Instructor – Adjunct • DeAnza College:** 1983 to 1991
21250 Stevens Creek Boulevard, Cupertino, California 9501 (Accredited)
Advanced criminology/law enforcement Instructor: Social Science Division, Administration of Justice

**Professor – Adjunct • Columbia Pacific University:** 1987 to 1989
1415 Third Street, San Rafael, California 94901 (CA Dept. of Ed. Full Institutional Approval)
Adjunct Professor & faculty mentor for graduate & undergraduate studies: Criminal Justice Program

**Instructor – Adjunct • San Jose City College:** 1977 to 1981
2100 Moorpark Avenue, San Jose, California (Accredited)
Basic Police Academy, Regional Criminal Justice Training Center. Instructor of advanced law enforcement studies for corrections and probation departments

## Visiting Lectureships

- U. S. Naval Special Warfare Command, SEAL Team One, Coronado, California
- San Jose State University, Center for Transitional Studies
- San Joaquin Delta Community College, Regional Criminal Justice Training Center
- Los Medanos College, Criminal Justice Training Center
- Butte College, Criminal Justice Training Center
- University of Nevada-Reno, Criminal Justice Division
- Truckee-Meadows Community College, Law Enforcement Academy
- Tampa College, Florida, Criminal Justice Division
- Wyoming Law Enforcement Academy, Wyoming Div. of Criminal Investigations
- Crafton Hills College, Criminal Justice Division
- Atlanta Police Department & Police Academy, Atlanta, Georgia

## Professional Certifications (Partial List Only)

- Peace Officer Standards & Training Advanced Certificate, 1980 #A9825; POST Trng #A99-Y53
- Certified Medical Investigator: American College of Forensic Examiners Institute, 2015
- Certified Force Analyst: Force Science Institute, Minnesota State University, 2010
- Board Certified in Forensic Traumatology, National Center for Crisis Management, 2008, 2012, 2014
- Diplomate, American Academy of Experts in Traumatic Stress, NCCM, 2008, 2012, 2014
- Kinesic Interviewing – Public Agency Training Council, 2011
- Certified Litigation Specialist: Police Practices & Corrections, AELE, 2009
- Forensic Analyst: Excited/Agitated Delirium & In-Custody Death, (National) IPICD, 2009
- Administrative & Internal Affairs Investigations, AELE, 2008
- Officer-Involved Shooting Investigations, Los Angeles Police Department, 2008
- Officer-Involved Shootings & In-Custody Death Investigations, AELE, 2008
- Jail & Prison Legal Issues & Litigation, AELE, 2008, 2010, 2012
- Sexual Assault Investigator School, San Jose State University, POST, 1996
- Homicide Investigator School, California District Attorney's Association, 1995
- Child Physical/Sexual Abuse & Sexual Exploitation Investigator School, POST, 1994
- Criminal Psychological Profiling Certification, National Law Enforcement Institute, 1988
- Computer Crime & Complex Economic Fraud Certification, U.S. Dept. of Justice, 1981
- Bilingual Spanish language Certification, City of San Jose, 1977

## Instructor Certifications (Past – Present)

- California Community College Instructor Certificate (Life), Police Science/Administration of Justice (1977) #146515
- Law Enforcement Training Provider & Instructor (CA, NV, AZ, AK, WY, NE, TX, GA, FL, USVI)
- Law Enforcement Training Provider & Instructor, California Board of Corrections #0970, 1980 – 2008
- De-escalation Instructor, TX, 2015
- Responses to Psycho-medical Emergencies Instructor, TX, 2015
- Simunitions FX, Officer-Involved Shooting & Scenario Safety Training Instructor, 2006
- Law Enforcement Firearms (Tactical Pistol) Instructor (CA)
- NRA Law Enforcement Firearms Instructor, 2004, 2007 (National)
- NRA Civilian Firearms Instructor (Pistol/Shotgun), (National), 2005, 2007, 2013
- NRA Home Defense Instructor, (National), 2005, 2007, 2013
- Excited-Agitated Delirium, Sudden In-Custody Death Recognition, IPICD (National), 2009, 2012, 2014, 2015
- Agonal Breathing Instructor – Institute for the Prevention on In-Custody Death, 2015
- Total Appendage Restraint Positioning (TARP) Instructor, IPICD, 2015
- Peacekeeper Rapid Containment Baton Adv. Instructor, Peacekeeper Products (National), 2012
- Peacekeeper Rapid Containment Baton (RCB) Instructor, Peacekeeper Products (National), 2009
- Carotid Restraint Control Hold Instructor, Carotid Restraint Training Institute (National), 2013, 2015
- Grav Maga Edged Weapons Defense (National), 2002
- Electronic Weapons Instructor (Master Instructor), CA-POST #6730-23092-11, 2011
- Electronic Weapons Instructor (Master Instructor), AZ-POST, #11-256, 2011
- Advanced TASER Electronic Control Devices Instructor, TASER Intl., (National), 2002, '05, '07, '10, 2011
- Gunsite Law Enforcement Firearms Instructor, (National) 1998
- Chemical Agents, OC Pepper Spray Aerosol & Chemical Munitions Instructor, CA-POST, 1993, 2011
- Less Lethal Weapons & Munitions Instructor (Defense Technology), CA-POST, 1993
- Less Lethal Weapons & Munitions, 40mm Launcher & Exact Impact Sponge Round, 2004
- Defensive Force Management Instructor (CA, NV, NE, WY, FL)
- Defensive Force:  Unarmed Defensive Tactics Instructor (CA, NV, WY, NE)
- Arrest, Control, and Restraints Tactics Instructor (CA, NV, NE)
- Officer Survival Tactics for First Responders Instructor (CA, NV)
- Tactics for Armed Officers Instructor (CA)
- Tactical Negotiation & Conflict Resolution Instructor (CA)
- Field Training Officer & Field Training Supervisor Course (CA, USVI)
- Special Emergency Response Teams (SERT) for Corrections Institutions Instructor (CA)
- Survival Tactics for Unarmed Field & Institutions Officers Instructor (CA)
- Officer Safety/Survival in High-Risk Environments Instructor (CA)
- Integrated Force Instructor (CA)
- Probation Field & Institution Supervision Instructor (CA)
- Street Gang Dynamics & Investigations Instructor (CA, NV, WY, NE, FL)
- White Supremacist Groups, Organizations & Hate Crime Investigations Instructor (CA, NV)
- Prostitution – Vice Investigations Instructor (CA)
- Field Training Officer & Field Training Supervisor Instructor (USVI), FTO In-Service (CA)
- Probation/Corrections Training Officer Instructor (CA)
- Report Writing & Testimony for Critical Incidents Instructor (CA)

- Risk Management, Civil Liability & Training Instructor (CA)
- CA Board of Corrections Title 15 Instructor (CA)
- Officer & Suspect Psychology & Physiology during Critical Incidents Instructor (CA)
- Supervisor Response to Critical Incidents, In-Custody Deaths & Officer-Involved Shootings Instructor (Corrections & Field Officers) (CA)

## Awards & Professional Achievements (Partial List Only)

- Contributing Police & Crime Expert, FOX News
- Contributing Police & Crime Expert, One America News Network
- Contributing Police & Crime Expert, CNN & CNN Headline News
- Contributing Police & Crime Expert, Discovery Channel
- Contributing Police & Crime Expert, The History Channel
- Contributing Police & Crime Expert, Investigations Discovery Channel
- Contributing Police & Crime Expert/Writer: America Out Loud
- Contributing Writer – USA TODAY
- Contributing Writer – The Hill
- Contributing Writer – PoliceOne.com
- Contributing Writer – Officer.com
- Contributing Writer – The Forensic Examiner (magazine)
- Contributing Writer – POLICE Magazine
- Contributing Writer – Law & Order Magazine
- Contributing Writer – The Law Enforcement Executive Journal, Illinois
- Contributing Writer – Peace Officers Research Association of CA (PORAC) News
- Board Chair – Certified Medical Investigator Program, American College of Forensic Examiners Institute (ACFEI)
- Distinguished Faculty for 2014, Lorman Education Services, Inc.
- Diplomate, American Academy of Experts in Traumatic Stress, NCCM, 2008, 2012
- Prevailing Police Expert, U.S. Supreme Court Case, *White v. Pauly, 580 U.S. __ (2017)*
- Presenter, Wisconsin State Sheriff's Association, *"The Black Lives Matter Movement and Policing Strategies Moving Forward,"* 02/2017, Green Bay, WI
- Presenter/Instructor, 2016 Conference, International Law Enforcement Educators & Trainers Association (ILEETA)
- Presenter/Instructor: American College of Forensic Examiners Institute (ACFEI), Executive Summit National Conference, Las Vegas, NV, *"Use of Force and Electronic Control Weapon Investigation & Analysis,"* 2012
- Presenter/Instructor: American College of Forensic Examiners Institute (ACFEI) International Conference, Orlando, FL, *"Agitated – Excited Delirium and Sudden In-Custody Death,"* 2010
- Presenter/Instructor: International Law Enforcement Educators & Trainers Association (ILEETA) International Conference, Chicago, *"Suicide by Cop: Police Tactical Responses",* 2009
- Key Presenter/Instructor: CA Board of Corrections Law Enforcement Training Manager's Seminar, 2006, *"Risk Management, Training and Law Enforcement Liability"*
- Presenter: CA Probation, Parole & Corrections Officers Assoc. State Conference, *"Tactical Psychology & Physiology in Officer Involved Shootings;" "TASER Electronic Control Device Weapon Systems"* 2005
- Presenter: CA State Park Rangers Association State Conference, 2007 *"Tactical Psychology: Dealing with Stress Inoculation during Critical Incidents"*
- Presenter: CA State Park Rangers Association State Conference, 2005 *"Training, Standards and Law Enforcement Liability; Arming of Park Rangers"*
- Visiting Instructor: U.S. Naval Special Warfare Command, SEAL/s *Hand to Hand Combat Instructor/UDT Course,* 2000

- Presenter: California Probation, Parole, & Correctional Assoc. State Conference, *"Managing Risk & Liability in Training,"* "Standards for Arming Peace Officers," 2002, '04
- Visiting Instructor: Atlanta Police Department *"Undercover Street Crimes Operations"* 2003
- Presenter: American Society of Law Enforcement Trainers Use of Force National Conference, *"Unarmed Defensive Tactics/Tactical Ground Fighting Instructor's Course",* 1999
- Presenter: CA Probation Chief's Association State Conference, *"Risk Management & Training",* 1998
- Expert Witness, *Caliber Press, Inc.* Law Enforcement Agency Defense Services, 1997
- Key Presenter: California Probation, Parole, & Correctional Assoc. Conference, *Use of Force Training"* 1996
- Key Presenter: California Probation Administrator's State Conference, *"Use of Force Liability"* 1995
- Appointed *"Use of Force Advisor",* CA Probation Chief's Arming Committee, 1993-94
- San Jose Police Department Employee Recognition Awards, 1987, 1988, 1989
- Nominated San Jose Police Department Medal of Valor, 1981
- San Jose Police Department & Santa Clara County "Top Cop Award" Most Felony Arrests, 1980
- San Jose Police Department Outstanding Duty Award, 1980
- Recipient of over **140** departmental, community, and citizen commendations for outstanding performance and community service
- Peace Officer Research Association of California Graduate Studies Scholarship, 1985
- Chair, Education & Training Committee, Northern California Gang Investigators Association 1983-84
- Outstanding Service Award, American Association of Retired Persons, 1981
- Appointed Child Abuse Task Force, San Mateo County Supervisors, 1980
- California Youth Gang Task Force, (Governor's Consultant) 1980 Instructor/Presenter: CA State Park Rangers Association State Conference, 2007 *"Tactical Psychology: Dealing with Stress Inoculation During Critical Incidents"*
- Instructor/Presenter: CA State Park Rangers Association State Conference, 2005 "Training, Standards and Law Enforcement Liability; Arming of Park Rangers"

## Professional Memberships (Past & Present)

- American College of Forensic Examiners Institute, (ACFEI), #111434
- National Institute of Forensic Science
- California Academy Director's Association (CADA)
- International Association of Chiefs of Police (IACP), #1688415
- International Association of Coroners & Medical Examiners
- The Society for Police and Criminal Psychology
- American Academy of Experts in Traumatic Stress (AAETS), #4897
- National Center for Crisis Management (NCCM)
- Crime Scene Investigator's Association
- Commission on Forensic Education (COFE)
- National Internal Affairs Investigators Association (NIAIA)
- International Law Enforcement Educators & Trainers Association (ILEETA), #1423
- International Association of Law Enforcement Firearms Instructors (IALEFI)
- American Society of Law Enforcement Trainers (ASLET)
- Americans for Effective Law Enforcement (AELE)
- National Rifle Association Law Enforcement Activities Division (NRA-LEAD)
- California Probation, Parole, & Correctional Association (CPPCA)
- California Association of Police Training Officers (CAPTO)
- California Peace Officers' Association (CPOA)

- Association of Security & Intelligence Specialists (ASIS) International, #306956
- Peace Officers' Research Association of California (PORAC)
- Crime Scene Investigators & Trainers Association
- California Gang Investigators Association
- Northern California Gang Investigators Association (Founding Member)
- National Tactical Officers Association (NTOA)
- American Society of Criminology
- Society of Police Psychologists
- International Assoc. Crime & Intelligence Analysts
- Calif. Association of Licensed Investigators (CALI), Qualified Manager, #10808
- Police Marksman Association
- U.S. Navy UDT/SEAL Association
- Navy League
- Professional Association of Diving Instructors, PADI Open Water Diver #14030A3023


## Publications Authored (Texts)

- ***The Truth Behind the Black Lives Matter Movement and the War on Police***
  Martinelli & Associates, Justice & Forensic Consultants, Inc., Graphic Printsource, 2016

- ***The Law of Self-Defense and the Use of Force In California,*** Michel & Associates, PC,
  (Contributing Expert-Author), 2016, Distributed by the California Rifle & Pistol Association

- ***The Violent Gang***
  Shield Criminal Justice Publications; San Carlos, 1991, '92, '93, '94

- ***The Stroll: Victims and Violators of the World's Oldest Profession – Prostitution***
  Shield Criminal Justice Publications; San Carlos, 1986, '87, '90

- ***Street Gangs: Violent Nations Within a Violent Nation***
  Shield Criminal Justice Publications; San Carlos, 1986, '87

- ***Streetwise Criminology***
  Martinelli & Associates Justice Consultants, Inc., Los Osos, CA 1999


## Training Manuals Authored

- ***The Truth Behind the Black Lives Matter Movement and the War on Police (PowerPoint)***
  Martinelli, Ron, Ph.D., Martinelli & Associates: Justice & Forensic Consultants, Inc., 2016

- ***Forensic Determinations of "bath salts" Influence (Manual& PowerPoint),*** *2014*
  Martinelli, Ron, Ph.D., Martinelli & Associates: Justice & Forensic Consultants, Inc.

- ***The Investigation of Self-Defense Homicides,*** (Manual & PowerPoint), 2014
  Martinelli, Ron, Ph.D., with Mark Jarmie, Esq.
  Martinelli & Associates, Justice & Forensic Consultants, Inc.
  Lorman Education Services, Eau Claire, WI

- ***Electronic Control Weapons Instructor (Manual & PowerPoint),*** 2012, 2014
  Martinelli, Ron, Ph.D., (2012, 2014); Ed Flosi (2012 Edition)
  Martinelli & Associates: Justice & Forensic Consultants, Inc.

- ***Electronic Control Weapons and Legal Liability (Manual & PowerPoint)***, *2012, 2013*
  Martinelli & Associates: Justice & Forensic Consultants, Inc.
  Lorman Educational Services, Eau Claire, WI

- ***Lethal and Less Lethal Uses of Force (Manual & PowerPoint)***, *2011*
  Martinelli & Associates: Justice & Forensic Consultants, Inc.
  Lorman Educational Services, Eau Claire, WI

- ***TASER® - ECW Force Investigations and Analysis (Manual & PowerPoint)***, *2010, 2012*
  Martinelli & Associates: Justice & Forensic Consultants, Inc.

- ***Agitated Excited Delirium and Sudden In-Custody Death Forensic Investigations (Manual & PowerPoint)***, *2010, 2012*
  Martinelli & Associates: Justice & Forensic Consultants, Inc.

- ***Suicidal Behavior and Police Responses to "Suicide by Cop" (Manual & PowerPoint)***, *2009, Martinelli & Associates: Justice & Forensic Consultants, Inc.*

- ***Field Training Officer & FTO Supervisor's Course (Manual & PowerPoint)***, *2008*
  *Strategic Training & Consulting, LLC – USVI*

- ***Police Supervisor's Liability Course (Manual & PowerPoint)***, *2007*
  Martinelli & Associates Justice Consultants, LLC

- ***Supervisor Responses to Critical Incidents (Manual & PowerPoint)***, *2007*
  Martinelli & Associates Justice Consultants, LLC

- ***Tactical Psychology & Physiology: How the Body Acts when Stress Inoculated***
  Martinelli & Associates Justice Consultants, LLC, 2005, '06, 2015

- ***Managing Risk & Civil Liability Through Training (Manual & PowerPoint)***
  Martinelli & Associates: Justice Consultants, LLC, 1999, '01, '02, '06

- ***Arrest, Control, & Restraint Tactics (ACT)***
  Martinelli & Associates: Justice Consultants, LLC, 1994, '97, '98, '03, '07

- ***Arrest, Control, & Restraint Tactics (ACT) Instructor***
  Martinelli & Associates: Justice Consultants, LLC, 1998, '00, '03, '07

- ***Chemical Agent OC Pepper Spray Defense (Manual & PowerPoint)***
  Martinelli & Associates: Justice Consultants, 1994, '95, '96, '97, '98, '03, '06, '07

- ***Probation Training Officer (PTO Manual & PowerPoint)***
  Martinelli & Associates: Justice Consultants, LLC, 1996, '97, '98, '02, '06

- ***Tactical Use of OC Spray***
  Martinelli & Associates: Justice Consultants, LLC, 1995, '96, '97, '98, '03, '07

- ***Report Writing & Testimony for Critical Incidents***
  Martinelli & Associates Justice Consultants, LLC, 1998, 2000

- ***Use of Force: Unarmed Defensive Tactics (UDT)***
  Shield Criminal Justice: Consultants, LLC, 1993, '96, '97, '03

- ***Weaponless Defense for Corrections Instructor***
  Martinelli & Associates: Justice Consultants, LLC, 2003

- ***Laws of Arrest, Search & Seizure (Manual & PowerPoint)***
  Martinelli & Associates Justice Consultants, LLC, 2005, 2006

- ***Tactical Negotiation & Conflict Resolution (Manual & PowerPoint)***
  Martinelli & Associates: Justice Consultants, LLC, 1995, '98, 2002, 2015

- ***High-Risk Environments for Officers (Manual & PowerPoint)***
  Martinelli & Associates: Justice Consultants, LLC, 1995, '97, '99, 2002, '07

- ***Armed Officer Academy: Semi-Auto Pistol Transition***
  Martinelli & Associates: Justice Consultants, LLC, 2000, '02, '03
  Co-Author Larry Nichols

- ***Arrest & Control Tactics (ACT) Instructor***
  Martinelli & Associates: Justice Consultants, LLC, 2000, 2003

- ***Unarmed Defensive Tactics (UDT) Instructor***
  Martinelli & Associates: Justice Consultants, LLC, 2003

- ***The Juvenile Street Gang Phenomenon***
  Martinelli & Associates: Justice Consultants, LLC, 1981

- ***Defensive Force Management for Administrators & Supervisors***
  Martinelli & Associates: Justice Consultants, LLC, 1994, '95, 2001

- ***Probation Supervisor's Manual (& PowerPoint)***
  Martinelli & Associates: Justice Consultants, LLC, 1995, 2007
  Co-Author Al Petrides

- ***Outlaw Motorcycle Gangs & Clandestine Labs***
  Martinelli & Associates: Justice Consultants, LLC, 1993, '95, '98
  Co-Author Anthony Tait (Compilation of OLMCG & Narcotics Data)


## Articles Authored (Recent)

- ***"Chiefs, Sheriffs, Politicians – Time to take a stand on Black Lives Matter,"*** Officer.com
  http://www.officer.com/article/12264944/chiefs-sheriffs-and-politicians-its-time-to-take-a-stand-on-black-lives-matter-movement, 10-04-16

- ***San Jose "Ground Zero" for the Fight for America's Core Values,"*** Officer.com
  http://www.officer.com/article/12218024/san-jose-ground-zero-for-the-fight-for-americas-core-values, 06/06/16

- ***"Response to Psycho-Medical Emergencies,"*** Peace Officer Research Association of California (PORAC) Magazine, 02/2016, pp. 14-15

- ***"Response to Psycho-Medical Emergencies,"*** POLICE Magazine, 01/2016, pp. 40-46

- ***"Response to Psycho-Medical Emergencies,"*** The Forensic Examiner Magazine, 01-21-16

- *"The 21-Foot Rule: Forensic Fact or Fantasy,"* International Law Enforcement Educators & Trainers Association (ILEETA) Journal, Winter Edition, 2015, pp. 78-80

- *"Black Lives Matter – The Good, Bad and Ugly of this Militant Movement,"*
  POLICE Magazine, 10-2015, pp. 68 – 75

- *"America's Ticking Time Bombs,"* Tactical Solutions Magazine, Fall, 2015, pp. 27-30

- *"The Need for A Credible Independent Review of Major Uses of Force: A Search for the Truth,"* Law Enforcement Executive Forum, 10-2015, Issue 15(3), pp. 61-63

- *"The Black Lives Matter Movement's 10-Point Policing Program Needs a Dose of Reality,"*
  The Forensic Examiner Magazine, The American College of Forensic Examiners Institute, 10-2015

- *"America's Turning Point – The War On Police,"* POLICE Magazine, on-line, 09-01-15, http://www.policemag.com/blog/patrol-tactics/story/2015/09/america-s-turning-point-the-war-on-police.aspx?ref=rel-recommended

- *"America's Turning Point – The War On Police,"* The Forensic Examiner Magazine,
  The American College of Forensic Examiners Institute, 09-2015

- *"The Investigation of Homicides where Self-Defense is Asserted,"* 07-16-15, Officer.com, http://www.officer.com/article/12091535/the-investigation-of-self-defense-asserted-homicides

- *"Just the Facts – The Need for Independent Review,"* POLICE Magazine, Co-Author Mark Jarmie; June, 2015, pp. 34 – 39

- *"Remove the Incentive to Service and You'll Get No Service,"* POLICE Magazine, On-Line, 06-02-15, http://www.policemag.com/blog/patrol-tactics/story/2015/06/remove-the-incentive-to-serve-and-you-ll-get-no-service.aspx

- *"What's Missing from the National Narrative on Improving Police-Community Relations,"*
  POLICE Magazine, On-Line, 05-29-15

- *"The Value of Police Reserve Officers,"* USA Today, Editorial Page, On-Line Edition, 04-22-15
  http://usat.ly/1Gjlmlq

- *"The Investigation of Self-Defense Asserted Homicides,"* Tactical Solutions Magazine, Winter Edition, pp. 49-54, 01-2015   http://www.bluetoad.com/publication/?i=242056

- *"The Investigation of Self-Defense Asserted Homicides,"* POLICE Magazine,
  October, 2014, pp. 50-57

- *"The Investigation of Self-Defense Asserted Homicides,"* Law Enforcement Executive Forum, 2014, 14(4), pp. 31-35

- *"The '21 Foot Rule' Forensic Fact or Fantasy,"* International Law Enforcement Educators and Trainers (ILEETA) Journal, Winter 2015 Edition, Vol. 5, Edition 1, 01-2015, pp. 78-81

- *"Re-analyzing the "21 Foot Rule,"* Peace Officer Research Association of California (PORAC) Magazine, O9-2014, pp. 32-34

- **"Re-analyzing the "21 Foot Rule,"** POLICE Magazine, Internet Edition, "The Winning Edge," http://www.policemag.com/channel/weapons/articles/2014/09/revisiting-the-21-foot-rule.aspx, 09-18-14

- **"Re-analyzing the "21 Foot Rule,** The Forensic Examiner, American College of Forensic Examiners Institute magazine, 07-09-15, http://www.theforensicexaminer.com/2015/martinelli_758.php

- **"Reconsidering Carotid Restraint Control,"** POLICE Magazine, 01-2014, pp. 56-61

- **"Reconsidering Carotid Restraint Control,"** Peace Officer Research Association of California (PORAC) Magazine, O2-2014, pp. 36-39

- **"The Sandy Hook Massacre – What No Cop Should Ever Experience: Post-Shooting Trauma,"** Peace Officer Research Association of California (PORAC) Magazine, O2-2013, pp. 8-10

- **"The Sandy Hook Massacre – What No Cop Should Ever Experience: Post-Shooting Trauma,"** **Internet Article:** PoliceOne.com News, 12-23-12, http://www.policeone.com/active-shooter/articles/6069664-Newtown-shooting-What-no-cop-should-experience/; Police & Security Magazine, 12-2012

- **"Duty Dangers: The Deadly Cost of Technology,"** POLICE Magazine, April, 2012 http://www.policemag.com/channel/technology/articles/2012/04/duty-dangers-the-deadly-cost-of-technology.aspx

- **"The Dynamics of Suicide,"** Internet Article, Forensic Forum® Series, Ron Martinelli, Ph.D., 05-07-12, Distribution via Martinelli & Associates, Inc. website

- **"The Trayvon Martin Shooting Case,"** Internet Article, Forensic Force® Series, Ron Martinelli, Ph.D., 04-20-12, Distribution via Martinelli & Associates, Inc. website

- **"Foot Pursuits: To Chase or Not to Chase,"** POLICE Magazine, December, 2011, Tactical Solutions Magazine, 10-2014; http://www.bluetoad.com/publication/?i=230355

- **"The Tucson Shooting Incident: America's Ticking Time Bombs,"** Internet Article, Ron Martinelli, Ph.D., 01-16-11, Distribution via Martinelli & Associates, Inc. website

- **"Pre-contact Threat Assessment and the 'Art of Force,' "**Internet Article, PoliceOne.com News, 01-14-11, www.policeone.com/pc_print.asp?vid=3199272 Peace Officers Research Association of California (PORAC) News, 02-2011

- **"Foot Pursuits: To Chase or Not to Chase?"** Peace Officers Research Association of California (PORAC) News, 01-2011; Internet Article, PoliceOne.com News, 04-22-11; www.policeone.com/pc_print.asp?vid=3531874

- **"The Officer Mehserle BART Shooting: Murder or Hypervigilance?"** Peace Officers Research Association of California (PORAC) News, 12-2010

- **"Profiling Hollywood Publicist Ronnie Chasen's Killer,"** Internet Article, Mid Valley News, 11-24-10; www.midvalleynewsonline.com

- **"Assessing Subjects Under TASER® - ECD Influence,"** PoliceOne.com News – Internet Article, Police Magazine, 08-30-10

- ***"Psychophysiological Responses to TASER®-ECD Influence,"*** Co-authored with Jerry Staton, CLS, SMTI, Law Enforcement Executive Forum Journal, 2010 Edition, Vol. 10, No. 4

- ***"Taser ®- ECD Mentality"***
  PoliceOne.com News – Internet Article, 10-09-09, www.policeone.com
  Peace Officer's Research Association of California (PORAC) News, 03-2010
  Law Enforcement Executive Forum, 2011 Edition, Vol. 11

- ***"Playing the Race Card: Analyzing the Gates vs. Sgt. Crowley Incident"***
  PoliceOne.com News – Internet Article, 09-03-09, www.policeone.com

## Documentaries and News: Film, Television, Radio, Print Media

- ***Radio Interview, KXDJ Radio FM 98.3, Chris Samples Show***, 10-22-15
  Discussion on Gun Control and the War on Police

- ***Radio Interview, WHK Radio AM 1040 The Answer, Bob Frantz Show,*** 10-12-15
  Discussion of the forensic protocols of investigating officer-involved shootings and the standards of proof in criminal and civil cases.

- 
- ***Newspaper Interview, The Press Enterprise,*** San Bernardino, Reporter Brian Rokas, Expert's Analysis of Civilian Versus Police Shootings and Standards of Proof, 10-06-15

- 
- ***Radio Interview, KPRL Radio 1230 AM, "Sound Off,"*** Host Dan Del Campo, Discussion of Gun Control and Black on Black Gun Violence, 10-06-15

- ***Radio Interview, WYAY News Radio 106 FM, Atlanta, GA***, Host Bob Frantz, 10-05-15
  Discussion of Gun Control, Oregon College Killings and Black on Black Gun Violence,

- ***Radio Interview, WHK Radio AM 1040 The Answer, Bob Frantz Show,*** 10-05-15
  Discussion of Gun Control, Oregon College Killings and Black on Black Gun Violence,

- ***National Radio Interview, FOX News Radio, The Sean Hannity Show,*** 10-03-15
  Discussion of Gun Control, Oregon College Killings and Black on Black Gun Violence,

- ***Television Interview, FOX 29, San Antonio, Texas,*** 10-03-15
  Discussion of Gun Control, Oregon College Killings and Psychological Profile of Killer

- ***National Television Interview, CCTV News USA/China,*** 10-02-15
  Discussion of Gun Control, Oregon College Killings and Psychological Profile of Killer

- ***National Television Interview, FOX NEWS, "The Factor," Host Bill O'Reilly,*** 10-02-15
  Discussion of Gun Control, Oregon College Killings and Psychological Profile of Killer

- ***Radio Interview, WHK Radio AM 1040 The Answer, Bob Frantz Show,***
  Discussion of the Black Lives Matter movement, police-related death cases and the War on Police, 09-14-15
- ***International Television Interview***, CCTV News USA/China
  Discussion of Psychological Profile of VA Reporters Murder Suspect, 08-26-15
  https://www.youtube.com/watch?v=ufBlq6sOnsE&feature=youtu.be

- ***National Radio Interview, CBS News Radio, New York***
  Discussion of workplace violence and psychological profile of VA reports murder suspect Vester Flanigan, 08-26-15
- ***National Newspaper Interview, USA TODAY,*** Editor George Hager, Wash. DC
  Discussion of increase in police officers killed/assaulted in line of duty, 2015, 08-26-15
- 
- ***Lecture Series – Lorman Education Services, national webinar***
  "Lethal and Less Lethal Uses of Force," 11-12-14,
  www.lorman.com ID390766 CEU 1.5

- ***National Television Discussion and Live Demonstration, CNN News***
  "Deadly Force Encounters, Use of Force and the "21 Foot Rule,"
  CNN News, http://outfront.blogs.cnn.com/2014/08/22/how-are-cops-trained-for-deadly-for. 08-22-14

- ***Newspaper Interview – Press Enterprise, San Bernardino, CA***
  "Recruit's training put to life and death test."  Reporter Brian Rokos
  www.pe.com/articles/training-748789-field-training.html  08-23-14

- ***Radio Interview – AM 590 Inland Empire, "The Answer" Firing Line Program***
  Discussion on criminal investigations involving homicides where self-defense is asserted, 06-21-14

- ***Lecture Series – Lorman Education Services, national webinar***
  "Forensic Determinations of "Bath Salts" Influence," 07-17-14
  www.lorman.com ID391875 CEU 1.0

- ***Television Series – "Deadly Secrets," Investigation Discovery Channel***
  On-going retention, Forensic Expert Contributor, 07-16-14

- ***Radio Interview – AM 590 Inland Empire, "The Answer" Firing Line Program***
  Discussion and opinions on newly proposed firearms legislation in CA, 06-21-14

- ***Interview – Salt Lake City Tribune,***
  Police executing search warrants for non-violent crimes.
  Reporter Nate Carlisle, http://www.sltrib.com/sltrib/news/58028660-78/shurtleff-search-police-martinelli.html.csp. 06-04-14

- ***Lecture Series – Lorman Education Services, national webinar***
  "Electronic Control Weapons & Legal Liability," 12-19-13
  www.lorman.com/393407

- ***Interview – Orange County Register,*** "Kelly Thomas Police Beating Homicide,"
  Forensic explanation of use of force/excessive force and the analysis of recorded media in establishing criminal corpus and the presentation of evidence. 11-28-13

- ***Interview – BBC, London***
  *Christopher Dorner Shootout with Police*, Reporter Jon Kelly, 02-13-13

- ***Interview- Washington Times, Washington D.C.***
  "Shootout or suicide likely fate of L.A. fugitive, "Not going to be taken alive."
  http://www.washingtontimes.com/news/2013/feb/11/shootout-or-suicide-likely-fate-  of-fugitive/#.URp5IvaAj3A.email, 02-11-13

- **Interview- Press Enterprise Inland Empire (CA)**
  *"Expert Profiles Cop Killer Christopher Dorner – This Will End Badly"* 02-07-13
  http://blog.pe.com/crime-blotter/2013/02/07/dorner-manhunt-expert-says-this-will-end-badly/

- **Interview – KFI 640 AM Radio – Los Angeles**
  "Posttraumatic Stress and Post-Shooting Trauma – The Sandy Hook School Massacre"
  12-18-12

- **Lecture Series – Lorman Education Services, national webinar**
  "Electronic Control Weapons and Legal Liability," 12-19-13
  www.lorman.com ID389046 CEU 1.5

- **Lecture Series – Lorman Education Services, national webinar**
  "Agitated-Excited Delirium, Responses to Agitated Chaotic Events" 11-13-13
  www.lorman.com ID388285 CEU 1.5

- **Lecture Series – Lorman Education Services, national webinar**
  "Lethal and Less Lethal Uses of Force," 12-04-12,
  www.lorman.com ID390766 CEU 1.5

- **Lecture Series – Lorman Education Services, national webinar**
  "Agitated-Excited Delirium, Responses to Agitated Chaotic Events" 11-29-12,
  www.lorman.com ID388285 CEU 1.5

- **Interview – Associated Press, Miami, Florida**
  "Treyvon Martin Shooting Homicide" Provided forensic information on recorded media
  analysis of police department surveillance video. 03-29-12

- **Lecture Series – Lorman Education Services, national webinar**
  "Electronic Control Weapons and Legal Liability," 02-08-12
  www.lorman.com ID389046 CEU 1.5

- **Lecture Series – Lorman Education Services, national webinar**
  "Lethal and Less Lethal Uses of Force," 08-10-11,
  www.lorman.com ID388285 CEU 1.5

- **Interview – KVOA NBC Channel 4, Tucson, AZ**
  "The Tucson Incident: America's Ticking Time Bombs", 01-21-11
  Morning News Hour

- **Interview – WTVG ABC Channel 13, Toledo, Ohio**
  "The Tucson Incident: America's Ticking Time Bombs", 01-23-11
  Sunday Roundtable Discussion

- **Interview – KYNO 940 AM Radio, Fresno, CA**
  "The Tucson Incident: America's Ticking Time Bombs", 01-20-11
  The Bill McEwen Show

- **"History's Mysteries" Series, 'Butch Cassidy & The Sundance Kid:
  Did they Survive their Famous Shootout?'**
  The History Channel, August, 2004
  Technical Advisor/Appearance

- ***"Myth Busters" Spike TV*** (New Series)
  Demonstrations of Bullet Ricochets & Forensic Results, 2008
  Technical Advisor/Appearance

- ***"Dangerous Missions" Series, 'Law Enforcement Snipers & Force'***
  The History Channel, August, 2002
  Technical Advisor/Appearance

- ***"History's Mysteries: Forensic History" Series, 'Investigating the Shoot-Out At the OK Corral'***
  The Discovery Channel, November, 2002
  Technical Advisor/Appearance

- ***"Officer-Directed Violence": 'Officers Facing Violent Encounters'***
  KICU-TV Channel 36 San Jose, 1996
  Technical Advisor/Appearance

- ***"Criminal Psychological Profiling of A Serial Killer"***
  'Hard Copy' Cable Television Documentary Series, 1993
  Technical Advisor/Appearance

- ***"Satanism & The Occult"***
  KICU-TV Channel 36 San Jose, 1993
  Technical Advisor/Appearance

- ***"Crime & Criminology"*** Radio Talk Show Series Guest
  KGO-ABC Radio 810 AM San Francisco 1986-1990

- ***"Shaved & Dangerous: White Supremacy In America"***
  'Hard Copy' Cable Television Documentary Series, 1990
  Technical Advisor/Appearance

- ***"Street Gangs"***
  'Hard Copy' Cable Television Documentary Series, 1989
  Technical Advisor/Appearance

- ***"Street Prostitution in America"*** (News Feature)
  'The Today Show' NBC-TV, 1986, Appearance

## Recent Professional Courses Attended:

- ***Beyond Ferguson: Officer Safety Training Needs for the Future***
  Instructor: Brian McKenna
  International Law Enforcement Educators & Trainers Association
  2016 Conference, Chicago, 03-13-16

- ***The Truth Behind the Black Lives Matter Movement and the War on Police***
  Instructor: Ron Martinelli, Ph.D.
  International Law Enforcement Educators & Trainers Association
  2016 Conference, Chicago, 03-12-16, 03-13-16, 03-15-16

- **The Neuroanatomy of Street Survival**
  Instructor: Tony Blauer
  International Law Enforcement Educators & Trainers Association
  2016 Conference, Chicago, 03-14-16

- **One Breath™ - Recognizing & Managing Breathing Problems**
  Instructor: Brian Casey, St. Paul (MN) Police Department
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-16-15
  AELE Credit

- **Excited Delirium Syndrome: Pathogenesis & Pathophysiology**
  Instructor: Dr. Deborah mash, Ph.D., Univ. Miami Miller School of Medicine
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-16-15
  AELE Credit

- **Agonal Breathing Instructor Course**
  Instructor: Dr. Michael Curtis, M.D., Chief Medical Director, Ministry Health
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-16-15
  AELE Credit

- **Operation Impact on Your Jail and Officer Force Options on Pre-trial Detainees**
  Instructor: Ken Wallentine, J.D., Lexipol, Inc.
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-17-15
  AELE Credit

- **The Anatomy of an In-Custody Death**
  Instructor: Dr. Gary Vilke, M.D., UCSD School of Medicine
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-17-15
  AELE Credit

- **The Field treatment of Agitated Agents**
  Instructor: Dr. Michael Curtis, M.D., Chief Medical Director, Ministry Health
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-17-15
  AELE Credit

- **The Science of Positional Asphyxia**
  Instructor: Dr. Tom Newman, M.D., UCSD School of Medicine
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-17-15
  AELE Credit

- **Total Appendage Restraint Positioning Instructor Course**
  Instructors: Brian Casey, St. Paul (ME) Police Department
  Dr. Michael Curtis, M.D., Chief Medical Director, Ministry Health
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-17-15
  AELE Credit

- **10th Annual Conference, Excited Delirium, Agitated-Chaotic Events, Arrest-Related and In-Custody Deaths**
  Institute for the prevention of In-Custody Death, Las Vegas, NV, 11-16/17-15
  AELE, ACFEI Credit 16.0 hours

- **Carotid Restraint Control Hold Instructor Course**
  Instructors: Jim Boydd, Roger Owen, Ron Martinelli, Ph.D., CMI-V
  **Officer Responses to Psychomedical Emergencies**
  **In-Custody Death Investigations Forensic Protocol**
  Carotid Restraint Training Institute, Chula Vista, CA, 01-08-15, 16.0 hours
  Instructor: Ron Martinelli, Ph.D., CMI-V
  Sponsor: San Diego County Sheriff's Department

- **Agonal Breathing, Identification & Response**
  Instructor: Dr. John Peters, Ph.D.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-05-14, CLE 2.0
  AELE Credit

- **Excited Delirium Deaths from a Pathologists' Viewpoint**
  Dr. Frank Sheridan, M.D., Chief Forensic pathologist, San Bernardino Co. CA
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-05-14, CLE 3.0
  AELE Credit

- **Excited Delirium, Stress, and Sudden Death**
  Instructor: Dr. Debra Mash, Ph.D.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-05-14, CLE 3.0
  AELE Credit

- **Neck Restraints and Leg Control During Capture**
  Instructor: Lt. John Domingo, Huntington Beach PD
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-05-14, CLE 1.0
  AELE Credit

- **Excited Delirium: Origin, Behavioral Cues and Best Practices**
  Instructor: A David Berman, M.S.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-04-14, CLE 2.0
  AELE Credit

- **Excited Delirium Field Research**
  Instructor: Lt. Charles Wilhite, J.D.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-04-14, CLE 2.0
  AELE Credit

- **Critical Factors in Use of Force Decisions**
  Instructor: Orville A. Nickel, RCMP Ret.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-04-14, CLE 2.0
  AELE Credit

- **Working with Inmates: Behavioral Health & Cognitive Impairments**
  Instructor: Dr. William Beverly, Psy.D.
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-04-14, CLE 1.0
  AELE Credit

- **Restraint Asphyxia Deaths**
  Instructor: De. Ronald O'Halloran, M.D., Chief Medical Examiner, Ventura Co. CA
  Institute for Prevention of In-Custody Death, Las Vegas, NV, 11-04-14, CLE 2.0
  AELE Credit

- ***Forensic Determinations of "Bath Salts" Influence***
  Ron Martinelli, Ph.D., Instructor, www.lorman.com/391875
  Lorman Education Services, Inc., National Webinar, 07-17-14 CLE 1.0

- ***Homicide & Questioned Death Scene Determination,***
  ***Reconstruction and Blood Spatter Analysis***
  Tom Martin, Crime Scene Investigator, New York State Police
  Public Agency Training Council, Las Vegas, NV, 05/28 – 30/2014   24.0 hours

- ***Lethal and Less Lethal Weaponry & Litigation***
  Ron Martinelli, Ph.D., Instructor, www.lorman.com/394141
  Lorman Education Services, Inc., National Webinar, 05-21-14, CLE 1.5

- ***Electronic Control Weapons Instructor Course***
  Ron Martinelli, Ph.D., Sgt. Jim Boydd (Ret.)
  Martinelli & Associates, Justice & Forensic Consultants, Inc.
  California State Parks Ranger Division, Asilomar, CA, 04-22/23-14, 16.0 hours

- ***Police Interviews and Interrogations***
  Ron Martinelli, Ph.D., Lt. Dennis Gomez, Joe Dane, Esq.
  Lorman Education Services, Inc., Santa Ana, CA, 02-26-14, 6.0 MCLE

- ***Forensic Pathology for the Death, Homicide & Criminal Investigator***
  Tracey S. Corey, M.D., Forensic Pathologist
  Public Agency Training Council, Las Vegas, NV, 02-13/14-2014, 16.0 hours

- ***Gunshot Wounds***
  Tracey S. Corey, M.D., Forensic Pathologist
  Public Agency Training Council, Las Vegas, NV, 02-13-14

- ***Dealing with the Mentally Ill & Persons with Diminished Capacity***
  ***Legal Update and Best Practices***
  John "Jack" Ryan, Esq., Dr. Rob Cipriano, Psy.D.
  Public Agency Training Council; Legal Liability & Risk Management Institute,
  Internet Webinar, 12-20-13 1 CEU

- ***Electronic Control Weapons & Legal Liability***
  Ron Martinelli, Ph.D., BCFT (Instructor)
  Lorman Education Services, Internet Webinar, 12-19-13 1.5 CEU
  www.lorman.com/393407

- ***Recognizing and Responding to Excited Delirium***
  Ron Martinelli, Ph.D., BCFT (Instructor)
  Lorman Education Services, Internet Webinar, 11-12-13 1.5 CEU
  www.lorman.com/392581

- ***Carotid Restraint Control Hold Instructor Course***
  Jim Boydd, Roger Owen, Ron Martinelli, Ph.D. (Co-Instructed)
  Carotid Restraint Training Institute
  San Diego Regional Public Safety Academy, Miramar, CA 07-2013 16.0 Hours

- ***Police Liability and Litigation***
  Michael P. Stone, Esq., Dennis E. Wagner, Esq., Grey Myer
  Lorman Education Services, Santa Ana, CA   06-25-13 6.0 CLE Credit

- ***Identifying Excited Delirium Syndrome at Autopsy: Biomarkers, Pathways and Candidate Genes.*** Deborah Mash, Ph.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Sudden Cardiac Arrest Following Deployment of A TASER® ECW***
  Douglas P. Zipes, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Restraint Physiology: Update on Latest Research***
  Theodore Chan, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Introduction to K2, Spice, and Bath Salts***
  Steven B. Karch, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Brain Biomarkers of Excited Delirium: Science in the Aid of Law Enforcement***
  Deborah Mash, Ph.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012   AELE Credit

- ***Excited Delirium, In-Custody Death and the Courts***
  Hon. Emory J. Plitt, Jr., Americans for Effective Law Enforcement (AELE)
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Excited Delirium and Sudden In-Custody Death: Research for Patrol Officers***
  Christine Hall, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012   AELE Credit

- ***Ketamine Sedation for the Control of the Agitated and Combative***
  Michael D. Curtis, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012   AELE Credit

- ***Electronic Control Devices and the not so shocking truth about their lethality***
  Gary M. Vilke, M.D.
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Developing 9-1-1 Protocols for Excited Delirium Calls***
  Charles Carter
  Institute for the Prevention of In-Custody Death National Conference
  Las Vegas, NV, 11-2012    AELE Credit

- ***Defending Corrections Agencies in Use of Force Litigation***
  Carrie Hill, Esq.
  Institute for the Prevention of In-Custody Death National Conference

Las Vegas, NV, 11-2012    AELE Credit

- ***Pitfalls in Forensic Science: Lessons Learned in High Profile cases***
  Dr. Henry Lee, Dr. Cyril Wecht, Forensic Pathologists
  American College of Forensic Examiners Institute, Executive Summit
  Las Vegas, NV, CE: 2.0, ACFEI, ACCME, 10-2012

- ***Analyzing and Interpreting Behavior in the Serial Murder and Sexual Homicide Crime Scene***; Mark Safarik, Forensic Behavioral Sciences, FBI Supervisory SA
  American College of Forensic Examiners Institute, Executive Summit
  Las Vegas, NV, CE: 2.0, ACFEI, 10-2012

- ***Human Factors Threat & Error Management***
  California Training Institute, Craig E. Geis, Ph.D.
  Huntington Beach (CA) Police Department, 02-2012
  CA-POST Control No. 1095-10801-11003

- ***Defending Law Enforcement Litigation***
  Public Agency Training Council; Las Vegas, NV, 12-2011, CE: 16

- ***Chemical Agents – OC Pepper Spray Instructor***
  San Jose (CA) Police Department, Officer Ken Hardesty
  CA-POST Control No. 25602162511001, 11-2011

- ***TASER® Electronic Control Weapon Model X-2 Familiarization***
  San Jose (CA) Police Department, 11-2011, CA-POST Accredited
  TASER International approved

- ***Electronic Control Weapons – TASER® Legal Issues and Litigation***
  Jack Ryan, Esq., Alphonse Gerhardstein, Esq.
  Public Agency Training Council; Las Vegas, NV, 2011, CE: 20

- ***Excited Delirium Syndrome***; William Oliver, M.D. (Pathologist)
  Public Agency Training Council; Las Vegas, NV, 2011, CE: 20

- ***Use of Force Investigation and Review,***
  Los Angeles Office of the Inspector General, Django Sibley
  Los Angeles Police Department – Force Investigation Division, Det. III Bruce Hosea
  Corona Police Department (CA), 2011

- ***Force Science Analyst – Officer Involved Shootings Certification Course***
  Force Science Center® - Minnesota State University,
  San Jose Police Department (CA), 2010

- ***Understanding & Leveraging the Psychophysiology of Emotional Intensity,***
  Matthew Sztajnkrycer, MD, Ph.D.
  San Jose Police Department (CA), 2010

- ***Observe, Deduce and Corroborate Forensic Evidence,***
  Katherine Ramsland, Ph.D., CMI-V
  American College of Forensic Examiners Institute, National Conference
  Orlando, (FL), 2010, CE: 2.0 ACFEI

- ***Forensic Analysis & Presentation of Recorded Evidence,***

Michael C. McDermott, Gregg M. Stutchman, Stephen C. Buller
American College of Forensic Examiners Institute, National Conference
Orlando, (FL), 2010, CE: 3.0 ACFEI

- ***Quiet Eye Characteristics that Can Save an Officer's Life,***
  Joan N. Vickers, Ph.D., Kinesiology Department, University of Calgary, Canada
  San Jose Police Department (CA), 2010

- ***Fundamentals of Human Performance Applications to Police Activities***
  Richard Schmidt, Ph.D., Psychology Department, UCLA
  San Jose Police Department (CA), 2010

- ***The Cognitive Interview: Memory Enhancing Techniques for Investigative Interviewing,*** Edward Geiselman, Ph.D., Psychology Department, UCLA
  San Jose Police Department (CA), 2010

- ***Biomechanics of Lethal Force Encounters,***
  William Lewinski, Ph.D., Force Science Center®, Minnesota State University
  San Jose Police Department (CA), 2010

- ***Law Enforcement Officer Safety Research: 1990 – 2010,***
  Anthony Pinizzotto, Ph.D., FBI Behavioral Science Unit (Ret.)
  Force Science Center®, Minnesota State University
  San Jose Police Department (CA), 2010

- ***Rapid Containment Baton (RCB) Advanced Baton Instructor Course***
  San Bernardino Co. Sheriff's Department (CA), 2010

- ***Kinesic Interview & Interrogation ®,*** Stan B. Walters & Associates, Inc.
  Public Agency Training Counsel, Las Vegas, NV, 2009

- ***Sudden Death, Excited Delirium and In-Custody Death Conference,***
  Las Vegas, NV, Institute for the Prevention of In-Custody Deaths, 2009

- ***Identifying Brain Mechanisms and Biomarkers for Excited Delirium,***
  Debra Mash, Ph.D., Michelina Witte, Ph.D., Department of Neurology, Molecular
  and Cellular Pharmacology, University of Miami School of Medicine, 2009

- ***Heart Disease in Stimulant Abusers,*** Steven Karch, M.D., FFFLM,
  Institute for the Prevention of In-Custody Deaths, Las Vegas, NV, 2009

- ***Excited Delirium: Behavioral Cues,*** A. David Berman
  Institute for the Prevention of In-Custody Deaths, Las Vegas, NV, 2009

- ***Evaluating and Communicating with Psychotic Persons,*** Ellis Amdur, M.A.
  Institute for the Prevention of In-Custody Deaths, Las Vegas, NV, 2009

- ***Restraint Asphyxia from a Medical Examiner's Perspective,***
  Ronald L. O'Halloran, M.D., Ventura County (CA) Medical Examiner's Office, 2009

- ***Forensic Alcohol Evidence***, John Beck, Ph.D., CMI-V
  American College of Forensic Examiners Institute, Medical Investigators
  Certification Program, Las Vegas, NV, CE: 2.0 ACFEI, 2009

- *Eyewitness Cognition: Eyewitness Performance for Field & Courtroom*,
  Matthew Sharps, Ph.D., FACFEI, DABPS,
  American College of Forensic Examiners Institute, Forensic Consultant
  Certification Program, Las Vegas, NV, CE: 1.5 ACFEI, 10-2009

- *Investigating False Allegations of Sexual Abuse: Adults & Children*,
  Susan Robbins, Ph.D., LCSW, DFSW,
  American College of Forensic Examiners Institute, American Psychological
  Association, CE: 1.5 APA, 10-2009

- *Certified Medical Investigator Update Course, "Abusive Head Trauma: Forensic Medical Protocols in the Investigation of Childhood Injuries & Death,"*
  Douglas W. Beal, MD, MSHA, CMI-V
  American College of Forensic Examiners International Conference, Las Vegas, NV
  CE: 1.5 ACCME, 10-2009

- *Suicide Ideation: Suicide Note Evaluation*, Lori Bates, MA, CFC,
  American College of Forensic Examiners Institute, Forensic Consultant
  Certification Program, CE: 1.5 ACFEI, 10-2009

- *Forensic Consulting: In Search of the Truth, Veracity of Criminal Investigations*,
  Alva Bush
  American College of Forensic Examiners Institute, Forensic Consultant
  Certification Program, CE: 1.5 ACFEI, 10-2009

- *The Rise of Islamic Terrorism in the United States*, **Bridgette Gabriel**,
  American College of Forensic Examiners International Conference, Las Vegas, NV
  CE: 1.0, ACFEI, ABCHS, 10-2009

- *Excited-Agitated Delirium, Sudden In-Custody Death Recognition Instructor Course*
  Institute for the Prevention of In-Custody Death (IPICD), Las Vegas, NV, 2009

- *Forensic Analyst Certification Course – Excited Delirium, Sudden In-Custody Deaths*
  Institute for the Prevention of In-Custody Death (IPICD), Scottsdale, AZ, 2009

- *Peacekeeper Rapid Containment Baton (RCB) Instructor Course,*
  Peacekeeper Products, Jim Boydd, Master Instructor, Chicago, 2009

- *Jail & Prison Legal Issues (No. J29),* 2009
  Americans for Effective Law Enforcement (AELE), Las Vegas, NV

- *Discipline & Internal Affairs Investigations (No. D49),* 2008
  Americans for Effective Law Enforcement (AELE), Las Vegas, NV

- *Officer-Involved Shooting Investigations,* 2008
  Los Angeles Police Department (CA)

- *Lethal & Less Lethal Force (No. L04),* 2008
  Americans for Effective Law Enforcement (AELE), Las Vegas, NV



**MARTINELLI & ASSOCIATES**
Justice & Forensic Consultants, Inc.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DISTRICT

JAMES R. STILLWAGON, Plaintiff

VS

THE CITY OF DELAWARE and DETECTIVE BENJAMIN SEGAARD, and
FORMER DETECTIVE PATRICK GERKE, and OFFICER ADAM WILLAUER, and
DETECTIVE SERGEANT JONATHAN RADABAUGH, and RICHARD O. MATTINGLY,
Defendants

Case Numbers: 2:14-CV-1606-EAS-TPK
and 2:14-CV-807-EAS-TPK

Report of Defendants' Police Practices Expert, Ron Martinelli, Ph.D., CMI-V, BCFT, CFA,

I have been retained by the law firm of Mazanec, Raskin & Ryder, as an "expert witness" in the above civil action. I am therefore submitting the following information and accompanying documents in support of the opinions and conclusions expressed in this report.

I have spent over twenty-two years as an active police officer and detective. Additionally, I have directed a California Criminal Justice Training Center and Basic Law Enforcement Academy.

I possess a doctorate degree (Ph.D.) in Criminology with emphasis in forensic psychology and a Master's degree in Public Administration with emphasis in Justice Administration (MPA/JA) and a specialization in municipal government consulting.

I am an adjunct professor of Forensic Science at National University – San Diego where I instruct in the University's Masters in Forensic Science program. I am a former adjunct professor of Forensic Psychology at Argosy University – San Francisco and a former adjunct professor of Criminology at California Polytechnic State University – San Luis Obispo. Since 1978, I have also been a credentialed instructor or adjunct professor of law enforcement, police practices, forensics and the administration of justice at numerous accredited universities and colleges in California, Nevada and Florida.

I am a member in good standing with the American College of Forensic Examiners Institute (ACFEI), where I have presented nationally as an expert in police practices, forensics, crime scene analysis, force investigations, TASER® electronic control weapons (ECW) and forensic force analysis.

Exhibit 2

I am certified as a Medical Investigator through the American College of Forensic Examiners, as accredited through the Missouri State Medical Association and the Accreditation Council for Continuing Medical Education. I am a current member of ACFEI's Certified Medical Investigator's program Board where I am involved in the development and instruction of medical and forensic investigations curriculum.

I am Board Certified in Forensic Traumatology by the American Academy of Experts in Traumatic Stress and the National Center for Crisis Management, where I also hold Diplomate Status. This certification indicates specific expertise in the areas of stress-induced incidents, and psychological/emotional trauma. My specific areas of expertise in forensic trauma are mental health disorders, psycho-medical emergencies, human factors, psychophysiology and performance under intense stress.

I am certified as a Force Analyst through the Force Science Training Institute®, at Minnesota State University which is an accredited institution of higher learning. The primary field of research and curriculum at the Force Science Institute® is the analysis of crime scenes and forensic evidence relating to officer-involved shootings, in-custody deaths and human factors involved in major uses of force.

I am a Certified Force Investigator, with specialization in officer-involved shootings and in-custody deaths through the Los Angeles Police Department's prestigious Force Investigations Division. The majority of my forensic education through LAPD's Force Investigations Division was crime scene management, evidence identification, recovery and forensic analysis.

I am a Certified Litigation Specialist in police and corrections litigation through Americans for Effective Law Enforcement (AELE) which is the largest law enforcement amicus curie litigation defense organization in the nation. I maintain active participation in this professional organization, attending courses in police practices, investigations, forensics and civil rights laws pertaining to law enforcement encounters with the public.

I am either currently, or have been recently retained as a retained police practices and forensic expert for the States Attorney General's Offices of Alaska, Oregon, Nevada, New Mexico, Nebraska, Illinois, West Virginia, Delaware and Vermont; the Cities of Portland, Sacramento, San Jose, Long Beach, Los Angeles, San Diego, Denver, Miami Beach, Cleveland, Columbus, Richmond, VA, Schenectady, NY; and numerous municipalities in California and Illinois. I am currently and have been a retained civil rights and forensic police practices expert to a number of nationally recognized law firms specializing in civil rights and police practices litigation representing plaintiffs and defendant agencies.

I was the independent Special Investigator for the City of Riverside (CA) Police Community Review Commission where I reviewed officer-involved shootings and in-custody deaths for this civilian body through the Office of Mayor.

I am a law enforcement/forensics expert for the United States Marine Corps Judge Advocate General's (JAG) Office.

As a law enforcement officer and investigator, I have personally investigated, and/or supervised over three hundred complex crime scenes, recovering and documenting evidence from them.

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK
Ron Martinelli, Ph.D., CMI-V*

As a forensic criminologist and a Certified Medical Investigator, I have personally investigated, reviewed, analyzed, documented evidence and consulted on and/or testified in nearly three hundred (300) major uses of force including over one hundred (150) complex officer and citizen involved shootings and in-custody deaths.

I am a former director of a California Commission on Peace Officer Standards & Training (POST) police and corrections academy, where I also served as Division Dean of Criminal Justice. In this position I administrated over, supervised and evaluated a staff of over one hundred tenured and adjunct law enforcement faculty who instructed police/corrections practices. As director, I was also involved in developing training methodologies relating to contemporary police practices and defensive force including firearms and deadly force decision making.

Since 1980, I have been approved as an instructor or training provider by the states of California, Nevada, Arizona's Commission on Peace Officer Standards & Training (P.O.S.T.), and the Texas Commission on Officers Law Enforcement training (TCOLE). In this capacity, I have served as an instructor in the areas of police practices, laws of arrest, search and seizure, Tactical Negotiation, de-escalation, mental health disorders, use of force, officer safety tactics, Arrest & Control Tactics, chemical agents, electronic control weapons (ECW) – TASER®, Unarmed Defensive Tactics, impact weapons and less lethal munitions; firearms instruction, criminal investigations, the investigation of violent crimes including shootings; "Suicide by Cop," psychological profiling, the psychology of criminal behavior, the body's psycho-physiological responses to stress-induced circumstances; police responses to psycho-medical emergencies; and the investigation of officer-involved and civilian self-defense shootings.

I also hold certifications as a firearms instructor through Gunsite® and the National Rifle Association's Law Enforcement Activities Division (NRA-LEAD). I am a recognized member of the International Law Enforcement Firearms Instructors Association. I have presented California POST and Board of Corrections approved courses in basic and advanced tactical pistol instruction. I am a certified deadly force scenario instructor through Simunitions®. I am an approved firearm, deadly force and concealed carry instructor by the Riverside and San Diego County Sheriff Departments where I teach the legal aspects of deadly force; as well as the physical aspects of pistol craft and combatives to civilians, retired peace officers and military personnel who are in application for the California Concealed Carry Permit.

I am an approved firearms instructor through the State of Arizona's Department of Public Safety to instruct basic firearms, the legal and practical aspects of deadly force for the department's Concealed Carry Permit program. This program includes reciprocity training to train and certify civilians and military personnel to carry concealed firearms in thirty-five other states including the State of Ohio.

I am an approved firearms, deadly force and self-defense instructor by the California State Bar Association and instruct classes in these areas for attorneys and judges for CLE credit.

I am a member in good standing of the International Law Enforcement Educators and Trainers Association (ILEETA) and have presented to national and

international law enforcement audiences on use of force investigations and the analysis of forensic evidence.

As a police officer, detective, law enforcement, and municipal government trainer and consultant, I have consulted with over three hundred law enforcement and criminal justice agencies and specialized military units. I have personally trained over 60,000 peace officers and military personnel in my certified areas of instruction.

I have consulted with and/or trained numerous county, state and federal prosecutors; Assistant State Attorney Generals; Superior Court judges; and various professional training organizations including the California District Attorneys Association (CDAA) and the Center for Judicial Research & Education. I remain an active trainer and consultant within my areas of expertise.

As a forensic criminologist, law enforcement, municipal government trainer and consultant, and a Federal/State Courts qualified police/corrections practices expert since 1993, I have been retained by county counsels, city attorneys, plaintiff attorneys, prosecutors, criminal defense attorneys and a state attorney general's office in over three hundred Federal and State Court cases.

I have been deposed and have testified in numerous federal and state civil and criminal actions; and have been designated by Federal and State Superior Court judges as a qualified authority in police practices, laws of arrest, search and seizure, traffic enforcement, criminal investigations, crime scene investigations, forensics, officer safety tactics, use of force/excessive force at all force levels including TASER® electronic control weapons (ECW); officer-involved shootings; civilian self-defense shooting; alcohol and narcotics influence; human factors and psycho-physiological responses to stress-induced circumstances. I have also been qualified in both Federal and State Courts to render findings and opinions on the subjects of hiring, supervision, training, police practices negligence, internal affairs investigations and law enforcement liability.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge and I pray that the Court will find that my professional experience, expertise and education are sufficient to be designated as an expert in this matter.

Signed _____ Date: February 3, 2017

Ron Martinelli, Ph.D., CMI-V
Forensic Criminologist/Certified Medical Investigator
Federal/State Courts Qualified Police Practices Expert

Mazanec, Raskin & Ryder's counsel for the defendants, requested that I prepare this declaration outlining my basic opinions in this case. Those findings and opinions to date have been incorporated into this document.

As is usually the case in investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process that I might wish to review which may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

### DOCUMENTS REVIEWED FOR THIS ANALYSIS

1. Court Document – Plaintiffs' Complaint for Damages, Case # 2:14-CV-01606-ALM-NMK- Filed 09/18/14
2. Court Document – Plaintiffs' Complaint for Damages, Case # 2:14-CV-00807-EAS-TPK- Filed 07/10/14
3. Court Document- Plaintiff's First Amended Complaint, Case # 2:14-CV-00807-EAS-TPK- Filed 05/16/16
4. Court Document – Grand Jury Packet (94 Pages)
5. Investigation – Background Check (11 Pages)
6. Investigation – Delaware County Emer. Comm.- Incident Run Report (4 Pages)
7. Investigation – Ohio Bureau of Criminal Investigative Report (15 Pages)
8. Investigation – Evidence Reports (39 Pages)
9. Investigation – Investigation Reports (33 Pages)
10. Investigation – Property Report (1 Page)
11. Investigation – Name Summary Report (2 Pages)
12. Investigation – Offense Report (4 Pages)
13. Investigation – Witness Statements (5 Pages)
14. Trial Transcript – Deputy Rashad Pitts
15. Trial Transcript – Detective Benjamin Segaard
16. Trial Transcript – Detective Sergeant Jonathan Radabaugh
17. Trial Transcript – James Stillwagon
18. Trial Transcript – Officer James Ailes
19. Trial Transcript – Richard Mattingly
20. Trial Transcript – Sergeant James Flynn
21. Trial Transcript – Special Agent Gary Wilgus
22. Trial Transcript – Witness Daniel Powell
23. Trial Transcript – Witness Gordon Burns
24. Trial Transcript – Witness Keith Cogan
25. Trial Transcript – Witness Louise Reninger
26. Trial Transcript – Witness Ruth Sayre

27. Trial Transcript – Witness Susan Ocena
28. Trial Transcript – Witness Williams Brown
29. Transcript – Stillwagon Arraignment (108 Pages + 11 Pages)
30. Deposition – Adam Moore
31. Deposition – Audrey Corley
32. Deposition – Benjamin Segaard with Exhibits
33. Deposition – Bruce Pijanowski with Exhibits
34. Deposition – Chris Renkes
35. Deposition – Adam Willauer with Exhibits
36. Deposition – Daniel Powell with Exhibits
37. Deposition – Frank Orcena with Exhibits
38. Deposition – Heidi Thomas with Exhibits
39. Deposition – James Ailes with Exhibits
40. Deposition – Janelle Kunkel
41. Deposition – Jason Flynn
42. Deposition – Jon Radabaugh w/ Exhibits
43. Deposition – Lois Reninger
44. Deposition – Patrick Gerke with Exhibits
45. Deposition – James Stillwagon with Exhibits
46. Deposition – William Brown with Exhibits
47. Deposition – Exhibits 1through 11
48. FTO File – FTO File (445 Pages)
49. Personnel Files – Segaard Personnel File (43 Pages)
50. Personnel Files – Segaard Additional Documents (161 Pages)
51. Personnel Files – Segaard Evaluations (65 Pages)
52. Personnel Files – Segaard Additional Discipline Documents (62 Pages)
53. Personnel Files – Segaard 2003 IA (11 Pages)
54. Personnel Files – Segaard Performance Correction Notices (4 Pages)
55. Personnel Files – Segaard Promotion Documents (59 Pages)
56. Personnel Files – Segaard Sergeant Written Exam (1 Page)
57. Personnel Files – Gerke Personnel File (221 Pages)
58. Personnel Files – Gerke IA File (202 Pages)
59. Personnel Files – Gerke Hiring Documents (244 Pages)
60. Personnel Files – Gerke Detective Application Documents (43 Pages)
61. Personnel Files – Radabaugh Personnel File (179 Pages)
62. Interview – Kevin Cogan
63. Interview – Chris Linkous
64. Interview – Louise Reninger
65. Statement – Chris Linkous
66. Statement – Susan Orcena
67. E-mails re: Reninger – 3 Pages
68. Direct Exam – Kevin Cogan
69. Photos – Crime Scene (184 Files)

70. Video – Cruiser Video
71. Video – Stillwagon Interview
72. Video – DCSO Dep. Pitts Dashcam Video (2 Files)
73. Video – Eagles Video (5 Files)
74. Video – Grand Jury Power Point & Videos
75. Video – Mattingly Home Interview
76. Video – Mattingly Interview
77. Video – Jail Video
78. Video – Ohio Organized Crime Video
79. Video – Witness CJ Linkous Interview
80. Statute – Ohio Revised Code §2307.601, "Self-defense"
81. Statute – ORC §2901.01(A)(1)(2), "Force," "Deadly Force"
82. Statute – ORC §2901.01(A)(3)(5), "Physical Harm to Persons"
83. Statute – ORC §2901.09, "No Duty to Retreat"
84. Statute – ORC §2901.01 (A)(7)(8), "Risk," "Substantial Risk"
85. Statute – ORC §2903.02, "Murder"
86. Statute – ORC §2903.03, "Voluntary Manslaughter"
87. Statute – ORC §2903.04, "Involuntary Manslaughter"
88. Statute – ORC §2903.11, "Felonious Assault"
89. Statute – ORC §2903.12, "Aggravated Assault"
90. Statute – ORC §2903.13, "Assault"
91. Statute – ORC §2935.03, "Officer's Power to Arrest"
92. Statute – ORC Title 29
93. Standards – Commission on Accreditation for Law Enforcement Agencies (CALEA) Policing Standards, 2006 – 2012
94. Standard – CALEA #1.2.4, "Search & Seizure"
95. Standard – CALEA #1.2.5, "Laws of Arrest with and without a Warrant"
96. Standard – CALEA #1.3.1, "Use of Reasonable Force"
97. Standard – CALEA #1.3.6, "Reporting Reasonable Force"
98. Standard – CALEA #33.5.1, "Annual Retraining Programs"
99. Standard – CALEA #42.2.1, "Preliminary Investigation Steps"
100. Standard – CALEA #42.2.2, Follow-up Investigation Steps"
101. Standard – CALEA #42.2.10, "Interview Rooms"
102. Standard – CALEA #70.1.1, "Pre-transportation Prisoner Searches"
103. Standard – CALEA #70.1.1, "Procedures, Transport to Destination"
104. Standard – CALEA #70.2, "Restraint Devices"
105. Standard – CALEA #70.2.1, "Prisoner Restraint Requirements"
106. Standards – Delaware PD Field Training Program (FTP) Recruit Performance Objectives
107. Standard – DPD FTP Objective #33, "Arrest & Search Procedures"
108. Standard – DPD FTP Objective #34, "Handcuffing"
109. Policy – Delaware PD Policy #Ch. 1 "Code of Ethics"
110. Policy – DPD Policy #Ch. 6 "Arrest" Full
111. Policy – DPD Policy #Ch. 6, Arrest §6.1.2, "Searching Prisoners"
112. Policy – DPD Policy #Ch. 6, §6.1.3, "Handcuffing Prisoners"
113. Policy – DPD Policy #Ch. 10, "Response to Resistance"

114. Policy – DPD Policy #Ch. 10, §10.2.6.1, "Parameters for Use of Less Lethal Force"
115. Policy – DPD Policy #Ch. 10, §10.2.7, "Approved Less Lethal Force Techniques"
116. Policy – DPD Policy #Ch. 10, §10.2.8, "Response to Resistance"
117. Policy – DPD Policy #Ch. 12, "Patrol Functions," §12.17 "In-Cruiser Audio/Video"
118. Case Law: Title 42 1983 U.S.C.
119. Case Law: Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) - UOF
120. Case Law: Saucier v. Katz, 533 U.S. 194, 201 (2001) - UOF
121. Case Law: Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994) - UOF
122. Case Law: Tennessee v. Garner, 471 U.S. 1 (1985) – UOF/Warnings
123. Case Law: Garnett v. Athens-Clarke County, 378 F.3d 1274, 1280, n. 12 (11th Cir. 2004) – UOF
124. Case Law: Forrett v. Richardson, 112 F.3d 416 (9th Cir. 1997) – UOF
125. Case Law: Deering v. Reich, 183 F.3d 645, 652-53 (7th Cir. 1999) – UOF
126. Case Law: Collins v. Nagle, 892 F.2d 489, 493 (6th Cir. 1989) – UOF
127. Case Law: Director General of Railroads v. Kastenbaum, 263 U.S. 25 (1923) – RS/PC
128. Case Law: Terry v. Ohio, 392 U.S. 1 (1968) – Detentions/Searches
129. Case Law: Sokolaw (1989) 490 U.S. 1, 7-8 - Detentions
130. Case Law: Tony C. (1978) 21 Cal. 3d 888, 893 - Detentions
131. Case Law: Twilley (9th Cir. 2000) 222 F. 3d 1092, 1095 - Detentions
132. Case Law: Andre P., (1991) 226 Cal. App. 3d 1164, 1169 – Detentions
133. Case Law: Hodari D. (1991) 499 U.S. 621, 627-628 – Detentions
134. Case Law: Wardlow (2000) 528 U.S. 119 – RS/Detentions
135. Case Law: White (1990) 496 U.S. 325, 330 – RS/Detentions
136. Case Law: Mims (1992) 9 Cal.App 4th 1244, 1248 – Special Knowledge/Detain
137. Case Law: Celis (2004) 33 Cal.App. 4th 667, 675-676 – Detain/Handcuff
138. Case Law: Bond v. Queen, 71 F.3d 1151 (1st Cir. 1999) – UOF/Handcuff
139. Case Law: Calamia v. City of New York, 879 F.2d 1025 (2nd Cir. 1989) UOF/Handcuff
140. Case Law: DeGraff v. District of Columbia, 120 F.3d 298 (D.C. Cir. 1997) – UOF/Handcuff
141. Case Law: McCrory v. New Orleans, 558 So. 1322 (La. Ct. App. 1990) – UOF/Handcuff
142. Case Law: Johnson v. Morel, 876 F.2nd 477 (5th Cir. 1989) – UOF/Handcuff
143. Case Law: Wisniewski v. Kennard, 901 F.2d 1276 (5th Cir. 1990) – UOF/Handcuff
144. Case Law: Trout v. Frega, 70 F.3d 304 (E.D. Ill. 1996) – UOF/Handcuff
145. Case Law: Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997) – UOF/Handcuff
146. Case Law: Taft v. Vine, 70 F.3d 304 (4th Cir. 1995) – UOF/Handcuff
147. Case Law: Carter v. City of Wyoming, Lexis 24988 (W.D. Mich. 2007) – UOF/Handcuff
148. Case Law: Kopec v. Tate, 361 F.3d 772 (3rd Cir. 772 2004) – UOF/Handcuff
149. Case law: Baskin v. Smith, 50 Fed. Appx. 731 (6th Cir. 2002) – UOF/Handcuff
150. Case Law: Shelton v. City of Taylor, 2004 U.S. App. LEXIS 2007 (6th Cir. 2004) –

UOF/Handcuff/Policies

151. Case Law: Hensley (1985) 469 U.S. 221 – Detention – Knowledge from Others
152. Case Law: State v. Robbins, 58 Ohio St.2d 74, 388 N.S.2d 755 (1979) Self-defense
153. Case Law: State v. Ludt, 906 N.E.2d 1182, 1188 (Ohio App. 2009) Self-defense/DF
154. Case Law: Martin v. Ohio, 480 U.S. 228 (1987) Self-defense/DF
155. Case Law: State v. Davis, 456 N.E.2d 1256, 1260 (Ohio App. 1982) Self-defense/DF
156. Case Law: State v. Miller, 778 N.E.2d 1103, 1105 (Ohio App. 2002) Self-defense/DF
157. Case Law: State v. D.H., 865 N.E.2d 90, 99 (Ohio App. 2006) Self-defense/DF
158. Case Law: Sledd v. Linsday, et al., USDC, 7th District, Case No. 95-2360, 12-11-96
159. Case Law: City of Canton v. Harris, 489 U.S. 109, C. Ct. 1197 (1989) - Trng
160. Case Law: Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989) – Trng
161. Case Law: City of Oklahoma City V. Tuttle, 471 U.S. 808 (1985) – Deliberate Indifference
162. Case Law: Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)
163. Case Law: Polk County v. Dodson, 454 U.S. 312 (1981) – Deliberate Indifference
164. Manual: *Concepts of Criminal Law, Laws of Arrest, Search & Seizure*, Ron Martinelli, Ph.D., © 2005, 2011, Martinelli & Associates: Justice Consultants, LLC
165. Manual: *Tactical Psychology & Physiology*, Ron Martinelli, Ph.D., 2007, Martinelli & Associates: Justice & Forensic Consultants, Inc.
166. Manual: *Arrest & Control Tactics*, Ron Martinelli, Ph.D., 2000 – 2005, Martinelli & Associates: Justice Consultants, LLC.
167. Text: *Officer-Involved Shootings and Use of Force*, Hatch, David E., © 2003, CRC Press, New York, N.Y.
168. Text: *Practical Shooting Scene Investigation: The Investigation and Reconstruction of Crimes Scenes Involving Gunfire*, Garrison, Dean H., Jr. © 2003, Universal Publishers, USA
169. Text: *Shooting Incident Reconstruction,* Haag, Lucien, © 2006, Academic Press, San Diego, CA
170. Text: *Use of Force Investigations*, David, Kevin, R., © 2012, Responder Media, Bloomington, IN
171. Text: *Gunshot Wounds*, 2nd Edition, DiMaio, Vincent J.M., MD, © 1999, CRC Press, Boca Raton, FL
172. Text: *Blink*, Gladwell, Malcolm, © Back Bay Books, New York, N.Y.
173. Text: *On Killing, The Psychological Cost of Learning to Kill in War and Society*, Grossman, Dave, Col., U.S. Army, © 1996, Back Bay Books, New York, N.Y.
174. Text: *Processing Under Pressure: Stress, Memory and Decision Making in Law Enforcement*, Sharps, Matthew, Ph.D., © 2010, Loose Leaf Publishing, Flushing, N.Y.
175. Text: *In Defense of Self and Others: Issues, Facts & Fallacies – The Realities of Law Enforcement's Use of Deadly Force*, Patrick, Urey W., Hall, John C., © 2010, Carolina Academic Press, Durham, NC

176. Text: *How We Decide*, Lehrer, Jonah, © 2010, First Mariner Books, Boston, MA
177. Seminar Notes – *"Quiet Eye Characteristics that Can Save An Officer's Life,"* Dr. Joan   Vickers, Force Science Center, Minnesota State Univ., 2010
178. Seminar Notes – *"Some Fundamentals of Human Performance,"* Dr. Richard A. Schmidt, 2010, Force Science Center, Minnesota State Univ.
179. Seminar Notes - *"Biomechanics of Lethal Encounters,"* Dr. William Lewinski, 2010, Force Science Center, Minnesota State Univ.
180. News Story – Handcuffed Prisoner Steals CHP Patrol Unit, 11-06- http://www.nbcsandiego.com/news/local/Shots-Fired-Suspect-Flees-in-Patrol-Car-281843691.html
181. Article - http://www.foxnews.com/us/2017/01/10/texas-man-dies-after-shooting- himself-in-back-police-car-while-handcuffed.html
182. Research – *Police Officers Killed/Injured in Line of Duty*, Law Enforcement Officer Memorial Fund, www.leomf.org

## REVIEW OF INCIDENT

On September 30, 2012, the plaintiff identified as James Stillwagon (hereafter referred to as "Stillwagon") was on a motorcycle ride northbound on Ohio Route 42. This was a route that he had driven on numerous previous occasions. (Dep. Stillwagon, pp. 61:7-10, 63:2-4)

At approximately 3:10 pm Stillwagon had left the Marathon gas station on Route 42 and was crossing a bridge at Exit 33 where the road narrows down from two lanes to one lane. Stillwagon states that at this time, he was narrowly missed by "inches" by the driver of a pick-up truck later identified as Richard Mattingly (hereafter referred to as "Mattingly") who he estimates was driving "70 mph." (Dep. Stillwagon, p. 68:22-25; 69:1-12)

Stillwagon recalls that when Mattingly drove past him, he was laughing, burning rubber and driving at a high rate of speed. He says he next observed Mattingly stopped partially blocking the roadway at "Select Sires" waving a baseball bat out of the window and directing him to drive around his truck. (Dep. Stillwagon, pp. 70:5-9, 12-16, 19-25)

Stillwagon states that he passed by Mattingly and stopped about fifty yard in front of his truck. He recalls that Mattingly then sped off down the road and out of sight. Stillwagon thought that the incident was over. (Dep. Stillwagon, p. 74:1-8)

Stillwagon states that he proceeded northbound down Route 42 in the same direction and next observed Mattingly at Conklin Farms. He described Mattingly as parked half-way into the roadway at a turnaround and waving his baseball bat out the window again. Stillwagon states that he stopped and Mattingly "peeled out" and sped away, but eventually got stuck behind some slow-moving vehicles, so Stillwagon passed him. (Dep. Stillwagon, pp. 74:1-8; 75:1-19; 76:1-14)

Stillwagon recalls that Mattingly then passed him in his pick-up truck and "slashed" by him three times, causing Stillwagon to hit his brakes each time. He states

that Mattingly then sped past him and suddenly hit his brakes. He states that Mattingly then sped through a red light at Route 42 and Watkins-Moore Road. A portion of this erratic driving behavior was observed by witness Lois Renniger. Stillwagon states that he thought that Mattingly was DUI, or crazy, so he was going to break off contact. (Dep. Stillwagon, pp. 78:12-17; 79:1-11; Det. Segaard Int. Wit. Renniger, pp. 22:7; 23:1)

Stillwagon pulled off the roadway in the vicinity of Route 42 and Watkins-Moore Rd. and spoke to another driver identified as Lois Renniger, who had followed him the roadway. Wit. Renniger described Stillwagon as upset and shaking and asked him if he was alright. Renniger states that Stillwagon asked him if he was calling police and Renniger told Stillwagon that he would stay with him and be a witness. Another driver then pulled off the roadway with them and called police.

Witness Renniger states that Stillwagon told him, *"I'm going to get that son of a bitch."* Stillwagon concedes that he said words to the effect of, *"I guess I'll see what he wants."* However, he later Stillwagon told Officer Ailes that while he was following Mattingly he said, *"I'm going to get that son of a bitch for being so crazy."* (Det. Segaard Int. Wit. Renniger, pp. 23:1, 3; Dep. Stillwagon, p. 79:12-21; 80:2-24; 83:12-22; (Supplemental Report, PO Ailes, p. 8:1; PO Ailes' unit dashcam audio time stamps: 08:08 – 08:46; 08:55 – 08:57)

Stillwagon states that he did not want to wait since he felt that the police were not coming and drove off, continuing northbound in the same direction as Mattingly. Stillwagon states that he had a cell phone with him but it was new and he didn't know how to use it. (Dep. Stillwagon, pp. 80:2-24; 81:2-6)

Stillwagon's statements indicate that even though he acknowledges that he had been taught not to have confrontations with people in cars because the person on the motorcycle would not win, he continued driving after Mattingly northbound on Route 42. He states that he arrived at a red light at Section Line and admits that after waiting for about thirty-five seconds, he drove through the red light. The evidence indicates that Stillwagon continued northbound on Route 42 still in the direction that Mattingly had been seen driving. (Dep. Stillwagon, pp. 85:3-13; 89:11-18)

Stillwagon states that he next observed Mattingly passing cars behind him until his truck came within inches of his motorcycle. He estimates that their speeds to be about "85 mph," which is excessive for Route 42. The two vehicles began a series of dangerous sudden braking and speeding up maneuvers, passing each other along the roadway. Stillwagon states that he had a concealed weapons permit and a Glock .45 Caliber semi-automatic pistol in his motorcycle bag over his gas tank. He states that he removed this gun from the bag and put it into his jacket pocket because he felt that Mattingly might try to run him over. (Dep. Stillwagon, pp. 35:11-24; 90:3-16; 91:1; 92:6-9; 94:9-11; 95:12-23; 96:1-11; PO Ailes' unit dashcam audio time stamps: 08:08 – 08:46)

The evidence, supported by Stillwagon's and Mattingly's statements shows that Stillwagon managed to catch up to Mattingly at Exit 23 E. Williams off ramp off Route 42. When driver Mattingly was stopped for a red light, Stillwagon pulled up a forty to fifty

yards behind him. Stillwagon initially told officers that when Mattingly displayed a baseball bat out the driver's side window of his truck, he fired two or three rounds from his Glock pistol towards Mattingly, striking the rear tailgate of his truck. Stillwagon told Officer Ailes, "*As soon as I come up behind him, he's waiving a baseball bat. That doesn't bother me…He got off on (Exit) 23. We were sitting dead stopped there (for the red light). He got out a baseball bat and I shot two holes in the back of his truck.*" PO Ailes' unit dashcam audio time stamps: 09:02 – 10:30; Dep. Stillwagon, pp. 120:4-21; 126:10-21; 127:22-23; 128:1-25; 132:7-8)

Although Officer Ailes states that he believed that Stillwagon had told him that he fired upon Mattingly as the driver was backing towards him, the officer's dashcam audio of their conversation does not support this.

Stillwagon later told detectives that he fired upon Mattingly as the driver began backing his truck up in his direction. Both driver's dispute whether Mattingly had started to back towards Stillwagon when this occurred. However, Stillwagon actually told police that he did not know if Mattingly's back-up lights were on when he fired and never specifically told detectives that he was aware that Mattingly was backing up when he fired.

During Stillwagon's interview with detectives he states, "*I said, that son of a bitch. I just wanted to know what his problem was. I didn't know if his back-up lights go on and that's when I shot.*" Stillwagon told he detectives that he shot at Mattingly's truck, "*Because I said, 'If this fucker's coming backwards on me and is going to run me over.*" (CCTV video Interviews Stillwagon, #1, time stamps: 03:35 – 03:50)

Stillwagon states that he was only firing at Mattingly's vehicle. He states that after he fired, Mattingly, the driver went through a red light and drove (eastbound) on E. Williams St. He states that he did not think of calling police. He represents that he then "waited for the light to change" and proceeded in the same direction as Mattingly.

The recorded media forensic evidence does not support Stillwagon's contentions that: (1) he waited at the traffic light after the shooting (to create distance between himself and Mattingly); (2) he had pulled into the parking lot before Mattingly; (3) he never saw Mattingly before pulling into the Autozone parking lot; (4) he entered the Autozone parking lot from a different driveway than Mattingly; or (5) that it was "a mere coincidence" that he and Mattingly ended up in the same parking lot. (Dep. Stillwagon, pp. 152:3-9; 160:1-19; 163:2-7; 166:14-19; 241:13-18; PO Ailes Int. Stillwagon, dashcam audio time stamps: 10:52 – 10:57)

The CCTV surveillance video from the Eagles Lodge located at the scene of Stillwagon's next confrontation and shooting at Mattingly, shows Stillwagon directly behind Mattingly's truck (estimated distance 80 – 100 yards; CCTV video time stamps: 15:30:56 – 15:31:02) and illegally crossing in front of oncoming traffic to follow Mattingly the Autozone parking lot within six seconds of the driver, using the same driveway. The video provides conclusive evidence that Stillwagon continued to aggress upon Mattingly and is consistent with his comments to witness Renniger and officers that he

wanted "to get" Mattingly. Stillwagon concedes that he told investigating officers at the scene, "I'm going to get that crazy son of a bitch for being crazy." (Dep. Stillwagon, pp. 128:1-25; 133:1-7; 144:1-3; 150:22-24; 152:3-9; 221:10-20; Eagles Lodge CCTV video, Camera 13, time stamps: 15:31:00 – 15:31:06)

The Eagles Lodge CCTV surveillance video also does not support Stillwagon's contention that he did not see Mattingly parking near a cement pillar. In fact, the video documents Stillwagon entering the same driveway as Mattingly; looking towards his left where Mattingly was just parking; and immediately turning towards and driving in his direction. (time stamp: 15:31:06) The video documents that there are no other vehicles parked at the E. Williams St. (south) end of the parking lot to obstruct Stillwagon's vision of Mattingly's truck. (Dep. Stillwagon, pp. 166:14:19; 168:9-15; 182:1-16; Eagles Lodge CCTV video, Camera 13, time stamps: 15:31:00 – 15:31:06)

Stillwagon states that he parked his motorcycle and heard Mattingly's truck engine revving. He states that as Mattingly began driving (out of the lot), he believed that Mattingly was going to come around back at him (to run him over); or get behind him on the roadway; get him sideways, or kill him; so, he began shooting at the tires of Mattingly's truck. He admits that he yelled out at Mattingly when he shot, *"I'm going to fucking kill you! Do you want to get killed today?!"* (Dep. Stillwagon, pp. 169:1-22; 174:1-24; 176:18-24; 177:1-23; 182:1-16; 221:1-21)

Stillwagon's statements are again not supported by the Eagles Lodge CCTV video. The video forensically documents that Mattingly had been parked perpendicular to Stillwagon's motorcycle and facing south towards E. Williams St. and had not been moving for six seconds before Stillwagon admits that he began shooting at his truck. (CCTV video, Camera 13, time stamps: 15:31:06 – 15:31:17)

Stillwagon states that after Mattingly drove out of the Autozone parking lot and then re-entered the lot driving towards him, he believed that Mattingly "was going to shoot him in the head;" so he began to shoot low in front of his truck and this caused the driver to stop. (Dep. Stillwagon, p. 187:1-8)

Stillwagon states that his plan was to approach Mattingly from the right front passenger side door, reach across the seat and drag Mattingly across the seat, but the window was closed. This statement is both illogical and irrational when compared to Stillwagon's belief that Mattingly was armed with a gun. However, Stillwagon's immediate approach and engaging Mattingly physically and while armed is consistent with his statements to detectives indicating that he was not afraid of Mattingly because the driver would not confront him. (Dep. Stillwagon, pp. 189:5-25)

*Stillwagon told detectives, "…He's just a pussy, you know. He wouldn't confront me or anything…"* (Det. Segaard Int. Stillwagon #2 video, time stamps: 03:00 – 03:49)

The forensic media evidence documents that when Mattingly's truck re-entered the parking lot and parked his vehicle behind and perpendicular to Stillwagon's motorcycle; Stillwagon left his motorcycle and immediately approached the right front

passenger door of the truck. (Video time stamps: 15:31:17 – 15:31:35) Stillwagon then quickly walked from the passenger side, around the rear of the truck and confronted driver Mattingly, who had exited the driver's side door. (Video time stamps: 15:31:35 – 15:31:42) Stillwagon states that when he approached the passenger side of Mattingly's truck and looked inside, he saw no weapons and "did not know" if Mattingly was holding a weapon. (Dep. Stillwagon, pp. 191:14-23; 192:1-3)

Stillwagon states that he was armed when he approached Mattingly who exited the truck with his head down and hands/arms low at his sides. He described Mattingly's demeanor at the time as a "sheepdog," indicating that the driver was submissive. Stillwagon states he told Mattingly, "*You're a fucker. You're a fucking asshole. If you have anything in your hand, I'm going to blow your fucking head off.*"… "*What the fuck's wrong with you, man? You want to get killed today, or what? You try killing me? I'm not going to let you do that to me.*" (Dep. Stillwagon, p. 200:1-2; Det. Segaard 2nd Int. Stillwagon, video time stamps: 06:30 – 06:55)

Stillwagon states that he kicked Mattingly in his leg and as Mattingly began to raise a hand, he struck the driver in the back of the head with his loaded Glock pistol. He states that he must have had his finger on the trigger at the time he struck Mattingly and this is what caused the weapon to negligently discharge. Stillwagon represents that did not know if Mattingly had anything in his hand at the time. He told detectives, "*And that's when I kicked him in the fucking leg (motions kicking with right leg) and he sort of raised his (motions right) hand and that's when I hit him in the back of his head with my gun.*" (Dep. Stillwagon, pp. 203:4-8; 206:11-18; 210:4-13; 211:7-19; 215:14-25; 2nd Int. video Time stamps: 06:30 – 06:55)

Witnesses at the scene of the shooting state that they observed an armed Stillwagon approach an unarmed driver Mattingly; kick him in the leg and then either shoot him or strike him in the head with a pistol. (Supplemental report Det. Segaard, Int. Wit. S. Orcena, p. 25:4; Int. Wit. Brown, p. 26:2)

The recorded forensic media evidence from Delaware County Deputy Pitts' patrol unit documents Stillwagon approaching the deputy, while exclaiming, "*I shot the fucker. I don't think he's shot.*" (Dep. Pitts patrol unit dashcam, time stamp: 15:36:51)

Plaintiff James Stillwagon was detained at the scene by officers and later arrested. The prosecutor filed felony attempted murder and assault charges and he was subsequently indicted by a Grand Jury. Stillwagon's case went to trial, where he was acquitted by a judge. Following his acquittal, he filed a Title 42, 1983 U.S.C. federal civil suit against the City of Delaware and the defendant officers including claims of false arrest, malicious prosecution and violations of civil rights to include due process, excessive force and deliberate indifference.

## ANALYSIS OF INCIDENT, POLICE PRACTICES AND LAW ENFORCEMENT ACTIONS TAKEN. EXPERT'S OPINIONS & FINDINGS

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK Ron Martinelli, Ph.D., CMI-V*

**Introduction**

The immediate case involves the arrest of plaintiff James Stillwell for assault with a deadly weapon upon another citizen.

Opinion #1 – Defendant Delaware Police Department Police Officers Ailes, Flynn, Segaard, Gerke, and Willauer had sufficient reasonable suspicion to detain, and probable cause to arrest, plaintiff Stillwagon. The officers' actions were consistent with state and national law enforcement guidelines and recognized, professional law enforcement standards of care. The information, circumstances, statements, facts and forensic evidence that support my finding and opinion are as follows:

1. Officers receive training in the basic police academy and during periodic training in laws of arrest and search and seizure that they can stop and detain a citizen if they are aware of or observe specific articulable facts or circumstances that connect that citizen with suspicious or criminal activity.

2. Officers are taught that they can detain and arrest for any crime that they reasonably believe will occur, is occurring in their presence, or has occurred, depending upon the nature of that crime.

3. Officers are taught that they can affect the arrest for any misdemeanor or felony crime occurring in their presence.

4. Officers are trained that "reasonable suspicion" and "probable cause" are objective standards of proof.

5. Officers are taught that "reasonable suspicion" to detain a person must be based upon "articulable circumstances, information, observations and facts that would lead a reasonable law enforcement officer/deputy to believe that criminal activity is afoot." They are taught that reasonable suspicion to detain is a lesser standard of proof than probable cause.[1], [2], [3], [4]

6. Officers are trained that they can use the information obtained from reporting persons, witnesses, police broadcasts and other officers as a basic in forming reasonable suspicion to detain subjects.

7. Officers are taught that "probable cause" to arrest a person must be based upon articulable circumstances, information, observations and facts that would lead a reasonable law enforcement officer/deputy to believe that a crime has been committed and the person to be arrested is the one who is or has committed that crime.

---

[1] United States v. Cortez, 449 U.S. 411 (1981)
[2] United States v. Jones, 432 F.3d 34 (1st Cir. 2005)
[3] Immigration & Naturalization Service v. Delgado, 466 U.S. 210 (1984)
[4] Terry v. Ohio, 392 U.S. 1 (1968)
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

8. Officers are taught that regarding civilian shootings where self-defense is asserted by the shooter; the shooter must prove that he was not at fault for creating the situation. The person claiming self-defense cannot be the first aggressor or initiator. Further, in proving the victim's fault, the shooter cannot point to other unrelated situations in which the victim was the aggressor. The investigative focus must be on the specific facts of the situation at hand at the moment(s) shot(s) were fired. (ORC §2901.01)

9. Officers are taught that if the shooter escalates a confrontation by attacking or drawing their handgun, that person is the aggressor. Most likely in that situation, the person aggressing, drawing the handgun and shooting cannot legitimately claim self-defense; nor would they be able to prove an affirmative defense. (ORC §2901.01)

10. Officers are taught that a shooter asserting self-defense must be able to prove that at the time, they had a real belief that they were in immediate danger of death or great bodily harm and that the use of deadly force was the _only_ way to escape from that danger. The shooter's belief must be objectively reasonable; not merely speculative. (ORC §2901.01)

11. Officers are taught that the shooter asserting self-defense must prove that they did not have a duty to retreat to avoid the danger. If a person can escape danger by such means as leaving or using less than deadly force, they must use those means. (ORC §2901.01)

12. Officers are taught that if they and prosecutors determine that a person's use of deadly force is not justified, criminal charges may be pursued. In a situation in which the victim is injured by the conduct of a CCW licensee using a handgun, the licensee can be charged with assault crimes, including — but not limited to — felonious assault, aggravated assault, or attempted murder. (ORC §2901.01)

13. Officers are taught that if the shooter fails to prove any one of the three conditions for self-defense or defense of another, he fails to justify his use of deadly force. (ORC §2901.01)

14. Officers are taught that if they have reasonable cause to believe that a person has a firearm or other deadly weapon with him or her in violation of any provision of law relating to firearms or deadly weapons, the officer may detain that person to determine whether a crime relating to firearms or deadly weapons has been committed. If probable cause exists to believe that they more likely than not committed a crime; the officer(s) can arrest them.

Fact pattern establishing reasonable cause to detain, search and handcuff Stillwagon

(1) On 09-30-12 at 3:35 pm hours, Delaware PD dispatch requested officers to respond to a report of shooting near the Autozone store, located at 137 E. Williams St.

(2) Delaware County Sheriff's Department Deputy Pitts and Delaware PD Officers Ailes and Flynn had arrived first on the scene. Dep. Pitts had already ordered plaintiff Stillwagon to the ground and was searching him for weapons. Officer Ailes asked Stillwagon where his weapon was and Stillwagon had replied that the pistol was, *"Over on the wooden thing,"* in a nearby raised planter box. (Supplemental Report, Det. Segaard #2, p. 1:2; Supplemental Report, PO Ailes, p. 7:2-3; Court transcript, PO Ailes, p. 186:9-24; Supplemental Report, PO Flynn, p. 5:2-3)

(3) Dep. Pitts informed officers that Stillwagon's firearm was away from his body. The deputy subsequently took Sgt. Willauer, Officer Flynn and Det. Gerke over to a nearby raised planter box in the parking lot, where they observed and recovered a black Glock .45 caliber pistol. (Supplemental Report, Sgt. Willauer, p. 8:4; Det. Gerke, 11:5; Dep. Sgt. Willauer, p. 97:3-6; PO Flynn, p. 5:3)

(4) DPD officers observed subject Richard Mattingly lying on the pavement next to his pick-up truck. They noted that Mattingly was initially not moving and was bleeding heavily from a head wound, where the blood stream extended from his wound, onto the pavement. Officer Willauer states that paramedics attending to Mattingly advised them that Mattingly *"had been shot in the head."* Det. Gerke states that paramedics advised them that Mattingly was *"being flown by Med-Flight to OSU Hospital for a gunshot wound to the head."* (Supplemental Reports PO Ailes, p. 7:2; PO Flynn, 5:4-5; PO Willauer, pp. 8:4; 9:1; Det. Gerke, p. 11:2)

(5) Sergeant Willauer and Officer Flynn believed that Mattingly had been shot in his head. Sgt. Willauer reports that paramedics told him that Mattingly had been shot in the head. Mattingly was conscious and upon questioning, related to the officers that he had been shot in the head. (Supplemental Reports, Sgt. Willauer, pp. 8:4; 9:4; PO Flynn, p. 6:1)

(6) During the officers' initial investigation at the scene, subject Mattingly was searched for weapons and was found to be unarmed. The officers noted that Mattingly had the odor of alcohol on his person. (Supplemental Reports, Det. Segaard #2, p. 1:5; PO Flynn, p. 6:1)

(7) The officers state that they spoke with witnesses at the scene who informed them that they had observed the man who had been on a motorcycle (Stillwagon) extract a pistol and begin shooting at the driver (Mattingly) from the passenger side of the truck. The witnesses also told the officers that when the driver exited the truck, Stillwagon, who had dismounted from his motorcycle, shot at Mattingly two more times. Wit. Linkous told Det. Segaard that when Stillwagon shot at the driver (Mattingly), the driver immediately fell to the ground. (Supplemental

Report #1, Det. Segaard, p. 26:1; #2, Det. Segaard, p. 6:3-4; Int. Wit. Keeran; Int. Wit. Mallory; Wit. Linkous; Supplemental Report, PO Flynn, p. 6:3-4)

(8) Officer Ailes Mirandized Stillwagon who admitted to shooting at Mattingly. Stillwagon told Officers Ailes and Flynn that he was shooting in self-defense because he believed that Mattingly was going to run him over. The officers state that Stillwagon told them he *"was going to kill (Mattingly)."* (Supplemental Report, PO Ailes, p. 6:6-7)

Based upon my review of the discovery evidence, and in consideration of my law enforcement, forensic and medical education, training and experience, I make the following findings and opinions to a reasonable degree of professional probability within my areas of expertise:

(1) Based upon their collective knowledge of law enforcement education, training and experience, including their observations and interviews with subject Mattingly, witnesses and plaintiff Stillwagon at the scene; the defendant officers had more than sufficient reasonable suspicion to believe that a crime occurred and that Stillwagon had some relationship to the shooting incident. (ORC §2935.03; DPD FTP Objective #33, §II(A), IV(A); See Case Laws)

(2) Based upon their observations of Mattingly's head injuries, Mattingly's statements that he had been shot by Stillwagon; and the on-scene medical professionals assessing Mattingly's head wound as a "gunshot" injury; the defendant officers had sufficient cause to believe that Stillwagon had shot Mattingly in the head. They therefore had reasonable suspicion to consider and/or believe and that they were investigating an attempted murder and a felony assault involving the use of a firearm. (ORC §§2903; 2903.11; 2903.12; 2903.13; 2923(I)(ii); DPD FTP Objective #33, §II(A), IV(A); See Case Laws)

(3) The involved defendant officers had more than sufficient cause to detain plaintiff Stillwagon for the investigation of the shooting of Mr. Mattingly, which was a serious felony crime. This also allowed the officers to transport Stillwagon to the police department to continue their investigation. (CALEA Stds. #s 70.1.1, 70.1.6, 70.2, 70.2.1; DPD FTP Objective #s 33, 34)

Fact pattern establishing probable cause to arrest plaintiff Stillwagon for the attempted murder of and the felonious assault with a firearm upon Mr. Mattingly

(1) The defendant officers including Dets. Segaard and Gerke had reasonable suspicion to detain, handcuff, search and transport plaintiff Stillwagon to the police department for suspicion of unlawfully shooting Mr. Mattingly. (See Opinion #1, 1-8; (1) – (3))

(2) Prior to being transported to the police department, Stillwagon was placed into the rear prisoner compartment of Officer Ailes' patrol unit. Officer Ailes states

and reports that he had Mirandized Stillwagon and had obtained a waiver to speak with him (Dashcam audio time stamp: 06:07 – 06:25).

Stillwagon's initial statement was forensically recorded by Officer Ailes dashcam. the plaintiff described a lengthy "road rage" incident between himself and subject Mattingly that took place over the course of approximately ten miles, culminating at the Autozone parking lot on E. Williams Street, where he fired a second series of shots "at (Mattingly's) pick-up truck. (Supplemental Report, PO Ailes, pp. 7:3 - 8:1; PO Ailes' unit dashcam audio time stamps: 06:07 – 11:50)

(3) Officer Ailes reports and his patrol unit's dashcam documents Stillwagon explaining his rendition of the circumstances leading up to the shooting. Stillwagon told Officer Ailes that while he was following Mattingly he said, *"I'm going to get that son of a bitch for being so crazy."* (Supplemental Report, PO Ailes, p. 8:1; PO Ailes' unit dashcam audio time stamps: 08:08 – 08:46; 08:55 – 08:57)

(4) Stillwagon told Officer Ailes that while he was following Mattingly, he removed his Glock .45 caliber pistol from his bag and placed it into his jacket. He then continued following Mattingly's pick-up truck down the highway. (PO Ailes' unit dashcam audio time stamps: 08:08 – 08:46)

(5) Stillwagon told Officer Ailes that Mattingly and he exited off Exit 23 (E. Williams St.) from Route 42. They were stopped for a red light and Mattingly could not go anywhere. At that point, Mattingly put a blue baseball bat out of the driver's side window and waived it. Stillwagon is heard to say, *"As soon as I come up behind him, he's waiving a baseball bat. That doesn't bother me…He got off on (Exit) 23. We were sitting dead stopped there (for the red light). He got out a baseball bat and I shot two holes in the back of his truck."* PO Ailes' unit dashcam audio time stamps: 09:02 – 10:30)

(6) Officer Ailes' report and the audio recording of Stillwagon's initial statements to him clearly indicate that while Stillwagon believed that subject Mattingly had attempted to assault his with his vehicle on approximately six separate occasions; Stillwagon continued to drive in the same direction as his alleged attempted assailant. Officer Ailes states that Stillwagon told him that at the E. Williams Street off ramp, Mattingly began backing up in his direction and in response, Stillwagon fired twice at Mattingly's truck. However, any mention of Mattingly backing up towards him immediately before he fired at the truck on the off ramp are not heard on the audio of his statement.
(Supplemental Report, PO Ailes, p. 8:1; PO Ailes Dashcam audio)

(7) There is no forensic evidence supporting plaintiff Stillwagon's contention that subject Mattingly was backing his truck in Stillwagon's direction when the plaintiff fired two shots at him.

(8) Stillwagon initially told Officer Ailes that he pulled into the parking lot of the Autozone, where Mattingly followed him into the lot and tried to run him over. Officer Ailes' dashcam audio records Stillwagon saying, *"I pulled into this lot and he comes at me with his truck."* Plaintiff Stillwagon's statement to police is not supported by the forensic evidence of the CCTV surveillance camera from a nearby Eagles Lodge.

What is in fact forensically documented is Stillwagon following Mattingly's pick-up truck into the Autozone parking lot (time stamp: 15:31:00 – 15:31:12). Mattingly parks his pick-up truck in the lot facing E. Williams St.; quickly followed by Stillwagon on his motorcycle. Stillwagon parks his motorcycle facing the driver's side door of the truck (time stamp: 15:31:12 – 15:31:17). Mattingly then drives his truck out of the lot; makes a circle and re-enters the lot and parks approximately twenty feet from Stillwagon with the front of the truck facing the street and the right passenger door side facing the rear of his motorcycle. The truck is not seen to move towards Stillwagon whatsoever at any time while in the parking lot. Stillwagon is observed to approach the right side of the truck where Mattingly remains behind the wheel. (Eagles Lodge CCTV video, Camera 13, time stamps: 15:31:17 – 15:31:34)

(9) Plaintiff Stillwagon's statements to Officer Ailes that Mattingly was attempting to run him down at the time that Stillwagon fired upon him and his truck with his .45 caliber Glock pistol, is not supported by the Eagles' Lodge CCTV surveillance video. (Supplemental Report, PO Ailes, p. 8:1; Eagles Lodge CCTV video, Camera 13, time stamps: 15:31:17 – 15:31:34)

(10)    The statements of witnesses, subject Mattingly and Stillwagon himself, supported by the forensic recorded media evidence of a CCTV surveillance video, provide sufficient probable cause evidence that plaintiff Stillwagon's shooting was not consistent with Ohio self-defense case laws and state statutes. (Supplemental Report, PO Ailes, p. 8:1; Eagles Lodge CCTV video, Camera 13, time stamps: 15:31:17 – 15:31:34; ORC §2901.01)[5], [6], [7], [8]

(11)    Forensic evidence found at two crime scenes and on Mr. Mattingly's pick-up truck supported the statements of subject Mattingly, witnesses and plaintiff Stillwagon that he fired upon Mattingly and his vehicle on two occasions. Stillwagon had mentioned to one witness and to police that he was *"going to get that son of a bitch,"* before removing his gun from a bag, placing the weapon into his coat, following Mattingly; and subsequently firing upon him.

The evidence documented that Stillwagon followed Mattingly off the Route 42, Exit 23 off ramp; shot twice at him while Mattingly's truck was stopped at a stop

[5] State v. D.H., 865 N.E.2d 90, 99 (Ohio App. 2006)
[6] Martin v. Ohio, 480 U.S. 228 (1987)
[7] State v. Ludt, 906 N.E.2d 1182, 1188 (Ohio App. 2009)
[8] State v. Robbins, 58 Ohio St.2d 74, 388 N.S.2d 755 (1979)
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

light; and then following Mattingly into the Autozone parking lot. In doing so, Stillwagon became the aggressor in this incident.

Based upon my review of the discovery evidence, and in consideration of my law enforcement, forensic and medical education, training and experience, I make the following findings and opinions to a reasonable degree of professional probability within my areas of expertise:

(1) The defendant officers had reasonable suspicion to detain plaintiff Stillwagon for suspicion of committing a felony crime(s).

(2) The defendant officers had probable cause to arrest plaintiff Stillwagon for the attempted murder and felonious assault of Mr. Mattingly.

(3) The officers' decisions to detain and arrest plaintiff Stillwagon were consistent with their law enforcement and investigations education, training and experience regarding Ohio state statutes; trained, recognized and applied state and federal criminal and civil rights court case laws; and the professional law enforcement standards of care recognized in Ohio and nationally.

(4) In my review of the discovery evidence submitted by the plaintiff, I find no significant, meaningful evidence that supports his assertion that he was unlawfully detained and arrested by the defendant officers during this incident.

Finding & Opinion #2 – The defendant officers' use of force upon plaintiff Stillwagon were reasonable and consistent with their law enforcement training, state statutes, civil rights guidelines and codified professional law enforcement standards of care. The circumstances, statements, facts and forensic evidence that supports this finding and opinion are as follows:

1. Officers are taught in the police academy and in periodic department training that they can use whatever force is objectively reasonable to affect an arrest, prevent escape, and/or overcome a suspect's resistance.[9] (ORC §2935.03; DPD FTP Objective #33, §§II(A), IV(A)(1)(2))

2. Officers are taught that they need not necessarily use the _least intrusive_ level of force when attempting to control a resisting subject; or in effecting an arrest. Again, they learn that whatever level(s) of force they use must be objectively reasonable. (Graham v. Connor)

3. Officers are taught that when considering non-force or forceful responses to a subject's resistance they must balance the "government need" against the "intrusion upon the individual." (Graham v. Connor)

[9] Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)
_Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK_
_Ron Martinelli, Ph.D., CMI-V_

4. Officers are taught that the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene and his understanding of the "totality of circumstances." An officer's calculus in his decision to use force, including deadly force includes the emergent nature of the circumstances; the need to decide about the use of deadly force under rapidly developing events or occurrences; as compared to a review of events in hindsight. (Graham v. Connor)

5. Officers are trained that an officer who makes or attempts to affect a detention or an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. They are taught that an officer shall not be deemed an "aggressor" or lose their right to self-defense using reasonable force to affect a detention or arrest; or to prevent escape; or to overcome resistance.

6. Officers are taught in the academy and during department update Use of Force training that prior to the deployment of force, when they are considering which force option(s) to select, they must consider the following: [10]

    1. The seriousness of the event.
    2. Does the subject pose a physical threat to the officer(s), or a 3rd person(s).
    3. What level of resistance is the subject using against the officer(s).
    4. Whether the subject is attempting to escape from or evade arrest.

Seriousness of the incident

(1) The discovery evidence shows that Delaware PD officers were responding to a report of a shooting in the Autozone parking lot. Shootings in-progress are among the highest risk calls for service police officers experience. During 2012, 131 peace officers died/were killed in the line of duty responding to in-progress calls for service.[11]

(2) The statements of witnesses to the shooting support the forensically recorded media evidence documenting that armed plaintiff Stillwagon fired several rounds at or towards subject Mattingly in a semi-crowded public environment amid pedestrians, passing and parked vehicles.

At the time that Delaware Co. Sheriff's Office Deputy Pitts and Delaware PD officers arrived on scene, the shooter had not been identified. Dep. Pitts' patrol unit dashcam video recorded the deputy and officers arriving to find one man (Mattingly) down, bleeding and not moving on the pavement next to the driver's side of a pick-up truck; with another man (Stillwagon) standing immediately near the body. (Dep. Pitts patrol unit dashcam video: time stamps: 15:36:38)

---

[10] Ibid., Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)
[11] http://www.nleomf.org/facts/officer-fatalities-data/daifacts.html
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

(3) The video documents that Stillwagon is dressed in a leather motorcycle jacket that is partially zipped down. As Dep. Pitts exits his patrol unit, Stillwagon immediately begins to approach him. The dashcam audio records Stillwagon saying to the deputy, *"I shot the fucker, but I don't think he's shot."* Stillwagon's statement immediately identifies himself as the shooter to Dep. Pitts.
(Dep. Pitts patrol unit dashcam video: time stamps: 15:36:38 – 15:36:51)

At this rapidly evolving and uncertain moment, Dep. Pitts has both reasonable suspicion and probable cause to believe that a serious crime (homicide, serious weapon assault with great bodily injury) has occurred and that Stillwagon is the person directly involved in this crime.

Risk to officer(s) and/or others and level(s) suspect of resistance

(4) Officers are taught that they often must make officer/citizen safety and use of force decisions, based upon information that can be incomplete or erroneous during circumstances that are rapidly evolving, tense and uncertain.[12]

(5) Dep. Pitt's dashcam documents that as plaintiff Stillwagon approaches the deputy, he is excited and begins to move his hands towards the jacket he is wearing. Dep. Pitts orders Stillwagon not to move to control him. Stillwagon ignores the deputy's commands and continues to make rapid, furtive movements towards the inside of his jacket. It is important to know that Dep. Pitts had not searched Stillwagon and did not know, but was trained to assume that the plaintiff was armed. (Dep. Pitts patrol unit dashcam video: time stamps: 15:36:53 – 15:37:00)

Officers are trained that 85% of suspects access concealed weapons from either the waistband, or center torso areas and 36% of officers killed each year are killed by suspects being able to access and use concealed weapons including firearms. In 2016, there was a nearly 70% increase in officers being killed by suspects with firearms and a nearly180% increase in officers being ambushed by suspects using firearms.[13], [14]

(6) Dep. Pitt's dashcam documents that as Dep. Pitt points his gun at Stillwagon and attempts to verbally control him, the plaintiff starts to unzip his jacket. This causes great concern to the deputy, who orders Stillwagon to the ground on his back. (Dep. Pitts patrol unit dashcam video: time stamps: 15:36:53 – 15:37:00)

Officers are taught in the officer safety and arrest and control classes that most tactically advantageous position of suspect control is to get them on their stomachs or on the backs on the ground.

---

[12] Ibid., Graham v. Connor
[13] USDOJ/FBI Statistics, "Officers Killed/Injured in Line of Duty, 2006"
[14] Law Enforcement Officers Memorial Fund, Officers Killed/Injured Statistics, 2016
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

(7) Dep. Pitt's dashcam documents that Dep. Pitts was attempting to verbally de-escalate and control plaintiff Stillwagon by ordering him to remain on his back. However, Stillwagon is observed to be agitated, ignoring the deputy's commands and is attempting to sit up. (Dep. Pitts patrol unit dashcam video: time stamps: 15:36:53 – 15:37:24)

Plaintiff Stillwagon's repeated, furtive movements increased, rather than decreased the deputy's reasonable suspicions that a shooting suspect he had not yet searched might be armed and attempting to access a concealed handgun. The circumstance created by plaintiff Stillwagon, elevated the officer safety risk to Dep. Pitts and other officers present.

(8) Dep. Pitt's dashcam documents that the deputy asks Stillwagon where his gun is and Stillwagon points over his left shoulder towards an elevated planter box. (Dashcam video: time stamp: 15:37:24)

The use of force used upon plaintiff Stillwagon - Handcuffing

(9) Nationally and in the State of Ohio, peace officers are trained that arrested suspects who are initially cooperative at the time of arrest can subsequently become more desperate, despondent and dangerous to closer they get to the location of booking; whereas the arresting officers tend to become more complacent and are targets of opportunity the closer they get to the booking location. [15]

(10) Dep. Pitt's dashcam video documents that under the cover of another armed female officer, Dep. Pitts moves forward and handcuffs Stillwagon with his motorcycle jacket removed. The video documents the deputy using two sets of handcuffs to secure Stillwagon in slow and deliberate moves.

Officers are taught in their officer safety classes to always handcuff and search suspects of violent crimes. Research into officers killed/injured in the line of duty show that 24% of officers are assaulted, injured or killed from the point of handcuffing to arrival at a jail facility where they are uncuffing a suspect.

Officers are trained in their arrest, control and restraint classes to always handcuff before searching a suspect. They are also taught to use two sets of linked handcuffs to secure suspects who might be injured, or who have large upper torsos.

(11) No officers from the Delaware PD are observed to be involved in the detention, handcuffing and searching of plaintiff Stillwagon at this point. It is important to note that the plaintiff has not listed the Deputy Pitts, nor the Delaware Co. Sheriff's Office as co-defendants in his lawsuit, although Dep. Pitts was the officer who first handcuffed Stillwagon.

---

[15] Manual, *"Tactical Psychology & Physiology,"* Dr. Martinelli, © 2009, p. 43
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

(12)     The fact that plaintiff Stillwagon believes that he was "cooperative and compliant" with his detention is irrelevant in any calculus an officer makes in their decision to physically and mechanically restrain Stillwagon in handcuffs for the reasons listed in this analysis. Recently, a cooperative and compliant suspect who was arrested, handcuffed and searched by an Austin, Texas police officer, was able to access a handgun he had concealed in his waistband and commit suicide while in the rear prisoner compartment of the officer's patrol unit.[16] This example underscores the fact that even handcuffed suspects can still be dangerous; can never be trusted; and should always remain restrained and monitored.

(13)     Delaware Patrol Sergeant Willauer states that all suspects are handcuffed with their hands behind their back. Officer Ailes states that this is department policy. (Dep. Sgt. Willauer, p. 20:13-20; Dep. PO Ailes, p. 166:2-7; DPD FTP Objective #34, "Handcuffing," §IV, A(3), Bates DEL 0754; CALEA Stds. #s 1.3.1, 70.2, 70.2.1)

Officers placing plaintiff Stillwagon into rear prisoner compartment of patrol unit

(14)     Plaintiff Stillwagon was escorted from the point of handcuffing, to Delaware PD Officer Ailes' patrol unit. He was then placed into the rear prisoner compartment of the patrol unit. Officer Ailes' patrol unit dashcam records that once the handcuffed Stillwagon is placed into the compartment, he is asked by Officer Ailes if his handcuffs were alright. The officer inquires, *"Cuffs on you OK?"* to which Stillwagon is heard to reply, *"Yeah."* This is a positive indication that the plaintiff was in no pain; his handcuffs were properly adjusted; and there was no excessive force applied. The patrol unit dashcam audio records no evidence that Stillwagon protested in any manner while being seated in the prisoner compartment of the patrol unit. (PO Ailes' patrol unit dashcam: time stamp: 07:19)

(15)     Officer Ailes states that plaintiff Stillwagon was only in the rear prisoner compartment of his patrol unit for 25:44 minutes. During this time, the officer observed no swelling, injury or deformity to Stillwagon's hands/wrists. (Dep. PO Ailes, pp. 174:12-16; 175:10-13)

(16)     I have not reviewed any evidence submitted by plaintiff Stillwagon that includes any forensic evidence, nor independent witness statements that support the plaintiff's allegation that he was harshly treated and protested pain and/or injury to officers while he was being placed into the rear prisoner compartment of Officer Ailes' patrol unit. Contrarily, the audio from Officer Ailes' patrol unit's dashcam records a normal process of placing a large person into

---

[16] Article - http://www.foxnews.com/us/2017/01/10/texas-man-dies-after-shooting-himself-in-back-police-car-while-handcuffed.html

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

the rear prisoner compartment, with Stillwagon being asked if his handcuffs were alright. (PO Alies' patrol unit dashcam: time stamp: 07:19)

In reviewing and analyzing the audio of Officer Ailes' initial interview of Stillwagon and the ambient (background) sounds, it is evident that Officer Ailes was interviewing the plaintiff with the rear prisoner door open. Upon completing his initial interview with Stillwagon and prior to closing the compartment door, Officer Ailes is heard to tell the plaintiff, *"I'm going to shut this for you, alright?"* Stillwagon is heard to reply, *"Thank you."* (PO Alies' patrol unit dashcam audio: time stamps: 11:35 – 11:41)

Officer Alies' dashcam audio forensically records no slamming of a car door; no cries out in pain, nor any protestations from the plaintiff that the officer(s) had harmed him in any way. Stillwagon is not heard to make any comments indicating that the officer(s) treated him harshly; slammed a door on his feet/legs; nor applied any gratuitous/malicious use of force upon him. This is a positive evidence that refutes the plaintiff's allegation that officers "slammed the door" on his feet/legs. On the contrary, the plaintiff's response of "Thank you," indicates that a calm and cooperative relationship between Officer Ailes and Stillwagon while the plaintiff was seated in the officer's patrol unit. (PO Alies' patrol unit dashcam: time stamp: 06:56 – 11:41)

<u>Bags placed upon plaintiff Stillwagon's hands to preserve forensic trace evidence</u>

(17)     After plaintiff Stillwagon had been secured in handcuffs, a decision was made to bag his hands to preserve any forensic trace evidence of gunshot residue (GSR) that might remain on his hands. This is a common, trained investigative police practice. The evidence suggests that initially, plastic and not paper bags were placed on Stillwagon's hands and the bags were secured onto his hands/wrists with tape.

It is acknowledged that the use of plastic rather than paper bags was a mistake in properly preserving trace GSR evidence. However, it was done in good faith by the detaining officers.

I have found no evidence from Officer Ailes' dashcam audio that records any protestations from plaintiff Stillwagon that the tape used to secure bags to his wrists were too tight and/or were restricting the flow of blood to his hands.

(18)     The plaintiff's assertion that the use of bags secured to his hands by tape was unnecessary and therefore an "excessive use of force" because (1) Stillwagon had already admitted to officers that he had shot his handgun; and (2) because he had been cooperative and had not resisted detention or arrest; is irrelevant in any determination as to whether the placement of the bags was reasonable, and/or any force applied was excessive.

In rebuttal, the placement of bags on Stillwagon's hands secured with tape is not classified by the courts as a use of force. Second and as discussed, albeit plastic rather than paper bags were used on the plaintiff's hands to preserve possible trace evidence; the placement of those bags was done in good faith and without malice. Third, the practice of bagging the hands of a shooting suspect is a commonly trained and reasonable investigative procedure.

The fact that Stillwagon had admitted to officers that he had fired his handgun is again irrelevant, since it is well known that suspect's often change their stories prior to any court appearance. Officers are trained to preserve forensic evidence beyond suspect confessions/admissions/statements in the event that a suspect changes their story and/or investigators might need to further reconcile statements with facts and forensic evidence.

(19)     Plaintiff Stillwagon was transported to the police department. At the department, Stillwagon's handcuffs and the bags were removed from his hands. He was then re-handcuffed to the front for officer safety. He was interviewed in an interview room and his interview was recorded. This is a standard police investigative practice. (Report, Det. Segaard, p. 13:2)

(20)     Officers are taught that they can use their officer safety discretion regarding the level of security and restraint they apply upon prisoners who they believe to have been involved in serious, life-threatening crimes.

(21)     The discovery evidence documents that after plaintiff Stillwagon had been transported to the Delaware PD and before he was interviewed by detectives, the handcuffs initially used to restrain his wrists/hands and the bags placed upon his wrists had been removed and replaced with alternate, loose-fitting handcuff restraints to the front of Stillwagon's torso. (CCTV surveillance videos #1-2, Interview room, Stillwagon interviews, Delaware PD)

(22)     Forensic recorded media evidence from a CCTV surveillance camera in the Delaware PD interview room where plaintiff Stillwagon was interviewed by detectives does not support the plaintiff's representations that he remained restrained in tight handcuffs that were causing injury to his wrists/arms.

The videos of Stillwagon's two interviews with detectives show that he is calm, comfortable and conversant with Detective Segaard. He is observed to be retrained with his hands secured in front of him with lose-fitting handcuffs which are connected by a two-foot thin chain. The cuff loops are observed to be freely moving at times from his wrists down to his lower forearms. No evidence of swelling, bruising or bleeding in the areas of the wrists are observed. Stillwagon makes no complaints that he is injured, or that the handcuffs are too tight. He makes no complaints regarding the previous placement of bags on his hands/wrists. He makes no complaints about any excessive force whatsoever. (CCTV Surveillance videos, Stillwagon Interviews #1-2, interview room, Delaware PD)

Based upon my review of the discovery evidence, and in consideration of my law enforcement, forensic and medical education, training and experience, I make the following findings and opinions to a reasonable degree of professional probability within my areas of expertise:

(1) Plaintiff Stillwagon asserts as a layperson that he was cooperative, complaint and was "under control;" and that there was no need to restrain him.

In rebuttal, I would opine that "control" to a law enforcement officer is a relative term. The forensically documented evidence of the actual "totality of circumstances" that the detaining officers had to contend with upon their arrival shows that they responded to a report of an in-progress shooting. They arrived to find a chaotic, unsecured crime scene with one person down, unmoving and bleeding with an excited shooting suspect (Stillwagon) moving towards officers and not-complying with direct orders at gunpoint.

The forensic video evidence from Deputy Pitts' patrol unit dashcam clearly shows that plaintiff Stillwagon was far from being "under control." Further, the plaintiff's perception that he was cooperative with detention and he was under control is irrelevant to an officer(s)' determination as to whether Stillwagon posed an imminent threat and whether he should have been restrained on the ground and better controlled in restraints.

(2) The use of handcuffing force initially applied to plaintiff Stillwagon by Delaware Sheriff's Office Deputy Pitts was appropriate, reasonable and consistent with arrest, control and restraint techniques and law enforcement policies recognized, accepted and applied in Ohio and nationally.

The handcuffing and procedure conducted by Dep. Pitts, who is not a defendant in this case, was consistent with professional law enforcement standards of care taught, recognized and applied in Ohio and nationally.

(3) The placement of detainee/prisoner plaintiff Stillwagon by Delaware PD officer(s) into a Delaware PD patrol unit (Officer Ailes' unit) was appropriate, reasonable and consistent with arrest, control and restraint techniques and law enforcement policies recognized, accepted and applied in Ohio and nationally. The procedure used by the officer(s) to place plaintiff Stillwagon into the patrol unit, was consistent with professional law enforcement standards of care taught, recognized and applied in Ohio and nationally.

(4) The videos/audios of the involved officers handcuffing and later placing plaintiff Stillwagon into Officer Ailes' patrol unit do not forensically support the plaintiff's representations that force was gratuitously, excessively, or maliciously applied to him via tight handcuffs; tight banding of wrists during the placement of bags on his wrists; or forcing him into the prisoner compartment of the patrol unit in a harsh manner.

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

(5) The videos/audios of plaintiff Stillwagon being interviewed by Delaware Detectives Segaard and Gerke in an interview room on two separate occasions, do not forensically support the plaintiff's representations that force was gratuitously, excessively, or maliciously applied to him via tight handcuffs; tight banding of wrists during the placement of bags on his wrists.

(6) My review and analysis of the restraints, methods of restraint and forensic evidence preservation techniques, finds that with the exception of the arresting officers using plastic rather than paper bags to preserve possible trace evidence of GSR; all of the force-related restraint techniques, methods of restraint and forensic preservations procedures used by the defendant officers were appropriate, reasonable and consistent with law enforcement policy, training taught, recognized, accepted and applied by law enforcement agencies in Ohio and nationally.

I find that the officers' uses of force and restraint were consistent with professional law enforcement standards of care in Ohio and nationally.

Opinion #3, The defendant detectives, supervisors and officers did not participate in any "malicious prosecution" of plaintiff Stillwagon. The defendants generally followed trained, recognized and accepted law enforcement investigative and forensic procedures. The circumstances, statements, facts and forensic evidence that support this opinion are as follows:

1. Detectives Segaard, Gerke and Det. Sergeant Radabaugh had probable cause to arrest plaintiff Stillwagon for attempted murder and felonious assault upon subject Mattingly. (See Opinion #1)

2. The discovery evidence indicates that the defendant detectives followed normal investigative and forensic protocols in reconciling the circumstances, facts and forensic evidence needed to present a case of attempted murder and felonious assault to the prosecutor and Grand Jury for filing.

   (a) The forensic recorded media evidence documents that after plaintiff Stillwagon had been detained by officers, Officer Ailes Mirandized him and Stillwagon verbally waived his rights and made an initial statement. Informing a detained person of interest/suspect of their Constitutional rights against self-incrimination and their right to having an attorney present with them before questioning, is a trained, recognized, and applied professional law enforcement practice. (PO Ailes' patrol unit dashcam audio: 06:07 – 06:25)

   (b) During Stillwagon's initial, Mirandized interview with Officer Ailes, he admitted he fired at Mattingly's truck on two occasions. The story he provided Officer did not reconcile with the witness statements, forensic facts, or evidence of the circumstances of this incident.

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK Ron Martinelli, Ph.D., CMI-V*

(c) Plaintiff Stillwagon was re-interviewed on two separate occasions by Dets. Segaard and Gerke. Both interviews were video/audio recorded. During these interviews, Stillwagon admitted that he had fired upon Mattingly's truck on two occasions, but denied any intention of firing at him.

(d) During both of Stillwagon's interviews, asserted he fired at Mattingly's vehicle in self-defense. However, his statements and descriptions of the circumstances of his encounter with subject Mattingly were inconsistent with the Ohio Revised Codes regarding the circumstances under which the application of deadly force in self-defense is legally justified. (ORC §2901.01(A)(1)(2))

(e) Plaintiff Stillwagon's descriptions of the incident and the actions of Mr. Mattingly and himself did not reconcile with witness statements, nor the forensic media evidence of the Eagles' Lodge CCTV surveillance video. (CCTV video, Stillwagon Int. #2, time stamps: 03:49 – 05:15)

1. Stillwagon told detectives that he had exited Exit 23 (E. Williams St.) off Route 42 behind Mattingly. He told them that Mattingly became stuck at a red light. Stillwagon told the detectives, *"I said, that son of a bitch. I just wanted to know what his problem was. I didn't know if his back-up lights go on and that's when I shot."* Stillwagon told he detectives that he shot at Mattingly's truck, *"Because I said, 'If this fucker's coming backwards on me and is going to run me over."* (CCTV video Interviews Stillwagon, #1, time stamps: 03:35 – 03:50;

2. Stillwagon told detectives during Interview #2 that he had a gun, was initially ahead of Mattingly on Route 42 and he had observed that Mattingly pulled back away from him.

   Stillwagon told detectives that he pulled off the roadway because he did not want to be in front of Mattingly's truck. When he pulled off the roadway, he was followed by Witness Louis Renniger, *"I'm going to go up the road. If I see that little bastard, I'm going to see what his problem is."* (Stillwagon Int. #1 video, time stamps: 0:00 – 01:08)

3. *Stillwagon told detectives, "I figured he'd wanna be gone. He's just a pussy, you know. He wouldn't confront me or anything…He (Mattingly) rips down that exit (Exit 23) and I said, "That son of a bitch. I just want to know what his problem is…I didn't know if I saw his back up lights go on and that's when I shot…Because if that fucker's coming backwards on me he'll run me right over."* (Int. Stillwagon #2 video, time stamps: 03:00 – 03:49)

4. Detectives asked Stillwagon why he had followed Mattingly off the highway, rather than simply just driving away, or seeking police.

Stillwagon replied, *"I had had enough of about six or seven of those deals and I thought he (Mattingly) was going to take my life…I was going to protect myself."*

Stillwagon's response to detectives did not reconcile the known circumstances of the incident. It was logical for the detectives to question why a rational person like Stillwagon, who alleges that he was being followed by someone with road rage; who had tried to kill him several times; then follow this allegedly threatening person (Mattingly) off the highway, unless the armed Stillwagon intend to eventually confront Mattingly? (CCTV video, 2nd Int. Stillwagon, time stamps: 07:25 – 08:01)

5. Plaintiff Stillwagon's statements to witness Renniger and detectives provide forensic and self-incriminating evidence that: (1) he followed Mattingly with the intent of having an armed encounter with him *"to see what his problem is."* (2) Stillwagon's actions in following Mattingly off Route 42 at Exit 23 made him the "aggressor" during this incident. (3) Stillwagon's assertion that he was concerned that Mattingly might do something to harm him was incredible and unreasonable.

Stillwagon told detectives, *"…(Mattingly's) just a pussy, you know. He wouldn't confront me, or anything."* (4) Stillwagon's actual statements regarding Mattingly's behavior behind the wheel of his truck on Exit 23 provide no proof that Mattingly ever backed up towards him.

It is irrelevant that detectives failed to find any skid marks from Mattingly's truck at the Exit 23 off ramp, since Stillwagon's statements to them indicated that the plaintiff had become the aggressor at this point in the encounter between himself and Mattingly.

6. My review of plaintiff Stillwagon's statements to the defendant officers finds that he never told Officer Ailes during his first interview that Mattingly ever backed up towards him on Exit 23. This is important.

7. Stillwagon never specifically told the detectives that he saw the back-up lights of Mattingly's truck activate; nor did he ever specifically say that Mattingly deliberately backed up towards him. Stillwagon merely told detectives (speculating) that, *"…Because if that fucker's coming backwards on me, he'll run me right over."* (2nd Int. Time stamps: 03:33 – 03:49)

8. As discussed, plaintiff Stillwagon's representations regarding the circumstances of his encounter with Mr. Mattingly were inconsistent with Ohio state statutes; Ohio case laws pertaining to the application of deadly force in self-defense; witness statements; and forensic video evidence.

9. Stillwagon told detectives that he had entered the Autozone parking lot before Mattingly had. This is not supported by the Eagle Lodge's CCTV

surveillance video. In fact, it was Mattingly who entered the parking lot first (Video time stamp: 15:31:00); followed soon after by Stillwagon on his motorcycle (Video time stamp: 15:31:05 - :12). (Eagle Lodge CCTV Camera-13 surveillance video, time stamp: 15:31:00 – 15:31:12)

10. Stillwagon told detectives that (Mattingly) then, *"…drove around some parked cars and I figured he was coming back around to ram me and I shot. I shot two times…I just shot down the middle. I wasn't trying to shoot the fucker."* (2nd Int. video Time stamps: 04:27 – 04:34)

11. The Eagles' Lodge CCTV surveillance video forensically documents that no vehicles were driving nor parked at the E. Williams St. end of the Autozone parking lot where the shooting occurred. The video records that Mr. Mattingly entered the parking lot at time stamp: 15:31:00 hours, drives in a semi-circle and parks at the end of the lot facing E. Williams St. at time stamp: 15:31:06 hours. (Eagle Lodge CCTV Camera-13 surveillance video, time stamp: 15:31:00 – 15:31:06)

The video records that Stillwagon follows Mattingly's truck into the lot at time stamp: 15:31:06 and parks perpendicular to and facing the driver's side of Mattingly's truck at time stamp: 15:31:10. The estimated distance between the two vehicles is approximately 25 feet. (Eagle Lodge CCTV Camera-13 surveillance video, time stamp: 15:31:06 – 15:31:10)

12. The Eagles Lodge CCTV video records that Mattingly's truck remains parked facing E. Williams St. and does not move for several seconds until fired upon by Stillwagon; time stamps: 15:31:06 – 15:31:17. (Eagle Lodge CCTV Camera-13 surveillance video, time stamps: 15:31:06 – 15:31:17)

13. Stillwagon told the detectives that after he shot at Mattingly's truck and Mattingly drove out of the lot, Stillwagon sought cover behind a nearby concrete pillar for safety. He told detectives that Mattingly returned into the parking lot heading directly for him. In response, he fired one round into the truck's engine. (2nd Int. video Time stamps: 04:48 – 05:11)

Stillwagon states, *"…So I turned to there (while drawing on a diagram). I hear (Mattingly's) engine roar and he was coming. I don't know what he was doing and I was going to get behind that concrete pillar to protect me. So, all of a sudden I got fixated. He was coming right for me (motions as if shooting a gun) and I shot again; right into his engine. And I said, 'I'll fucking kill you!'"* (2nd Int. video Time stamps: 04:48 – 05:11)

14. The Eagles Lodge CCTV video records that Mattingly's truck rapidly left the parking lot, turning left onto E. Williams. It then made a semi-circle onto a side street and re-entered the Autozone parking lot briefly heading in Stillwagon's direction, before parking perpendicular behind him and his motorcycle; with the truck again facing towards E. Williams St. During this

time, Stillwagon has not moved from his original position and has not disengaged, nor sought cover behind the concrete pillar near him. Mr. Mattingly's truck remains parked and does not move in any manner towards Stillwagon. (Eagle Lodge CCTV Camera-13 surveillance video, time stamps: 15:31:27 – 15:31:31)

15. The Eagles Lodge CCTV video does not support plaintiff Stillwagon's representation that he was so concerned about his personal safety from being run over by Mattingly that he sought cover behind a nearby concrete pillar. (Eagle Lodge CCTV Camera-13 surveillance video, time stamps: 15:31:27 – 15:31:31)

16. Plaintiff Stillwagon's statements to detectives of what transpired after firing the third time at Mattingly and/or his vehicle is consistent with the Ohio statute(s) addressing assault with a deadly weapon; and are not consistent with the circumstances needed to support an affirmative self-defense, defense.

17. Stillwagon told detectives that when Mattingly parked his truck, he went over to the driver's side of the vehicle. During his second video recorded interview, he verbally and physically describes his encounter with Mattingly. The plaintiff describes Mattingly as exiting his vehicle with his head down and hands/arms at his side, while approaching Stillwagon.

18. Stillwagon states that he approached Mattingly while holding his Glock pistol in his right hand. Stillwagon states that he thought that Mattingly might have had a rope in his right hand; but was not sure. He states,

*"Then I went over (to Mattingly's truck) and he got out like a sheepdog. You know, like a punk. I told (Mattingly), 'What the fuck's wrong with you, man? You want to get killed today, or what? You try killing me? I'm not going to let you do that to me.' And that's when I kicked him in the fucking leg (motions kicking with right leg) and he sort of raised his (motions right) hand and that's when I hit him in the back of his bead with my gun."*
(2nd Int. video Time stamps: 06:30 – 06:55)

19. Based upon plaintiff Stillwagon's own statements, the statements of witnesses and the forensic media and ballistics evidence, Detectives Segaard, Gerke and Detective Sergeant Radabaugh had sufficient probable cause to believe that Stillwagon's assertion of self-defense was inconsistent with the Ohio Revised Codes and self-defense case laws in Ohio. [17], [18], [19], [20], [21] (ORC §2901.05)

[17] Ibid., State v. D.H., 865 N.E.2d 90, 99 (Ohio App. 2006)
[18] Ibid., State v. Ludt, 906 N.E.2d 1182, 1188 (Ohio App. 2009)
[19] Ibid., State v. Davis, 456 N.E.2d 1256, 1260 (Ohio App. 1982)
[20] Ibid., State v. Miller, 778 N.E.2d 1103, 1105 (Ohio App. 2002)
[21] Ibid., State v. Robbins, 58 Ohio St.2d 74, 388 N.E.2d (1979)
*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

20. Based upon plaintiff Stillwagon's own statements, the statements of witnesses and the forensic media and ballistics evidence, Detectives Segaard, Gerke and Detective Sergeant Radabaugh had sufficient probable cause to believe that Stillwagon had more probably than not committed the crimes up to an including: Attempted Murder, Felonious Assault, Assault and Improper Handling of a Firearm in/on a Motor Vehicle. (ORC §§2903; 2903.11(1), E (1); 2903.12; 2923.16(1)(ii)(IV); ORC §2935.03)

21. The Ohio Revised Code does not have an explicit definition of the legitimate use of deadly force in all situations. Instead, much of the legal concept of self-defense in Ohio is based on common law and past court rulings.

In general, Ohio law allows people to use deadly force against another person if they have a reasonable belief; even if mistaken; that the person poses an imminent "danger of death or great bodily harm, and the defending person cannot exercise their "duty to retreat" to escape the situation.

Officers in Ohio are taught that an affirmative self-defense is invalid if the person shooting did anything to cause the situation that resulted in them being placed in danger, or failed to take an opportunity to safely leave the scene. In other words, Person A cannot instigate a confrontation with Person B, and then shoot Person B, when B attacks Person A.

Officers in Ohio are taught that, unless Person A is in their own home, Person A always has a duty to retreat. In other words, Person A must try to avoid the use of deadly force unless it is absolutely necessary. Further, Person A cannot shoot at Person B simply to scare them off, since shooting at or towards Person is still considered an application of deadly force.

22. As discussed, in the immediate case, the defendant detectives were aware based upon Stillwagon's statements, the statements of independent witnesses and the recovered recorded media and ballistics evidence that the plaintiff: (1) Ultimately followed Mattingly off of the highway and became the aggressor when he fired upon Mr. Mattingly on three separate occasions; (2) when he approached Mattingly armed with a handgun, and kicked him in the leg and struck him over the head with a loaded handgun, which negligently caused that firearm to discharge, nearly killing Mattingly; (3) had no reasonable cause to believe that Mattingly's actions constituted an imminent threat of death or great bodily injury; and that he had multiple opportunities to disengage from his encounter with Mattingly and find police before he repeatedly fired upon and physically assaulted Mattingly with a deadly weapon.

23. In reviewing then suspect Stillwagon's Mirandized statements; the statements of independent witnesses; and the forensic evidence including CCTV

surveillance videos that recorded the incident, the police response and Stillwagon's statements; I have determined that Detectives Segaard, Gerke and Sgt. Radabaugh had sufficient elements of the felony crimes of attempted murder, felonious assault, aggravated assault, assault and mishandling of a firearm in/on a vehicle existed to present a case to the prosecutor.

The discovery evidence I have reviewed indicates that there were sufficient self-incriminating statements made by Stillwagon that were not consistent with the statements of witnesses and forensic evidence. Hence, there was no need for a victim statement.

24. <u>Murder/Attempted Murder</u> – ORC §2903.02 (A)(B) states, *"(A) No person shall purposely cause the death of another, or the unlawful termination of another's pregnancy. (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony for the first or second degree and that is not a violation of ORC §§2903.03 or 2903.04."* These elements would also apply to any attempt to commit murder.

(a) Stillwagon's statements to the investigating officers included an admission that he shot Mattingly; as well as threats to kill Mattingly when he shot at him. Even absent a victim's statement, Stillwagon's statements alone provide irrefutable forensic evidence that (1) He aggressed upon Mattingly when he walked up to his truck to confront him; (2) Mattingly was unable to extract himself and disengage from Stillwagon; (3) Stillwagon said and mimicked that Mattingly was a "sheepdog" and had his head and hands down in submission. This indicates that Stillwagon was not concerned about his personal safety at this point; and (5) Mattingly was unarmed and posed no reasonable threat to Stillwagon, immediately before (6) Stillwagon kicked and then struck Mattingly in the head with a loaded gun that discharged.

(b) Deputy Pitt's dashcam records the deputy first encountering Stillwagon who was standing next to Richard Mattingly's body and then approaching the deputy while exclaiming, *"I shot the fucker. I don't think he's shot."* (Dep. Pitts dashcam video, time stamp:15:36:51)

(c) When Stillwagon was describing the second volley of shots he fired at Mattingly in the parking lot of the Autozone parking lot, he stated as he was firing the shots, *"I will fucking kill you, you son of a bitch! And I fired two times into his (truck) engine. He looked at me and turned and couldn't get away."* (2nd Int. Stillwagon video, time stamps: 08:05 – 08:17)

(d) Stillwagon is recorded as telling Det. Segaard, *"Then I went over (to truck) and (Mattingly) got out like a sheepdog. You know, like a punk. I told him, 'What the fuck's wrong with you, man? You want to get killed today*

*or what? You trying to kill me? I'm not going to let you do that to me. And that's when I kicked him in the fucking leg and he raised his hand (motioning only a partial rise of hand) and that's when I hit him in the back of the head with the gun." "…My finger must have been on the trigger. I don't think I shot him. I don't know what I did."* (2nd Int. Stillwagon video, time stamps: 05:32 – 05:59; 06:30 – 06:55)

(e) When Det. Segaard asked Stillwagon if Mattingly had anything in his hands when he got out of his truck, Stillwagon responded, *"I don't even fucking know."* (2nd Int. Stillwagon video, time stamps: 08:37 – 08:40)

(f) Stillwagon told Det. Segaard that when he walked over to Mattingly's truck to confront him, Mattingly was unable to disengage from the confrontation. He stated, *"Then (Mattingly) couldn't get out and I went over (to his truck) and he came out of the car like this"* (physically mimicking Mattingly with his head down, with his hands low and at his sides). (2nd Int. Stillwagon video, time stamps: 05:31 – 0539)

(g) Deputy Pitt's patrol unit dashcam recorded Mattingly lying on the pavement and not moving after having been struck by the armed Stillwagon. Witnesses who observed the confrontation; Mattingly; officers and emergency medical personnel at the scene all believed that Stillwagon had shot Mattingly in the head.

(h) Forensic medical evidence later documented that Stillwagon had struck Mattingly in the head with a firearm. Stillwagon later admitted as much to detectives; including the fact that he had his finger on the trigger when he struck Mattingly, claiming that the weapon negligently discharged.

(i) Given the known circumstances, statements, facts and forensic evidence of this incident, it was reasonable for the investigating officers to believe that plaintiff Stillwagon's actions were inconsistent with any assertion of self-defense and were serious felony criminal violations of Ohio law.

25. <u>Felonious Assault</u> – ORC §2903.11 (A)(1)(2) states, *"No person shall knowingly (1) cause serious physical harm to another, to another's unborn; (2) Cause or attempt to cause physical harm to another, or to another's unborn by means of a deadly weapon or dangerous ordinance."*

26. <u>Aggravated Assault</u> – ORC §2903.12 (A)(1)(2) states, *"(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:* (1) *Cause serious physical harm to another or to another's unborn;* (2) *Cause or attempt to cause physical harm to another or to another's*

*unborn by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code."*

27. <u>Improper handling of a firearm in/on motor vehicle</u> – ORC §2923.16 (1)(ii) states that it is illegal to handle or fire a firearm, (ii) *"in the direction of a street, highway, or other public/private property used by the public for vehicular traffic or parking."*

28. The Ohio courts have ruled that ultimately to avoid being convicted of murder, manslaughter, or felony assault; a defendant who has been charged and claims self-defense must invoke something known as an "affirmative defense." They must prove to a jury that it more likely than not that all the elements for a legal self-defense were present.

29. The responsibility of the investigating officers in any criminal investigation is to collect evidence and submit a viable case to the prosecutor for their review, filing and presentation before a Grandy Jury and/or criminal court for prosecution. The role of the prosecutor is the supervision of a criminal case investigation to ensure all the evidence and elements needed to obtain a conviction are present.

30. <u>Malicious prosecution of Stillwagon</u> – Among the specifics of this allegation by the plaintiff are that: (1) detectives falsely arrested Stillwagon and had insufficient circumstances, statements, facts and forensic evidence to establish probable cause for an arrest; (2) were aware that subject Mattingly had been drinking while driving during the incident; and (3) detectives were aware of the histories of both men. They knew that Stillwagon had no criminal history, whereas, Mattingly was on parole and had served time in prison for violent crime(s).

(a) The issues of plaintiff Stillwagon's initial detention and arrest by the defendant officers and detectives has been addressed in Opinions #1 and Opinion #3 of this report.

(b) Whether Mattingly had been drinking; or was driving while intoxicated during this incident was irrelevant to the defendant detectives' ultimate determination as to whether plaintiff Stillwagon had committed serious felony crimes involving the use of a firearm; or was legally justified in shooting at and/or injuring Mattingly in an act of self-defense.

(c) While it might be of background interest to know whether Stillwagon and/or Mattingly had been arrested in the past and for what; that information was irrelevant to the defendant detectives' ultimate determination as to whether plaintiff Stillwagon had committed serious felony crimes involving the use of a firearm; or was legally justified in shooting at and/or injuring Mattingly in an act of self-defense.

31. <u>Defendant officers made "false statements" in reports</u> – Plaintiff Stillwagon alleges that the defendant officers and detectives made "false statements" in their reports of this incident to further the alleged malicious prosecution of Stillwagon. The plaintiff alleges: (1) investigating officers called the incident a "mutual road rage," instead of a series of repeated assaults by subject Mattingly; (2) detectives reported that Stillwagon had not sought to get away from Mattingly before firing upon and assaulting him; (3) Stillwagon caused the incident to continue by following Mattingly into Delaware; (4) detectives misrepresented that Stillwagon entered the Autozone parking lot after Mattingly entered when this was not the case; (5) officers and detectives portrayed Stillwagon and not Mattingly as the aggressor in the incident.

In rebuttal of the plaintiff's assertions/allegations, my forensic analysis determined that:

(1) The defendant detectives correctly classified the circumstances of this incident as "mutual road rage." This classification was based upon a totality of statements from independent witnesses, suspect Stillwagon and forensic evidence.

(2) The statements of independent witnesses and Stillwagon, supported by the recorded media evidence of the Eagles Lodge CCTV video conclusively document that Stillwagon did not attempt to disengage away from Mattingly before shooting at him. Contrarily, the evidence documents and records that Stillwagon told witnesses and detectives that he was going to go after Mattingly, "*to see what his problems was;*" that Stillwagon chased after Mattingly on his motorcycle into Delaware; and fired upon him on the Exit 23 off ramp when he had numerous opportunities to disengage and break the encounter. The evidence shows that from this point until the conclusion of the incident, Stillwagon was the aggressor.

(3) It is a fact, supported by statements and forensic media evidence that Stillwagon caused this incident to continue by pursuing Mattingly into Delaware. See (2).

(4) The statements of independent witnesses and Stillwagon, supported by the recorded media evidence of the Eagles Lodge CCTV video conclusively document that Stillwagon pursued subject Mattingly off Route 42 and onto Exit 23 (E. Williams St.) in Delaware. Stillwagon fired two rounds at Mattingly, striking the tailgate of his pick-up truck.

(5) The statements and forensic evidence document that Mattingly fled away from Stillwagon onto E. Williams St. with Stillwagon pursuing him. The Eagles Lodge CCTV video conclusively documents that Mattingly drove into the Autozone parking lot, closely followed by Stillwagon on his

motorcycle. Mattingly is observed to park his truck facing E. Williams St. at the end of the lot. Stillwagon is observed to park his motorcycle perpendicular to the driver's door of Mattingly, approximately 25 feet away. The Eagles Lodge video records that Mattingly remained parked for several seconds without making any aggressive moves towards Stillwagon. The video documents that this is the point that Stillwagon fired upon Mattingly a second time. (Eagles Lodge CCTV Camera-13 surveillance video, time stamps: 15:31:00 – 15:31:17)

(6) It is important to note that plaintiff Stillwagon later testified that he could have gone a different way from Mattingly before their first confrontation on Exit 23. (Court Transcript, Stillwagon, p. 546:18-21)

(7) Contrary to what plaintiff Stillwagon alleges, the defendant officers did not "misrepresent" that Stillwagon followed subject Mattingly into the Autozone parking lot. This fact is well documented in the Eagles Lodge CCTV surveillance video. (Eagles Lodge CCTV Camera-13 surveillance video, time stamps: 15:31:00 – 15:31:17)

(8) The defendant detectives did not falsely portray plaintiff Stillwagon as the aggressor in this shooting and beating incident. The is ample evidence establishing this as a fact with respect to the criminal shooting and beating aspects of this case.

32. Much of plaintiff's allegations regarding any so-called false reporting by the defendant detectives can be explained by the initially inaccurate accounts by independent witnesses to Stillwagon's final confrontation with subject Mattingly, where the armed Stillwagon rendered Mattingly unconscious and on the pavement. (DPD Supplemental report Int. W. Brown, p. 26:2; DPD Written statement, Wit. S. Orcena, p. 25:4; DPD Supplemental report, p. 30:2)

At least four witnesses report that they observed Stillwagon armed with a handgun, confront Mattingly at his truck and then shoot him. Officers at the scene and paramedics initially reported that Mattingly sustained a gunshot wound to his head. Mattingly was hospitalized and was not immediately available to be interviewed when detectives established their probable cause to arrest Stillwagon.

The detectives' decision to arrest and charge Stillwagon was based upon the evidence and statements they had at that time. Their actions were consistent with trained police investigative protocols. (DPD Supplemental report, Int. W. Brown, p. 26:2; DPD Written statement, Wit. S. Orcena, p. 25:4; DPD Supplemental report, p. 30:2)

33. <u>Manufacturing, suppressing, omitting exculpatory evidence</u> – I have found no deliberate suppression or omission of so-called exculpatory evidence on the part of the defendant officers.

(a) <u>Ballistics evidence</u> – While fact that subject Mattingly sustained no gunshot wounds and the presence of bullet impacts in various areas of Mattingly's pick-truck, with then defendant Stillwagon telling a jury that he had no intent to shoot Mattingly might be persuasive to a jury considering a "guilt beyond a reasonable doubt" verdict; it did not diminish the detectives' probable cause to believe that Stillwagon had in fact attempted to fire at and harm Mattingly with a handgun. It is a well-documented fact that shooters in tense situations often miss their targets by wide margins. In fact, research into officer-involved shootings show that trained officers miss suspects they are shooting at 86% of the time from distances of two to ten feet.

(b) <u>Failure to locate and document skid marks from Mattingly's truck at the Exit 23</u> – Given the circumstances, time factors and evidence involved for review in this case, the defendant detectives prioritized the information, statements and forensic evidence they had to contend with. Stillwagon had admitted to officers and detectives that he had left decided to follow Mattingly off Route 42 at Exit 23, "I'm going to get that son of a bitch for being so crazy" … *"to see what his problem was."* This was consistent with a statement he had made to one witness. As discussed, this also indicated to detectives that not only had Stillwagon not broken off contact with Mattingly; but that he had pursued after him into Delaware. This made him the aggressor during this incident. (Initial Int. PO Ailes, dashcam audio, time stamps: 08:55 – 08:57; 2nd Int. Stillwagon video, time stamps: 0:00 – 01:08; 03:33 – 03:49; Int. Wit. Lois Renniger, Supplemental report, p. 23:3)

(1) Stillwagon had not told Officer Ailes during his first interview that Mattingly had backed his truck up towards him. He had told the detectives during two subsequent interviews that he had not seen Mattingly's back-up lights turn on before firing two shots at the vehicle. He also not specifically told the detectives that Mattingly had in fact been backing up towards him at the time he fired upon him. (2nd Int. Stillwagon video, time stamps: 0:00 – 01:08; 03:33 – 03:49;

(2) Officers and crime scene technicians found and documented two bullet impacts in the rear tailgate of Mattingly's truck.

(3) It is doubtful given the passage of time and vehicles that day or in days following the incident that detectives would have been able to locate and positively identify any skid marks with Mattingly's truck.

(4) It was appropriate for the detectives at this point in their investigation to follow the preponderance of statement and higher quality forensic evidence in their attempt to reconcile the incident.

(5) <u>Failure to reconcile video with circumstances, actions and statements</u>
The plaintiff's argument that the detectives ignored what was depicted in the Eagles Lodge video is specious. The detectives had the video enhanced and what is depicted in the video does not support what then suspect Stillwagon had told detectives regarding any type of affirmative self-defense assertion. It is irrelevant that it was ultimately determined that Stillwagon struck Mattingly in the head with a loaded firearm, rather than shooting him.

(a) As discussed, based upon the first responding officers and EMS personnel on-scene stated and the statements of nearby witnesses, it was reasonable for the detectives to initially believe that Stillwagon shot Mattingly.

(b) It was subsequently medically diagnosed that Mattingly had not been shot; but had suffered a laceration to his head. It was later determined that Mattingly's head wound was caused by Stillwagon striking him in the head with his loaded gun and it discharged. This was a very dangerous action with potentially deadly consequences. When Stillwagon admitted to striking Mattingly in the head with his gun and admitted that his finger was most likely on the trigger of the weapon, causing it to discharge; it was reasonable for the officers to charge Stillwagon with attempted murder and/or assault with a deadly weapon.

(c) In rebuttal to the plaintiff's assertion that the Eagles Lodge video documents "exculpatory" evidence for Stillwagon; it does not. As discussed, the normal and enhanced videos document at critical moments that Mattingly's truck was not moving and was parked behind and perpendicular to Stillwagon's motorcycle. Mattingly is not attempting to "run down" Stillwagon with the vehicle at the time that Stillwagon aggressively and violently engages Mattingly.

(d) The video documents Stillwagon approaching the right-side passenger door of the truck and then quickly walking around to the driver's side to engage driver Mattingly. The video records Stillwagon aggressively kicking Mattingly and then raising and lowering his right arm over Mattingly's head. The video is too blurred to see whether the plaintiff shot or struck Mattingly in the head with the weapon.

(e) More importantly, the Eagles lodge video does not support Stillwagon's statements regarding the most important aspects of this case which as have been discussed are: (1) Stillwagon followed Mattingly into the Autozone parking lot, making him the aggressor; (2) Stillwagon fired upon Mattingly when the victim was seated in a parked truck and was not aggressing on Stillwagon; (3) Stillwagon

never moved to the cover of a nearby pillar (as he had stated he had), indicating that he was not in fear of his life; (4) Stillwagon aggressed and assaulted driver Mattingly by first kicking and then using a loaded handgun to assault him; (5) Stillwagon ignored numerous opportunities to disengage and break off his encounter with Mattingly; and (5) none of the aforementioned actions by Stillwagon supported any assertion of self-defense.

(6) <u>Condition of Stillwagon's gun when recovered by police</u> – Plaintiff Stillwagon alleges that the fact that an empty cartridge was found inside the firing chamber of his .45 caliber Glock pistol indicated evidence that was exculpatory to him is incorrect.

   (a) As a firearms instructor and expert, I would rebut the plaintiff's assertion by stating there are several alternate reasons why an expended cartridge might remain in the firing chamber of a pistol, other than Stillwagon's explanation that it was because he struck Mattingly in the head with his gun. Among those are "limp-wristing" the weapon when firing it; dirty handgun; faulty ammunition; and other plausible and common explanations.

   (b) No matter what the condition Stillwagon's handgun was found in; this information was not exculpatory when reconciled with the Eagles Lodge video and Stillwagon's statements of his actions. Admitting to shooting towards a person; engaging an unarmed person who was non-menacing, non-threatening and then kicking and striking that person in the head with a loaded handgun that caused the weapon to discharge; is not exculpatory, nor mitigate the elements of the crimes of attempted murder and assault with a deadly weapon.

7. <u>Not disclosing the statement of Witness Powell</u> – While Witness Powell did state that he observed Stillwagon strike Mr. Mattingly on the head with his pistol; his statement merely indicated that the plaintiff did not actually shoot Mattingly. However, it was in no way exculpatory to Stillwagon being an aggressor and kicking and striking Mattingly on the head with a loaded handgun, which caused that weapon to dangerously discharge. Mr. Powell's statement that it "appeared" as if Stillwagon was shooting at Mattingly's truck to stop the truck was not exculpatory of the plaintiff's shooting directly towards a man who was driving a vehicle and was speculative as to Stillwagon's actual intent.

8. <u>Mattingly's statements in the hospital</u> – The plaintiff and his attorney who have no education, training, or expertise in the fields of medicine, psychology or stress memory recall merely speculate that victim Mattingly did in fact remember how he received his head injury. They assert that Mattingly did not experience any

temporary stress amnesia and "in truth" knew all along everything that had happened that day and that Stillwagon had not shot him in the head. They assert that Mattingly said he did not remember details because he was on parole and did not want to admit guilt to his actions that day.

(a) In rebuttal, the plaintiff's assertion is merely speculation, not supported by any direct or forensic medical evidence. It is a commonly known and well documented fact in the fields of medicine, psychiatry, psychology, human factors and law enforcement investigations that individuals who experience an acute, life-threatening event; especially those who have sustained head trauma; can and do experience "stress amnesia" and "stress memory recall."

(b) Plaintiff Stillwagon states in his complaint that Mattingly told physicians and detectives that he was struck in the head, but could not recall whether he had been shot in the head, or struck in the head by some object. (Plaintiff's Complaint #117)

(c) Whether Stillwagon shot Mattingly in the head; or struck him in the head with a loaded firearm that immediately and dangerously discharged, is irrelevant in the defendant detectives' ultimate determination as to whether plaintiff Stillwagon had committed serious felony assault crimes; as opposed to acting in self-defense during his encounter with Mattingly. The detectives acted in a reasonable manner consistent with their law enforcement education, training and experience in criminal investigations.

9. <u>"Manufacturing" Mattingly's testimony</u> – Plaintiff Stillwagon goes to great lengths accusing the defendant detectives of "manufacturing, coercing, and coaching" Richard Mattingly into making statements that are incriminating to the plaintiff.

> In rebuttal, my review and analysis of the defendant detectives' interviews and law enforcement actions in dealing with Mattingly and obtaining a final statement from him find no preponderance of evidence to suggest that they in any way sought to manufacture or coach false statements from Mattingly for the sole purpose of maliciously prosecuting plaintiff Stillwagon.

(a) The discovery evidence indicates that Richard Mattingly was a former felon on parole, who indeed had a past criminal history. The evidence suggests that more likely than not Mattingly was under the influence of alcohol while driving at the time of this incident. The statements of certain witnesses to Mattingly's and Stillwagon's encounter suggest that at times on Route 42, Mattingly was driving recklessly; all of which would have been violations of his conditions of parole.

(b) The totality of evidence I have reviewed also indicates that plaintiff Stillwagon apparently became unreasonably captured and enraged by Mattingly's driving behavior and stated his intent to follow and "get him" to "see what his problem is." It is also forensically documented as discussed, that Stillwagon: (1) never broke off contact with Mattingly; (2) never called or sought the help of police; (3) followed Mattingly off Route 42 at the Exit 23 E. Williams exit and into the Autozone parking lot; and (5) repeatedly engaged and assaulted his with a loaded handgun when Mattingly did not pose any reasonable threat to Stillwagon's safety.

(c) <u>Detectives offered Mattingly immunity</u> – While it is the ultimate prevue of a District Attorney/Prosecutor to make offers of immunity; it is also common for detectives to advise a subject, victim, or person of interest who may have committed a crime(s), that they would be willing to discuss a plea deal or immunity with the prosecutor if the subject provided a truthful account of an incident where they were involved. There is nothing conspiratorial nor unethical for detectives to do this.

(d) <u>Detectives coercing Mattingly to make a false statement</u> – There is some evidence in this case that detectives did remind Mattingly that he was on parole and that he should tell the truth about what happened, even if he was also culpable in criminal acts. However, I found no evidence suggesting that the defendant detectives attempted to coerce Mattingly to make deliberately false statements to maliciously prosecute Stillwagon.

It is a common probative interview technique for detectives to remind witnesses and persons of interest who are on probation/parole to be truthful when answering questioning, or they might violate their conditions of probation/parole. There is nothing unethical, unlawful, nor conspiratorial about doing this. The responsibility of an investigator is to obtain the most accurate and truthful account of any incident they are investigating when interviewing anyone who might be attempting to shield themselves from criminal culpability.

(e) <u>Detectives coaching Mattingly to make a false statement</u> – I found no evidence of the defendant detectives "coaching" Mattingly into making any deliberately false statements. It is common and completely appropriate for detectives to tell a witness or a person of interest so their statement does not sound accurate; that they believe the subject is not telling the truth; to provide them with a statement that makes more sense; and that they only want a truthful statement.

(f) The evidence I have reviewed indicates that the defendant detectives repeatedly questioned Mattingly about his statement and encouraged him to provide the most truthful account he could. I have found no preponderance of evidence suggesting that the defendant detectives conspired to coach Mattingly into providing a deliberately false statement to maliciously prosecute plaintiff Stillwagon.

(g) <u>Detectives had sufficient information to charge suspect Stillwagon without Mattingly's statement</u> – What I found unique about this criminal investigation and the evidence that the defendant detectives uncovered was that they did not need Richard Mattingly's statement to have sufficient probable cause to arrest; and for the prosecutor to file felony assault charges against then defendant Stillwagon. As discussed, there was a preponderance of evidence in the form of independent witnesses and Stillwagon himself, supported by significant forensic evidence to file upon and prosecute Stillwagon without Mattingly's statement.

(h) <u>Mutual road rage that transitioned into violent assault</u> - The evidence I have reviewed suggests that the defendant detectives and supervisor were fully aware that this incident involved "mutual road rage," where both Richard Mattingly and James Stillwagon were involved. However, as discussed, the detectives realized during the investigation of this case, that the mutual road rage subsequently transitioned into then armed and enraged defendant Stillwagon pursuing after Mattingly and violently assaulting him on three separate occasions when there was little to no elements of self-defense in his favor.

Once it was clear to detectives that Stillwagon became the armed aggressor in this incident; their logical investigative priority became the reconciliation of the circumstances, statements, facts and forensic evidence between Stillwagon's account of what had transpired between himself and Mattingly and where the evidence ultimately took them. Any more minor offenses committed by driver Mattingly such as reckless driving and DUI while on parole, paled in comparison to how armed driver Stillwagon had repeatedly responded to Mattingly.

34. <u>The issue of "favorable termination" and jury acquittal of Stillwagon</u> – It is a matter of law, decided by a trier of fact jury that plaintiff Stillwagon was eventually acquitted of all criminal charges relating to this incident.

In rebuttal, I offer the following points: (1) The immediate case does not deal with the issue(s) as to whether the higher standard of "guilt beyond a reasonable doubt" for conviction existed at the time the defendant officers

and detectives pursued their case against plaintiff Stillwagon. (2) The issue(s) in the plaintiff's complaint revolves around whether the officers had sufficient circumstances, statements, facts and forensic evidence constituting the lower legal standards of "reasonable suspicion" and "probable cause" to arrest then suspect Stillwagon; (2) whether the actions of the defendant officers were consistent with state and nationally accepted law enforcement practices and standards of care; (3) whether there is a preponderance of evidence indicating that the defendant officers acted unethically, and/or unlawfully during their investigation and conspired to maliciously prosecute Stillwagon; and (4) whether the actions, customs and practices of the defendant City of Delaware, its police department and employees were so egregious and malicious as to constitute any "deliberate indifference" to the civil rights of plaintiff Stillwagon.

Based upon my review of the discovery evidence, and in consideration of my law enforcement, forensic and medical education, training and experience, I make the following findings and opinions to a reasonable degree of professional probability within my areas of expertise:

1. As discussed, based upon how peace officers are educated and trained in the aspects of laws of arrest and search and seizure, there is a preponderance of evidence indicating that the defendant officers and detectives had both reasonable suspicion and probable cause to arrest and charge plaintiff Stillwagon for felony crimes of attempted murder, assault with a deadly weapon, assault and other lesser included offenses. (See Opinion #1)

2. As discussed, based upon how peace officers are educated and trained in the aspects of laws of arrest and search and seizure; there is a preponderance of evidence indicating that the defendant officers and detectives did not need the statements of victim Mattingly to develop sufficient elements constituting both reasonable suspicion to detain and probable cause to arrest and charge plaintiff Stillwagon. If this case would have resulted in a homicide where Mattingly were deceased an unable to provide a statement, this case without Mattingly's statement, could have been sent to the prosecutor for felony filing.

3. There is no preponderance of evidence suggesting that the defendant officers and detectives authored any false reports; deliberately ignored, manufactured or concealed evidence exculpatory to Stillwagon.

4. The evidence indicates that the defendant detectives made a good faith attempt to reconcile circumstances, facts and forensic evidence in this case that that their work product was consistent with codified police practices and standards of care recognized and applied in Ohio and nationally.

5.  There is no preponderance of evidence suggesting that the defendant detectives unethically, or unlawfully coerced, threatened, of coached victim Mattingly into making deliberately false statements to maliciously prosecute the plaintiff.

6.  The interview techniques used by the defendant detectives, albeit at times a bit rudimentary, did not violate department policies, nor codified law enforcement practices and standards of care recognized in Ohio and nationally.

Opinion #4 – Defendant supervisors Sergeants Willauer and Radabaugh were not negligent in their supervisory responsibilities during this incident. Their actions were consistent with codified, recognized and applied professional law enforcement practices and standards of care.  The circumstances, statements, facts and forensic evidence that support this opinion are as follows:

1.  Plaintiff Stillwagon has provided no evidence that patrol supervisor Sergeant Willauer, who was at the scene of the shooting was negligent in his supervision and training of the patrol officers under his command at the time that Stillwagon was detained, handcuffed, searched and arrested.

    (a) The forensic media evidence from Delaware Co. Deputy Pitts' patrol unit and officer statements document that Dep. Pitts was the officer who detained, handcuffed and searched the plaintiff.

    (b) Dep. Pitts is not a defendant in this case, so it is assumed that the plaintiff had no problems with the deputy detaining, handcuffing and searching him.

    (c) No Delaware PD officers were involved in the physical detention, handcuffing or searching of Stillwagon. Dep. Pitts was not under Sgt. Willauer's command.

    (d) Plaintiff Stillwagon's assertions that Delaware PD officers handled him harshly and used force upon excessively are merely speculative and are unsupported by any preponderance of evidence, including forensic evidence.

    (e) As discussed in Opinion #1 and elsewhere in this report, the detention and arrest of plaintiff Stillwagon was consistent with the defendant officers' law enforcement education and training, department policies, Ohio state statutes and state and nationally recognized, accepted and applied codified law enforcement standards of care.

    (f)  As discussed in Opinion #2 and elsewhere in this report, the use of handcuffing force was consistent with the defendant officers law enforcement education and training, department policies, Ohio state statutes and state and nationally recognized, accepted and applied codified law enforcement standards of care.

(g) Sgt. Willauer was not responsible for the subordinate officers' law enforcement training or recertification in laws of arrest, search and seizure, or use of force. This is a department responsibility. The personnel records show that all officers involved in this incident at the scene had been trained and tested for competency by the department. Deputy Pitts was not under Sgt. Willauer's supervision.

(h) None of the defendant detectives involved in the investigation of this incident were under the supervision of Sgt. Willauer.

2. Plaintiff Stillwagon has provided no evidence that investigations supervisor Detective Sergeant Radabaugh, who was supervising Detectives Segaard and Gerke, was negligent in his supervision and training of the detectives he was supervising during this investigation.

(a) As discussed in Opinions #1, #3 and elsewhere in this report, the detention, arrest and investigation of this incident involving plaintiff Stillwagon and Richard Mattingly was consistent with the defendant detectives law enforcement education and training, department policies, Ohio state statutes and state and nationally recognized, accepted and applied codified law enforcement standards of care.

(b) Sgt. Radabaugh's involvement in this investigation was minimal. He was involved in examining, disassembling, reassembling and test firing Stillwagon's Glock .45 caliber pistol. He found the weapon functioned normally. (Court Transcript, Det. Sgt. Radabaugh, pp. 366:24-25; 367:10-15; 368:15-21)

(c) Det. Segaard was the primary investigator in this case. He took Mirandized statements from subject Richard Mattingly and then suspect Stillwagon. His actions are analyzed in Opinion #3.

(d) Det. Gerke initially visited the crime scene, placed evidence markers over identified items of evidence and spoke with Deputy Pitts, who directed him to Stillwagon's pistol. Det. Gerke directed officers to bag Stillwagon's hands to preserve possible GSR trace evidence. Det. Gerke was only minimally involved in this case to support Det. Segaard during interviews. Det. Gerke made no determinations on arresting Stillwagon and had no opinions in this case. He did not testify in front of the Grand Jury, or at trial. (Supplemental Report, Det. Gerke, p. 11:3-5; Dep. Det. Gerke, pp. 220:6-7; 222:1-6; 383:2-3)

(e) Department policies and records indicate that it is the department's responsibility and not Sgt. Radabaugh's to train and certify detectives. Personnel records I have reviewed indicate that Sgt. Radabaugh, Det. Segaard and Det. Gerke were current in their law enforcement training and areas of certification at the time of this incident.

Based upon my review of the discovery evidence, and in consideration of my law enforcement, forensic and medical education, training and experience, I make the following findings and opinions to a reasonable degree of professional probability within my areas of expertise:

1. Plaintiff Stillwagon has failed to produce sufficient factual evidence that patrol Sergeant Willauer was negligent in the supervision of the uniformed patrol officers involved in the initial detention, use of force and investigation of the plaintiff at the crime scene.

2. No Delaware PD officers were involved in the initial detention, handcuffing, or searching of the plaintiff. Delaware County Deputy Sheriff Pitts, who initially detained, handcuffed and arrested Stillwagon is not a co-defendant in this case and was not under the supervision of Sgt. Willauer.

3. After reviewing this case and its evidence, I find that the law enforcement actions of the involved patrol officers and supervisor Sgt. Willauer were consistent with their law enforcement education and training; department policies and the codified professional law enforcement practices and standards of care recognized, accepted and applied in Ohio and nationally.

4. I find that the plaintiff has failed to produce any preponderance of evidence indicating that supervisor Detective Sergeant Radabaugh was negligent in his supervision of Detectives Segaard and Gerke during their investigation of this incident.

5. I find that the law enforcement actions of supervisor Det. Sgt. Radabaugh were consistent with his law enforcement education and training; department policies and the codified professional law enforcement practices and standards of care recognized, accepted and applied in Ohio and nationally.


Opinion #5 - No evidence that the City of Delaware and its Police Department were deliberately indifferent of plaintiff James Stillwagon's civil rights. The circumstances, statements, facts and forensic evidence which support this finding and opinion are as follows:

1. Plaintiff Stillwagon has provided no evidence whatsoever that the defendants designed, developed, authored, ordered, directed, or in any way ratified informal, or formal customs of practices which denied the plaintiff his due process or civil rights.

2. The plaintiff has provided no evidence whatsoever that the defendants tolerated, encouraged, approved, allowed, acquiesced in and/or ratified any unethical or unlawful behavior on the part of any defendant Delaware PD officers, which in any way violated, or were deliberately indifferent to Mr. Stillwagon's civil rights.

*Forensic Report, Rule 26(b), Stillwagon v. City of Delaware, et. al, Case #2:14-CV-ALM-NMK*
*Ron Martinelli, Ph.D., CMI-V*

3. The plaintiff has provided no evidence whatsoever that the defendants failed to properly train, instruct, monitor, supervise or discipline any of the defendant officers in this case. The personnel files of the defendant officers I have reviewed indicate that they all completed an application, selection, hiring and training process that is recognized, accepted and applied throughout the State of Ohio and nationally.

   I found that the defendant officers and supervisors had all successfully attended and passed a national model Field Training Program that included daily evaluations of police practices performance objectives. I further found that the defendant officers had successfully passed periodic update training and several areas of police recertification pertinent to the fact pattern of this case.

4. The Delaware PD has codified policies, procedures and practices which are consistent with professional law enforcement standards recognized and applied nationally.

5. The Delaware PD has a viable Internal Affairs citizen complaint process with policies which are consistent with professional law enforcement standards recognized and applied nationally.

6. The plaintiff has failed to produce evidence including additional cases for review which demonstrate a formal or informal custom or practice by the City of Delaware and its police department of ratifying, encouraging, and/or acquiescing to unethical, unlawful, malicious, egregious, willful, or otherwise purposeful behavior that was deliberately indifferent of citizen rights.

7. Based upon the discovery evidence I have reviewed, and in consideration of my collective knowledge of professional education, training and experience in law enforcement and in police practices as a retired police officer, a former California police academy director, a police instructor and a Federal/State qualified police practices expert; I find and opine that I can find no evidence to support the plaintiffs' allegations that the City of Delaware and its police department, police chief and the involved defendant officers were deliberately indifferent of Mr. Stillwagon's civil rights; or that the defendants failed to direct, supervise, monitor, or train any of the officers involved in this incident.

Opinion #6 - The Defendant were acting within his scope and authority during this incident. The circumstances, statements, facts and forensic evidence that support this finding and opinion are as follows:

1. I find that at the time of this incident, the defendant officers and detectives were all graduates of an accredited Ohio police academy and were fully sworn peace officers employed by the Delaware (OH) Police Department

2. I find that the defendant officers' law enforcement actions during the investigation of this incident were in conformance with City of Delaware Police Department policies; Ohio state statutes; constitutional guidelines pertaining to civil rights and state and nationally recognized and accepted professional law enforcement standards of care.


The aforementioned findings and opinions are based upon my initial review of the listed documents as provided to me at this time. I will alter, amend, enhance or delete my findings and opinions as necessary following my review of any additional discovery in this case.

I would so testify to the aforementioned findings and opinions under penalty of perjury if called upon in any subsequent civil proceedings.

Signed _____ Date: February 3, 2017

      Ron Martinelli, Ph.D., CMI-V

      Forensic Criminologist/Certified Medical Investigator

      Federal/State Courts Qualified Police Practices Expert